**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
------------------------------------------------------------ x
                                          :
In re:                                    :   Chapter 11
                                          :
THE CONTAINER STORE GROUP, INC., et al., :   Case No. 24-90627 (ARP)
                                          :
                  Debtors.¹               :   (Joint Administration Requested)
                                          :
------------------------------------------------------------ x
```

**DECLARATION OF CHAD E. COBEN, CHIEF RESTRUCTURING OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Chad E. Coben, declare under penalty of perjury:

1.        I am the Chief Restructuring Officer of Debtor The Container Store Group, Inc., and an officer of the other above-captioned debtors and debtors in possession (collectively, the "***Debtors***" and, together with their non-debtor affiliates, the "***Company***" or "***The Container Store***"). I am also a Senior Managing Director in the Corporate Finance and Restructuring segment of FTI Consulting, Inc. ("***FTI***"), a leading restructuring advisory services firm.

2.        Since May 2024, FTI has served as consultant and restructuring advisor to The Container Store. Since its retention, FTI has assisted The Container Store with long-term business plan development, liquidity analyses, general financial planning and analysis, the Strategic Alternatives Review (as defined below), and financial restructuring (starting in September 2024). Shortly before the Petition Date, I was appointed the Chief Restructuring Officer in connection with the filing of the above-captioned chapter 11 cases (the "***Chapter 11 Cases***").

---

¹        The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, Texas 75019.

3.      I have worked in the corporate finance and restructuring field for over 30 years and have been at FTI for over 15 years.  During the course of my career, I have served as an advisor or interim executive in the transformation, turnaround, and restructuring of dozens of public and private equity-backed companies, including CEC Entertainment, Monitronics, Sundance Energy, GTT Communications, Borden Dairy Company, 48 Forty Solutions, Bowery Farms, Wine.com, Interface Security, and many others.  Additionally, I have held executive officer roles including Chief Restructuring Officer of MediaLab AI, a digital publisher and technology company; Chief Restructuring Officer of CPXi, a leading ad tech and digital media company; Chief Restructuring Officer of LodgeNet Interactive, the leading provider of entertainment and connectivity services to hospitality and healthcare businesses; and Chief Financial Officer of Blue Nile, the largest online retailer of diamonds and fine jewelry, among others.

4.      I began my career at Bank of America, where I spent six years in the Media and Communications Finance Group originating, structuring, and underwriting credit products.  I joined FTI at the beginning of 2009 after FTI's acquisition of CXO, L.L.C., a boutique turnaround and advisory services firm.  Prior to that, I spent over six years as a part of a core management team involved in the consolidations, financings, and operations of telecommunications, media, and technology related businesses.  I hold a Bachelor of Science in Economics from the University of Texas at Austin and a Master of Business Administration from the Cox School of Business at Southern Methodist University.  I am also a former board member of the Turnaround Management Association, affiliated with the American Bankruptcy Institute, and have been certified as a Certified Turnaround Professional by the Turnaround Management Association.

5.      I am authorized to submit this declaration (this "*Declaration*") on behalf of the Debtors.  In my capacity as Chief Restructuring Officer of the Debtors, I am responsible for

overseeing the restructuring activities and operations of the Debtors, including reporting to and assisting the Restructuring Committee of the Board of Directors of The Container Store Group, Inc. (the "**Board**") in making and implementing major corporate decisions.

6. As a result of my experience with the Debtors, I am generally familiar with the Debtors' businesses, operations, financial matters, operating results, business plans, actual and projected cash flows, and underlying books and records, restructuring process, and creditor negotiations. Except as otherwise indicated, all statements set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team, employees, and advisors, my review of relevant documents, and/or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations provided by the Debtors' counsel. If called to testify, I would testify competently to the facts set forth in this Declaration.

7. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions (the "**Petitions**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"). I submit this Declaration in support of the Debtors' Petitions and the "first-day" motions and applications that are being filed with the Court concurrently herewith (collectively, the "**First Day Pleadings**").

8. The Debtors commenced these Chapter 11 Cases to implement a restructuring of their capital structure in a manner that will maintain go-forward business operations and allow the Company to emerge from bankruptcy as quickly as possible with a strong balance sheet that better

positions the Company for long-term success.  The Debtors seek to achieve these goals through the proposed *Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "**Plan**"), filed contemporaneously herewith, pursuant to which, if confirmed, the restructuring will be effectuated.  In support of the Plan and contemplated restructuring, the Debtors reached consensus with their key stakeholder constituencies and entered into that (a) certain Transaction Support Agreement dated December 21, 2024 (a copy of which is attached hereto as **Exhibit A**), executed by the Company's Prepetition Term Lenders (as defined below) holding over 90% of the outstanding principal amount and (b) the DIP & Exit ABL Commitment Letter (a copy of which is attached hereto as **Exhibit B**), executed by Eclipse Business Capital LLC ("**Eclipse**"). Accordingly, the Plan and contemplated restructuring enjoys the overwhelming support of the Company's financial creditors.  **Importantly, the Plan does not impair any of its general unsecured creditors.  If the Plan is confirmed, the Company anticipates that all trade vendor and similar claims will be paid or otherwise satisfied, and the Company will continue to operate in the ordinary course, ultimately protecting the jobs of more than 3,800 employees.**

9.      The Debtors seek the relief set forth in the First Day Pleadings to minimize any adverse effects of the commencement of these Chapter 11 Cases on their business.  I have reviewed the Debtors' Petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

10.     To familiarize this Court with the Debtors, their business, the circumstances leading to the commencement of the Chapter 11 Cases, the objectives of the Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** describes the Debtors' history, business operations, organizational structure, and prepetition indebtedness.

- **Part II** describes the circumstances leading to the commencement of the Chapter 11 Cases.

- **Part III** describes the path forward that the Debtors have charted for the Chapter 11 Cases.

- **Part IV** lists the First Day Pleadings and provides support for the relief requested therein.

## I.      COMPANY BACKGROUND

### A.      The Debtors' Corporate Structure

11.     The Container Store Group, Inc.—the lead Debtor and a publicly traded corporation incorporated in the state of Delaware—directly or indirectly owns and controls each of the other Debtors.  Specifically, (a) Debtor The Container Store Group, Inc. ("**TCSG**") directly owns and controls one hundred percent (100%) of the outstanding equity interests of Debtor The Container Store, Inc. ("**TCS**"), a Texas corporation; (b) TCS directly owns and controls one hundred percent (100%) of the outstanding equity interests of Debtor TCS Gift Card Services, LLC ("**TCS Gift**"), a Virginia limited liability company, and Debtor C Studio Manufacturing Inc ("**C Studio Inc**"), a Delaware corporation; and (c) Debtor C Studio Inc owns and controls one hundred percent (100%) of the outstanding equity interests of Debtor C Studio Manufacturing LLC ("**C Studio LLC**," and together with C Studio Inc, "**C Studio**"), a Delaware limited liability company.  As described below, the Company's Elfa subsidiaries are **not** debtors and will continue to operate in the ordinary course of business outside of the Chapter 11 Cases.

12.     The following organizational chart depicts the Company's legal and operating structure, with non-debtor entities shaded in blue:[2]



**B.     The Debtors' Business Operations**

**1.     *The Container Store's History and Business Overview***



13.     The Company was founded in 1978, when Garrett Boone, Kip Tindell, and investor John Mullen opened the doors of the Company's very first store location in Dallas, Texas.

---

[2]     This chart is subject to further updates by the Debtors in the event of any changes to the Debtors' corporate structure.

Notwithstanding a modest 1,600 square feet of retail space, the store's mission was to provide customers with storage and organization solutions to accomplish their projects through an assortment of innovative products and unparalleled customer service.  The store quickly gained popularity due to its unique product offerings, including collections of industrial shelving, plastic bins, and Swedish-made wire drawers.

14.     Since then, over the course of 45 years, the Company has grown to over 100 store locations, now operating in 34 states and the District of Columbia.

15.     As the Company has expanded its footprint across the United States, it achieved major milestones by satisfying the growing demand for home organization solutions.  In 1991, the Company expanded outside of its home state of Texas with the opening of a store in Atlanta, Georgia.  In 1999, the Company acquired Elfa International, a long-time Swedish vendor, thereby becoming the owner, distributor, retailer, and manufacturer of its best-selling product—Elfa Drawers.  In 2000, the Company launched containerstore.com, broadening its reach to customers nationwide.

16.     The Company's ownership structure changed in 2007 when it was sold to TCSG (formerly known as TCS Holdings, Inc.), a majority stake of which was owned by Leonard Green & Partners, L.P. ("*LGP*"), with the remainder held by other investors and certain employees of the Company.  On November 6, 2013, the Company completed the initial public offering of its common stock, at which time LGP held a controlling interest in the Company as the majority shareholder.  Since then, LGP has reduced its ownership to less than 50% of the Company's outstanding common stock.

17.     The Company continued to grow following the initial public offering.  In 2019, the Company established a second, 700,000 square foot distribution center in Aberdeen, Maryland (to

complement its first distribution center located in Coppell, Texas).   During the COVID-19 pandemic, the Company shifted to contactless curbside pickup and shipped a record number of packages to customers, eventually surpassing $1.0 billion in operational sales for fiscal year 2021. 2023 witnessed another milestone with the opening of the Company's 100th store in Princeton, New Jersey.

18.    Today, The Container Store remains the nation's only retailer with a solution-oriented offering of custom spaces, organizing solutions, and in-home services.   As an industry-leading specialty retailer in that space, The Container Store is dedicated to serving its customers who crave discovery, inspiration, and solutions that simplify their lives and maximize the spaces within their homes.    With the ultimate  objective of transforming lives through the power of organization, the Company continues to deepen its relationships with customers, expand its reach to attract new customers, and invest in its business practices.

## 2.    *Overview of Operations and Revenue*

19.    As discussed above, the Company provides merchandise and services covering a broad selection of custom spaces, organizing solutions, and in-home services.   The Company conducts business in physical stores (with product offerings tailored based on store location and size) and online.  Products are sourced both domestically and internationally and shipped to stores or customers from domestic distribution centers using contract carriers.

### a.    Product Segments

20.    The Company is divided into two main product segments: (a) the TCS segment (the "***TCS Segment***") and (b) Elfa.  For fiscal year 2023, the Company had total net sales of approximately $847.7 million.  The TCS Segment and Elfa accounted for approximately 94.5% ($801.4 million) and 5.5% ($46.3 million) of such sales, respectively.

21.    ***The TCS Segment***.  The TCS Segment is comprised of two sub-segments: Custom Spaces and General Merchandise (each as defined below).  The Container Store Custom Spaces sub-segment ("***Custom Spaces***") offers a range of branded product lines that are entirely owned and manufactured by the Company.  These lines provide customers with both metal- and wood-based organizational products, ranging from portable drawers to fully custom shelving units. Among the Custom Spaces brands, the Elfa Classic brand features epoxy-bonded steel products that are ideal for pantries, playrooms, and kid's spaces.  Elfa Décor+ provides organizational solutions with stylish back panels, LED lighting, full-extension drawers, and solid birch drawer fronts and trim.  Elfa Garage+ offers adjustable, specialized storage for gear and tools, and heavy-duty workspaces.  The Preston system allows customers to design their own luxury, custom, wood-based organization systems.    Across these  brands, customers can select from a comprehensive suite of customizable storage systems, which include in-home design and installation, at a variety of price points.

22.    To support Custom Spaces, the Company operates the C Studio manufacturing facility in Elmhurst, Illinois, which designs and manufactures the Company's premium wood-based custom space product offerings.  The facility is equipped with advanced manufacturing

technology and staffed by skilled artisans and designers who work collaboratively to create innovative and customaizable storage solutions.

23.     The Container Store General Merchandise sub-segment ("***General Merchandise***") provides complementary organization solutions to complete the Company's Custom Spaces offerings.  Within General Merchandise, the Company offers over 10,000 storage and organization products including drawers, boxes, bins, shelving, food storage, laundry hampers, hooks, and gift packaging, with the goals of simplifying customers' lives and maximizing the spaces within their homes.

24.     ***Elfa.***   The Container Store, Inc.'s wholly owned Swedish subsidiary, Elfa International AB ("***Elfa***"), designs and manufactures products featured and sold in the Company's TCS segment, such as component-based shelving and drawer systems.  Founded in 1948 and headquartered in Malmö, Sweden, Elfa has been a supplier to The Container Store since its opening in 1978.  The Company acquired Elfa in 1999 and remains the exclusive distributor of Elfa products in the United States today.  Elfa operates three manufacturing facilities with two located in Sweden and one in Poland.  In addition to supplying The Container Store, Elfa also sells its products on a wholesale basis to various retailers in approximately 30 countries around the world, concentrated in the Nordic region of Europe.  For the avoidance of doubt, Elfa and its subsidiaries are not debtors in the Chapter 11 Cases.

### b.     Sourcing and Distribution

25.     The Company has multiple domestic and international sources of supply for each category of products that it sells.  In fiscal year 2023, the Company sourced 47% of its purchases from domestic suppliers and the remaining 53% from foreign suppliers (approximately 33% of such foreign suppliers are located in China).  Elfa represents approximately 27% of the Company's purchases.  Although the Company does not enter into long-term contracts with its vendor partners,

15 of its top 20 vendors have worked with the Company for the last 10 years and several of those vendors have worked with the Company since its inception in 1978.

26.     In the TCS Segment, a majority of the Company's merchandise flows through one of the Company's two distribution centers, prior to being transported to the Company's retail stores and/or online customers.  The first distribution center is co-located with the Company's support center in Coppell, Texas.  The approximately 1.1 million square foot facility was designed and constructed specifically for The Container Store and is comprised of approximately 100,000 square feet of support center space and approximately 1 million square feet of distribution center space. The Company's second distribution center located in Aberdeen, Maryland is approximately 700,000 square feet and is comprised primarily of distribution center space.  The Company also operates the aforementioned C Studio manufacturing facility, a 58,000 square feet domestic location in Elmhurst, Illinois to directly manufacture and supply the Company's premium, wood-based Custom Spaces offerings.

27.     The Company's distribution centers serve dual purposes: replenishing retail store inventory and fulfilling direct-to-customer orders.  To transport products to stores, the Company relies on third-party truckload carriers, whereas major parcel carriers handle direct-to-customer deliveries.  With best-in-class logistics technology, the Company optimizes its operations and processes for receiving, picking, packing, and shipping, laying a strong foundation for future growth.  Continuous enhancements in process efficiency, material handling, and automation further strengthen the distribution centers, enable greater service level efficiencies, and improve inventory management.  These strategically located distribution centers enhance service levels for customers and expand the Company's network capacity.

### c.    Retail Channels

28.    Customers can purchase the Company's products online or at one of the Company's stores, all of which are operated pursuant to real property leases.  As of the Petition Date, the Company had 104 stores in 34 states and the District of Columbia, with approximately 24,000 square feet of floor space on average.  The Company's stores are strategically located near urban centers with high home project and custom space demands, facilitating unique home shopping experiences under one roof.  The below map illustrates the location of store locations and distribution centers by state:



29.    As a multi-channel retailer, The Container Store offers a full suite of e-commerce solutions, including a website, mobile application, and call center to complement the physical stores.  The website, containerstore.com, is intended to replicate the store experience, offering virtually the same product assortment and providing real time inventory information for stores, as well as certain products found exclusively online.  The Company offers free shipping on orders

over $99 or, in the alternative, customers can order online and then pick up at a store, utilize curbside pick-up services, or request same-day home delivery in select markets. For fiscal year 2023, approximately 28% of sales revenue was generated online.

### 3.    Human Capital

30.    As of the Petition Date, the Company employs approximately 3,800 people, of whom approximately 2,900 work in the Debtors' store locations.[3] Specifically, and as described further in the Wages Motion,[4] the Debtors' workforce consists of approximately 750 salaried employees, 2,200 part-time hourly employees, and 850 full-time hourly employees.

### C.    The Debtors' Prepetition Capital Structure

31.    As of the Petition Date, the Company had approximately $243.1 million of funded debt (inclusive of accrued and unpaid interest, but excluding issued but undrawn letters of credit under the Prepetition ABL Facility (as defined below)), consisting of (a) an asset-based revolving lending facility and (b) a secured term loan facility. The Company's prepetition funded debt obligations are summarized in the below table:

| Facility | Governing Document | Borrower | Maturity | Outstanding Principal |
|---|---|---|---|---|
| Prepetition ABL Facility | Prepetition ABL Credit Agreement | The Container Store, Inc. | November/October 2025 | $80,000,000[5] |
| Prepetition Term Loan Facility | Prepetition Term Loan Credit Agreement | The Container Store, Inc. | January 2026 | $163,125,321.74 |
| **Total Secured Debt** | | | | **$243,125,321.74** |

---

[3]    The average employee headcount per store is 26, and high-volume stores employ a Custom Spaces sales manager.

[4]    The "**Wages Motion**" is the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Contracted Labor; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief,* filed contemporaneously herewith.

[5]    This amount excludes letters of credit issued under the Prepetition ABL Facility.

### 1.     The Prepetition ABL Facility

32.     On April 6, 2012, TCS, as borrower, TCSG, TCS Gift, and TCS Installation Services, LLC,[6] in their respective capacities as guarantors thereunder, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "***Prepetition ABL Agent***"), and the other lenders and letter-of-credit issuers party thereto (the "***Prepetition ABL Lenders***") entered into that certain Credit Agreement (as amended by that certain Amendment No. 1, dated as of April 8, 2013, that certain Amendment No. 2, dated as of October 8, 2015, that certain Amendment No. 3, dated as of May 20, 2016, that certain Amendment No. 4, dated as of August 18, 2017, that certain Amendment No. 5, dated as of November 25, 2020, and that certain Amendment No. 6, dated as of May 22, 2023, the "***Prepetition ABL Credit Agreement***"), pursuant to which the Prepetition ABL Lenders provided an asset-based revolving credit facility (the "***Prepetition ABL Facility***") in a current aggregate principal amount of up to $100 million, with a $40 million sublimit for the issuance of letters of credit and a $15 million sublimit for the issuance of swingline loans.  In addition, the Prepetition ABL Facility includes an uncommitted incremental revolving facility for an amount of up to $50 million, which is subject to satisfaction of specified conditions.  The Prepetition ABL Facility matures on the earlier of (a) November 25, 2025 and (b) October 31, 2025, if any portion of the Prepetition Term Loan Obligations (as defined below) remains outstanding on such date and the maturity date of the Prepetition Term Loan Facility (as defined below) is not extended.  As of the Petition Date, there was approximately $80 million in principal outstanding and $7.5 million in letters of credit issued under the Prepetition ABL Facility.

---

[6]     TCS Installation Services, LLC has since been merged into TCS.

33.     The obligations arising under the Prepetition ABL Facility (collectively, the "***Prepetition ABL Obligations***") are guaranteed by Debtors TCSG, TCS Gift, C Studio Inc, and C Studio LLC and, as set forth in that certain ABL Facility Security Agreement dated as of April 6, 2012 (as amended by that certain Amendment No. 1 to Security Agreement and Pledge Agreement, dated as of October 28, 2024, the "***Prepetition ABL Security Agreement***"), secured by security interests in, and liens upon, substantially all assets of Debtor TCS and the above-mentioned Debtor guarantors, including first priority security interests in, and liens upon, the following assets of the Debtors:  (a) all accounts; (b) all chattel paper; (c) all deposit accounts, securities accounts (for each of clauses (a) through (c), excluding accounts, chattel paper, deposit accounts and securities accounts which constitute identifiable proceeds of Prepetition Term Loan Priority Collateral (as defined below)); (d) all inventory; and (e) documents, general intangibles, instruments, and commercial tort claims, supporting obligations, letter-of-credit rights, books and records, and collateral security and guarantees evidencing, governing, or relating to any of the items referred to in the preceding clauses (a) through (d) (collectively, the "***Prepetition ABL Priority Collateral***").  Pursuant to the Intercreditor Agreement (as defined below), the Prepetition ABL Lenders hold second priority security interests in and liens upon the Prepetition Term Loan Priority Collateral (as defined below).[7]

### 2.     *The Prepetition Term Loan Facility*

34.     On April 6, 2012, Debtor TCS, as borrower, and Debtors TCSG, TCS Gift, and TCS Installation Services, LLC,[8] in their respective capacities as guarantors thereunder, JPMorgan

---

[7]     The collateral package for the Prepetition ABL Facility also includes the equity pledge of Elfa, which was increased from 65.0% to 100.0% pursuant to that certain Amendment No. 1 to Security Agreement and Pledge Agreement, dated as of October 28, 2024.

[8]     TCS Installation Services, LLC has since been merged into TCS.

Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "***Prepetition Term Loan Agent***"), and the other lenders party thereto (the "***Prepetition Term Lenders***," and together with the Prepetition ABL Lenders, the "***Prepetition Secured Creditors***") entered into that certain Credit Agreement, dated as of April 6, 2012 (as amended by that certain Amendment No. 1 dated as of April 8, 2013, that certain Amendment No. 2 dated as of November 27, 2013, that certain Amendment No. 3 dated as of May 20, 2016, that certain Amendment No. 4 dated as of August 18, 2017, that certain Amendment No. 5 dated as of September 14, 2018, that certain Amendment No. 6 dated as of October 8, 2018, that certain Amendment No. 7 dated as of November 25, 2020, that certain Amendment No. 8 dated as of June 14, 2023, and that certain Amendment No. 9 dated as of October 8, 2024, the "***Prepetition Term Loan Credit Agreement***"), pursuant to which the Prepetition Term Lenders provided a senior secured term loan facility in an initial principal amount of $275 million (the "***Prepetition Term Loan Facility***," and together with the Prepetition ABL Facility, the "***Prepetition Credit Facilities***").  The Prepetition Term Loan Facility matures on January 31, 2026.  As of the Petition Date, there was approximately $163.1 million in principal outstanding under the Prepetition Term Loan Facility.

35.     The obligations arising under the Prepetition Term Loan Facility (the "***Prepetition Term Loan Obligations***") are secured by security interests in, and liens upon, substantially all assets of the Debtors, including first priority security interests in, and liens upon, the following assets of the Debtors: (a) all equipment, fixtures, real property, intellectual property and investment property (other than any investment property described as Prepetition ABL Priority Collateral); (b) all instruments, documents, and general intangibles (other than any instruments, documents, and general intangibles described as Prepetition ABL Priority Collateral); (c) all "Term Loan Priority Accounts" (as defined in the Intercreditor Agreement); (d) all other collateral other than

Prepetition ABL Priority Collateral; and (e) all collateral security and guarantees with respect to the foregoing and all cash, money, insurance proceeds, instruments, securities, financial assets, and deposit accounts received as proceeds of the foregoing, other than the Prepetition ABL Priority Collateral (collectively, the "***Prepetition Term Loan Priority Collateral***").[9]   Additionally, the Prepetition Term Loan Obligations are secured by second priority security interests in, and liens upon, the Prepetition ABL Priority Collateral.

### 3.   *The Intercreditor Agreement*

36.     The respective rights of the Prepetition ABL Lenders and the Prepetition Term Lenders with respect to their shared collateral are governed by that certain Intercreditor Agreement, dated as of April 6, 2012, by and between the Prepetition ABL Agent and the Prepetition Term Loan Agent (as amended by that certain Amendment No. 1 dated as of April 8, 2013, the "***Intercreditor Agreement***").  The Intercreditor Agreement governs, among other things, the division of collateral into Prepetition ABL Priority Collateral and Prepetition Term Loan Priority Collateral and the priority of claims with respect thereto, as well as the respective rights of the Prepetition ABL Lenders and the Prepetition Term Lenders in connection with certain bankruptcy matters, such as the provision of postpetition financing.

### 4.   *Unsecured Debt*

37.     In addition to their funded debt, the Debtors have customary unsecured debt, including amounts owed to trade vendors and landlords.  The Company routinely incurs fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  These include obligations owed to The Container Store's

---

[9]     The Prepetition Term Loan Priority Collateral also includes the equity pledge of Elfa, which was increased from 65.0% to 100.0% pursuant to that certain Amendment No. 1 to Security Agreement and Pledge Agreement, dated as of October 28, 2024.

extensive network of vendors, upon which the Company relies to supply merchandise.  A majority of these vendors conduct business with the Company on a purchase order-by-purchase order basis and are paid on prearranged terms.  As of the Petition Date, the Debtors estimate that approximately $25.9 million of merchandise trade debt is outstanding.  As discussed in greater detail in the All Trade Motion,[10] certain of these claims are entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code, or may give rise to liens in favor of shippers, warehousemen, or mechanics in the event they go unpaid.  However, regardless of whether such claims are afforded priority under the Bankruptcy Code, **the Debtors anticipate that all such vendor and service provider claims will be paid or otherwise satisfied in full in the ordinary course**.

38.     The Company also has certain lease obligations, as its stores, distribution centers, and corporate offices are operated exclusively from leased premises.  The Debtors estimate that an average of approximately $11.7 million accrues on account of lease and occupancy-related expenses each month.  A substantial liability accounting for the remaining expenses associated with the Debtors' leases is reflected on the Debtors' books at any given time.  **The Debtors are continuing to operate in the ordinary course during the Chapter 11 Cases.**

## II.     EVENTS PRECEDING COMMENCEMENT OF CHAPTER 11 CASES

### A.     Challenging Post-Covid Retail Environment, Strategic Alternatives Review, and Appointment of Transaction Committee

39.     The persistently challenging retail environment—including pulled-forward demand and subsequently reduced consumer spending in the storage and organization category, increased price sensitivity, post-COVID winddown, fewer home sales, and intensified

---

[10]   The "***All Trade Motion***" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief*, filed contemporaneously herewith.

competition—significantly impacted the Company's performance from its peak in 2021. These challenges resulted in a 10.5% year-over-year decline in revenue and a 77.1% year-over-year decline in adjusted EBITDA for the fiscal quarter ended September 28, 2024. Furthermore, the Company has faced increased interest expenses and looming debt maturities.

40.      Against the backdrop of these challenges, the Board initiated a formal review process to evaluate strategic alternatives including a potential sale of the Company, new equity investment, or refinancing of the Company's Prepetition Credit Facilities (such process, the "***Strategic Alternatives Review***"). In furtherance of the Strategic Alternatives Review and in consultation with the Company's advisors, the Board also determined that it was in the best interests of the Company and its stakeholders to establish a committee of the Board (the "***Transaction Committee***")[11] to assist the Board in fulfilling its responsibilities relating to the Strategic Alternatives Review and to oversee the Strategic Alternatives Review (including reviewing, negotiating, and evaluating any potential transactions and making recommendations to the Board regarding the advisability of one or more transactions).

**B.      The Initial Marketing Process and the Potential Equity Investment from Beyond, Inc.**

41.      As part of the Strategic Alternatives Review, the Transaction Committee retained JPMorgan Chase & Co. ("***JPMorgan***") as financial advisor. JPMorgan thereafter conducted an extensive marketing and outreach effort to gauge interest in a purchase of, or investment in, the Company. That effort included initial outreach to approximately forty (40) strategic investors and twenty-six (26) financial sponsors. Twenty parties submitted NDAs and engaged in diligence.

---

[11]   The Transaction Committee is comprised of certain members of the Board who are independent and disinterested with respect to any contemplated transaction (other than as a director of the Company or equity ownership in the Company). Kristofer Galashan, Lisa Klinger, Anthony Laday, and Nicole Otto served on the Transaction Committee.

Five parties submitted preliminary, non-binding purchase or investment proposals.  Four of those parties declined to progress beyond their initial non-binding proposals.

42.     Ultimately, the marketing process did not result in any offers to purchase the entire Company.  Instead, the Company received only one offer from Beyond, Inc. ("***Beyond***") to make a strategic investment in the Company through a preferred equity transaction.  On October 15, 2024, the Company announced a strategic partnership with Beyond with the goal of positioning the Company to achieve incremental sales growth over time by utilizing and benefiting from Beyond's intellectual property, customer data, network of brands, and affiliate relationships.  As part of the strategic partnership, Beyond agreed to invest $40.0 million in the Company through a convertible preferred equity transaction subject to certain terms and conditions, including an amendment or refinancing of the Prepetition Credit Facilities in a manner commercially acceptable to Beyond (the "***Beyond Equity Investment***").

**C.     The Formation of the Ad Hoc Group and the Company's Retention of Houlihan**

43.     Meanwhile, an ad hoc group of Prepetition Term Lenders (the "***Ad Hoc Group***") organized in response to the Company's financial performance and upcoming maturities.  When it became unlikely that the sale process would yield a sale of the entire Company and repay the Company's funded debt in full, the Company also retained Houlihan Lokey, Inc. ("***Houlihan***") in September 2024 to engage with the Ad Hoc Group and explore standalone financing options.

**D.     Deteriorating Business Performance and Continued Liquidity Pressures**

44.     During the Summer and Fall of 2024, the Company continued to experience worsening business performance and significant pressures on its liquidity.  For the second quarter ended September 28, 2024, the Company's consolidated net sales declined by 10.5% year-over-year to $196.6 million.  For the same period, the Company incurred a consolidated net loss of

$16.1 million, compared to a net loss of $23.7 million, respectively, in the second quarter of fiscal year 2023.  The Company's adjusted EBITDA for the same period was $3.9 million, representing a $43.8 million (or 91.8%) decrease from the peak level of $47.7 million in the second quarter of fiscal year 2021.

45.     In addition to the challenging retail environment that persisted during this time, the Company's liquidity was further negatively impacted by its need to increase its borrowings under the Prepetition ABL Facility in advance of the holiday period.[12]  These higher borrowings under the Prepetition ABL Facility and a higher interest rate on the Prepetition Term Loan Facility during the second quarter of fiscal year 2024 led to a 15.4% year-over-year increase in consolidated net interest expense to $6.0 million in the second quarter of fiscal year 2024.

46.     The Company's liquidity was further constrained by mounting vendor pressure in the form of strained vendor credit relationships resulting from the fear that the Company would not have enough cash on hand to pay vendors in full in the wake of its publicly reported operating performance and downgrades of the Company's credit ratings (by S&P Global Ratings in March 2024 and by Moody's Investor Service in November 2024).  Such pressure continues to impact liquidity and inventory levels as the Company works to address these vendor concerns.

**E.     Amendment No. 9 to Prepetition Term Loan Facility**

47.     The foregoing factors rendered the Company unable to comply with the consolidated leverage ratio covenant in the Prepetition Term Loan Credit Agreement for the second quarter of fiscal year 2024.  On October 8, 2024, as part of its continued support of the Company's business and strategic initiatives, the Ad Hoc Group agreed to enter into Amendment

---

[12]   Historically, the Company's liquidity fluctuates as a result of building inventory for key selling periods and the Company's borrowings generally increase in its second and third fiscal quarters as it prepares for promotional campaigns and the holiday season.

No. 9 to the Prepetition Term Loan Facility (the "***Prepetition Term Loan Amendment No. 9***")
which, among other things, (i) waived the testing of the consolidated leverage ratio covenant
(defined in the Prepetition Term Loan Credit Agreement as the ratio of total debt to consolidated
EBITDA) for the second quarter of fiscal year 2024; (ii) added a covenant for the Company to
enter into a qualified financing transaction, subject to the approval of the Required Lenders (as
defined in the Prepetition Term Loan Credit Agreement) by November 15, 2024 (which date has
been extended from time to time to December 31, 2024 by the Required Lenders); and (iii)
amended certain of the covenants in the Prepetition Term Loan Credit Agreement which, among
other things, narrowed the Company's ability to incur additional indebtedness or engage in certain
non-ordinary course transactions.

### F.    Beyond's Unwillingness to Consummate an Investment and the Pursuit of Alternative Transactions

48.    In connection with the potential Beyond Equity Investment, the Company and Ad
Hoc Group engaged in sustained, good-faith efforts to offer an amendment and/or refinancing
proposal acceptable to Beyond in order to move forward with consummating the contemplated
investment.  Unfortunately, despite the best efforts of the Ad Hoc Group and the Company, Beyond
ultimately indicated that it was unwilling to accept any of the financing proposals supported by
the Ad Hoc Group.[13]   Simultaneously, the Company's liquidity position continued to become
increasingly constrained, necessitating additional capital to support the business.[14]

---

[13]   Beyond stated publicly as early as November 20, 2024: "[T]he proposed financing terms we have reviewed to date fall short of what we believe is necessary to complete the transaction."  As of the date hereof, Beyond has not indicated it intends to accept any proposal made.

[14]   The Company's second quarter sales results represented sequential improvement compared to the prior quarter results.  For example, Custom Spaces continued to grow due to increased brand awareness from higher marketing spend and investments in in-home design services.  From a customer demand perspective, orders placed for Custom Spaces but not yet delivered experienced year-over-year growth during the second quarter of fiscal year 2024.  Additionally, General Merchandise continued to sequentially improve as the Company focused on ensuring core product categories are in stock, while enhancing key areas of the assortment with newness and innovation.

49.     Additionally, given the upcoming maturity wall (*i.e.*, springing maturity of the Prepetition ABL Facility on October 31, 2025 and maturity of the Prepetition Term Loan Facility on January 31, 2026), the Company faced the potential for events of default across its capital structure as early as June 2025, if it were unable to obtain an audit opinion for fiscal year 2024 financial statements without a going concern qualification.  In fact, without the Prepetition Term Loan Amendment No. 9 described above, the Company would have been in non-payment default under the Prepetition Term Loan Facility in October 2024.

50.     Accordingly, Houlihan pivoted to explore financing options that were not dependent upon the Beyond Equity Investment and solicited proposals to refinance the Debtors' Prepetition ABL Facility or provide incremental third-party financing (including debtor-in-possession financing).  Houlihan also engaged with the Ad Hoc Group to explore options to provide financing to support a standalone restructuring of the Company.  The Company and the Ad Hoc Group exchanged numerous proposals for the restructuring of the Company's capital structure on both an in-court and out-of-court basis.  As negotiations with the Ad Hoc Group and the Prepetition ABL Lenders progressed, the Board concluded that proceeding with a replacement ABL facility for a comprehensive balance-sheet restructuring would represent the most value-maximizing path and position the Company for long term success.

### G.     Appointment of Restructuring Committee

51.     In connection with the Company's ongoing exploration of strategic alternatives, on December 4, 2024, the Board constituted an independent special restructuring committee (the "***Restructuring Committee***")[15] that is responsible for exploring and overseeing negotiations

---

Nevertheless, such improvements were insufficient to counterbalance the overall challenging retail environment that is not expected to reverse course in the near future.

[15]     The Restructuring Committee members are Lisa Klinger, Nicole Otto, Karen Stuckey, and Charles Tyson.

related to potential restructuring transactions, including financing, sale, reorganization, recapitalization, strategic transactions, and other opportunities and transactions, for the Company and its subsidiaries, subject to Board approval.

52.     Based upon guidance from the Restructuring Committee, the Company, in consultation with its advisors, ultimately determined that it did not have sufficient liquidity to operate in the ordinary course during or beyond January 2025 absent new liquidity and a substantial modification of its current capital structure.  Accordingly, and in light of the fact that the Company faced both potential future defaults as well as upcoming maturities on both its Prepetition ABL Facility and the Prepetition Term Loan Facility, the Debtors and the Ad Hoc Group engaged in iterative negotiations regarding the terms of a value-maximizing path forward for the Company that would have the requisite stakeholder support and provide sufficient deleveraging and access to new capital.  These discussions ultimately led to entry into the Transaction Support Agreement on December 21, 2024.

## III.     ANTICIPATED PATH FORWARD

### A.  Generally

53.     The restructuring and recapitalization transactions contemplated by the Transaction Support Agreement provide for, among other things:  (a) $40 million in additional financing and related financial accommodations through the DIP-to-Exit Term Loan Facility (as defined below), which, together with any payable-in-kind interest and Prepetition Term Loan Obligations that are "rolled-up" into the DIP-to-Exit Term Loan Facility, will convert into committed exit financing upon confirmation and effectiveness of the Plan; (b) the refinancing of the Prepetition ABL Facility via a replacement DIP-to-Exit ABL facility providing incremental borrowing availability and liquidity; and (c) the equitization of a significant portion of the Prepetition Term Loan Obligations.  In connection with these transactions, the Company expects to emerge from

chapter 11 as a private company within two months of the Petition Date. **Notably, the Transaction Support Agreement calls for payment or satisfaction in full and in the ordinary course of all general unsecured creditors (including vendors, service providers, and employees, among others) under the Plan.** The Debtors believe that the comprehensive restructuring contemplated by the Transaction Support Agreement will position the Company for long-term viability as a going concern.

54.     As noted above, the Transaction Support Agreement provides for the Prepetition Term Lenders to receive any remaining new equity of reorganized TSCG under the Plan, after taking into account the DIP Equity Premium and the Management Incentive Plan (each as defined in the Plan). In addition, it is my understanding that all Prepetition Term Lenders have or will have been offered the right to participate, on a pro rata basis, in a superpriority DIP-to-exit term loan facility (the "***DIP-to-Exit Term Loan Facility***") comprising DIP Term Loans (backstopped by the DIP Backstop Parties (as defined in the Transaction Support Agreement)) in an aggregate principal amount of approximately $40 million (plus premiums owed to the DIP Backstop Parties and approximately $75 million of Prepetition Term Loan Obligations to be "rolled-up" into the DIP-to-Exit Term Loan Facility). Thus, no Prepetition Term Lenders will be prejudiced by the terms of the DIP-to-Exit Term Loan Facility as a result of not being afforded the opportunity to participate. The DIP-to-Exit Term Loan Facility will enable the Debtors to finance the Chapter 11 Cases before the loans thereunder are exchanged on the Plan Effective Date (as defined in the Transaction Support Agreement) for exit term loans.

55.     Further, under the DIP & Exit ABL Commitment Letter, Eclipse has agreed to provide a replacement ABL facility in the form of debtor-in-possession financing that will roll into

an exit ABL facility at the conclusion of these Chapter 11 Cases (the "***DIP-to-Exit ABL Facility***",
and together with the DIP-to-Exit Term Loan Facility, the "***DIP-to-Exit Facilities***").[16]

> **B.**   **Debtors' Need for Access to Cash Collateral, the DIP-To-Exit Facilities**

56.     Based on my review of the Debtors' actual and projected cash flows and underlying
books and records, and in connection with discussions with the Debtors' advisors, I believe it is
vital that the Debtors obtain immediate approval of the DIP-to-Exit Facilities to ensure that the
Debtors have immediate access to the interim new money financing and cash collateral necessary
to continue operations and administer these Chapter 11 Cases.   The Debtors had approximately
$11.8 million in cash as of the Petition Date.   As noted above, the Debtors, in consultation with
their advisors, expect to drop below minimum operational liquidity in early January if the DIP-to-
Exit Facilities are not available, and likely sooner, if suppliers reduce trade terms over concerns
around the viability of the business.   Without immediate access to the proceeds of the proposed
DIP-to-Exit Facilities, the Debtors will lack sufficient liquidity to maintain their business
operations after the Petition Date.   Indeed, the Debtors anticipate having negative cash flow during
the Chapter 11 Cases, and the liquidity provided by the DIP-to-Exit Facilities are critical to (a)
enable the Debtors to meet the minimum liquidity requirements of the use of Cash Collateral and
(b) provide operating liquidity across Debtor entities and meet the Debtors' working capital needs.

57.     The DIP-to-Exit Facilities are a critical requirement for the Debtors' consensual
use of the Cash Collateral of the Prepetition Secured Creditors (including the lenders under the
Prepetition ABL Facility).   Absent the DIP-to-Exit Facilities, I believe the Prepetition Secured

---

[16]   Defined terms used in connection with discussion of the DIP-to-Exit Facilities but not otherwise defined herein
shall have the meanings ascribed to them in the *Emergency Motion of Debtors for Interim and Final Orders (I)*
*Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use*
*Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status,*
*(III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V)*
*Scheduling a Final Hearing and (VI) Granting Related Relief* (the "***DIP Motion***").

Creditors would be unwilling to agree to the Debtors' use of their Cash Collateral or to the priming of their prepetition liens that would otherwise be necessary to obtain postpetition financing.

58.     Furthermore, without access to the proceeds of the DIP-to-Exit Facilities, the Debtors have insufficient liquidity to manage their working capital needs and pay the various disbursements identified in the Approved Budget, attached as Exhibit 4 to the DIP/Cash Collateral Orders.   The disbursements shown in the Approved Budget include, among other critical payments, payroll and benefits, merchandise, rent, shipping/freight, customs, and payments contemplated by the Debtors' proposed "first day" orders.   Any disruption in paying the Debtors' employees and vendors will result in the loss of the Debtors' workforce and the destruction of key vendor relationships and put at risk the ability to fulfill customer obligations and keep stores open.

59.     The Debtors' ability to pursue the Plan for the benefit of all stakeholders hinges on their ability to stabilize their businesses, and approval of the DIP-to-Exit Facilities will send a crucial signal to the Debtors' employees, suppliers, vendors, and customers that the Debtors intend to and will have the means to maintain ordinary course operations and meet their financial commitments throughout the course of these Chapter 11 Cases.   Moreover, time is of the essence for the Debtors, as they have faced mounting pressure from trade creditors and need to effectuate the restructuring contemplated under the Transaction Support Agreement and Plan as soon as possible to ensure they can exit chapter 11 in time to capitalize on an upcoming high season and manage trade partners appropriately.   Subject to Court approval, the Debtors intend to immediately use a portion of the first draw of the DIP-to-Exit Facilities to pay vendor payables and support continued shipments of products.   Additionally, the Debtors intend to use the first draw of the DIP-to-Exit Term Loan Facility to ensure timely payment of both merchandise and non-merchandise

vendor payments that will become due within the next four weeks, as well as rent payments due on January 1, 2025.

60.     The DIP-to-Exit Facilities has been extensively negotiated, and, in light of the Debtors' liquidity needs, the Debtors' fiduciaries determined in their business judgment that entry into the DIP-to-Exit Facilities was the best option to protect the Debtors' business and all parties in interest.  Accordingly, I believe that the Debtors' access to Cash Collateral and the DIP-to-Exit Facilities are both necessary and will provide sufficient liquidity to achieve the Debtors' value-maximizing goals and should therefore be approved.

### C.     Investigation Subcommittee

61.     The Transaction Support Agreement and the Plan also contemplate the provision of typical releases to the Debtors' directors and officers, among others.  In light of these proposed releases, on December 4, 2024, the Board constituted a two-member independent special sub-committee of the Restructuring Committee (the "***Investigation Subcommittee***").[17]   The Investigation Subcommittee tasked Hunton Andrews Kurth, LLP ("***Hunton AK***")[18] with leading, at the direction of the Investigation Subcommittee, an investigation into prepetition transactions and conduct to ensure that any releases to be provided under the Plan are appropriate in scope and nature.  This investigation has been overseen by the Investigation Subcommittee with the assistance of Hunton AK.  I understand that, to date, no viable claims have been identified that would affect the Board's decision to authorize entry into the Transaction Support Agreement and solicitation of the Plan.

---

[17]   The Investigation Subcommittee members are Karen Stuckey and Charles Tyson.

[18]   In connection with the Company's contingency planning efforts, the Company engaged Hunton AK as co-counsel on November 26, 2024.

## IV.    FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY PLEADINGS[19]

62.    In furtherance of their objective of preserving value for all stakeholders, the Debtors have filed the following First Day Pleadings and related orders (the "***Proposed Orders***") contemporaneously herewith, and have therein requested that the Court consider entering the Proposed Orders granting the relief sought in First Day Pleadings.  For the avoidance of doubt, as to those First Day Pleadings that seek authorization to pay prepetition obligations, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations that are the subject of the First Day Pleadings.  The First Day Pleadings include:

### A.    Administrative and Procedural Pleadings

    i.    *Emergency Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

    ii.    *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors; (II) Waiving the Requirement to File a List of Equity Security Holders; (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information; and (IV) Granting Related Relief*

    iii.    *Emergency Motion of Debtors for Entry of an Order Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in Debtors and (B) Claims of Certain Worthless Stock Deductions*

    iv.    *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants, LLC D/B/A Verita Global as Claims, Noticing, and Solicitation Agent*

### B.    Business Operation Motions

    i.    *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Contracted Labor;*

---

[19]    Unless otherwise defined herein, all capitalized terms in this <u>Part IV</u> shall have the meanings ascribed to them in the applicable First Day Pleadings.

        *(II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief*

  ii.     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

  iii.    *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Insurance Program Obligations, (B) Maintain the Insurance Policies Postpetition, (C) Maintain the Bonding Program and Honor Related Obligations, and (D) Honor Letters of Credit, and (II) Granting Related Relief*

  iv.    *Emergency Motion of Debtors for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance, and (IV) Granting Related Relief*

  v.     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Honor Prepetition Obligations to Customers and (B) Continue Customer Programs and (II) Granting Related Relief*

  vi.    *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Maintain Existing Deposit Practices, and (C) Perform Intercompany Transactions, (II) Waiving Certain U.S. Trustee Guidelines, and (III) Granting Related Relief*

**C.**    **All Trade Motion**

  i.     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief*

**D.**    **Solicitation Procedures Motion**

  i.     *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing to Consider (A) Final Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Form of Ballot, and (C) Confirmation of Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally Waiving Requirement of Filing Schedules of Assets and Liabilities, Statements of Financial Affairs, and 2015.3 Reports;*

*(VI) Conditionally Waiving Requirement to Convene the Section 341 Meeting of Creditors; (VII) Conditionally Approving the Disclosure Statement and (VIII) Granting Related Relief*

**E.    DIP Motion**

    i.    *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief*

63.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings: (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their businesses, and without loss of productivity or value; (b) is necessary to preserve valuable relationships with customers, trade vendors, landlords, and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates and a prudent exercise of the Debtors' business judgement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 22, 2024
      Dallas, Texas

                  */s/ Chad E. Coben*
                  Chad E. Coben
                  Chief Restructuring Officer