**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
THE CONTAINER STORE GROUP, INC., et al., :                   Case No. 24-90627 (ARP)
                                                        :
            Debtors.¹                                   :    (Joint Administration Requested)
                                                        :
------------------------------------------------------- x
```

**<u>EMERGENCY</u> MOTION OF DEBTORS FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY
POSTPETITION FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING
LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (IV) MODIFYING THE AUTOMATIC STAY;
<u>(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on December 23, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on December 23, 2024 at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1]   The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of interim and final orders (the "***Interim Order***" and the "***Final Order***," and together with the Interim Order, the "***DIP Orders***"), substantially in the forms attached hereto:

    a.      authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis in the aggregate principal amount of up to $115,000,000, *plus* applicable fees and premiums (the "***DIP Term Loan Facility***"), on the terms and conditions set forth in the Interim Order and that certain *Senior Secured Super-Priority Priming Debtor-In-Possession Term Loan Credit Agreement*, substantially in the form attached to the Interim Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***DIP Term Credit Agreement***", and, together with all other agreements, guarantees, pledge, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, filed and/or delivered in connection therewith, including the Loan Documents (as defined in the DIP Term Credit Agreement), the Master Consent (as defined in the DIP Term Credit Agreement), the Fronting Fee Letter (as defined in the DIP Term Credit Agreement), and the Syndication Procedures (as defined below) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Term Credit Agreement, collectively, the "***DIP Term Loan Documents***")), by and among The Container Store, Inc., as borrower (in such capacity, the "***DIP Term Loan Borrower***"), The Container Store Group, Inc., TCS Gift Card Services, LLC, C Studio Manufacturing Inc. and C Studio Manufacturing LLC, as secured guarantors (collectively, in such capacities, the "***DIP Term Loan Guarantors***", and together with the DIP Term Loan Borrower, the "***DIP Term Loan Parties***"), Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (collectively, in such capacity, the "***DIP Term Administrative Agent***") and Acquiom Agency Services LLC as collateral agent (in such capacity, the "***DIP Term Collateral Agent***" and, together with the DIP Term Loan Administrative Agents, in such capacities, the "***DIP Term Agents***"), and the lenders from time to time party thereto (collectively, the "***DIP Term Lenders***", and

together with the DIP Term Agents, the "**DIP Term Secured Parties**"), comprised of the following;

    i.   a new money first-out delayed draw term loan facility in an aggregate principal amount of up to $40,000,000, *plus* applicable fees and premiums (the "**First Out DIP Term Loan Facility**"; the commitments thereunder, the "**First Out DIP Term Commitments**", and the term loans extended thereunder, the "**First Out DIP Term Loans**"), pursuant to which (A) $20,000,000, plus applicable fees and premiums, shall be borrowed in a single borrowing on the Effective Date (as defined in the DIP Term Credit Agreement) (the "**Interim First Out DIP Term Loans**"), (B) an aggregate principal amount not to exceed $20,000,000, plus applicable fees and premiums, as set forth in the Approved DIP Budget (as defined below) shall be borrowed in a single borrowing on or after the entry of the Final Order (collectively, together with the Interim First Out DIP Term Loans, the "**DIP Term Borrowings**", and, each, a "**DIP Term Borrowing**"), which First Out DIP Term Loans that are borrowed on the Effective Date shall initially be provided and funded through the Fronting Lender (as defined in the DIP Term Credit Agreement) in accordance with the terms of the DIP Term Loan Documents, on such date set forth in the foregoing clause (A) and, thereafter, such First Out DIP Term Loans and First Out DIP Term Commitments shall be assigned by the Fronting Lender in accordance with the Syndication Procedures, in the case of each of the foregoing, subject to the terms and conditions set forth in the Interim Order and in the DIP Term Loan Documents (including, without limitation, the Approved DIP Budget and any conditions precedent to each of the DIP Term Borrowings set forth therein) and (C) the First Out DIP Term Loans shall be senior in right of payment to the Second Out DIP Term Loans (as defined below) and all proceeds of the DIP Collateral (as defined herein) shall be applied first to the First Out DIP Term Loans until Paid in Full (as defined here) and second to the Second Out DIP Term Loans until Paid in Full (as defined herein); and

    ii.   (A) subject to the entry of the Interim Order, the conversion of up to $37,500,000.00 of the Prepetition First Lien Secured Obligations (as defined below) (together with accrued and unpaid interest thereon) held by the DIP Term Lenders (or any of their respective designated Approved Funds (as defined in the DIP Term Credit Agreement)) into a second-out tranche of DIP Term Loans (such conversion, the "**Interim Second Out Roll Up**", and such converted amounts, the "**Interim Second Out DIP Term Loans**"), pursuant to which, after the completion of the earlier of (x) with respect each DIP Term Lender, its assignment in connection with the Syndication and (y) the Syndication Date (as defined in the Syndication Procedures

substantially in the form attached to the Interim Order as **<u>Exhibit 2</u>** (the "***Syndication Procedures***")), shall be deemed "rolled up" on a cashless basis of $1.875 of Interim Second Out DIP Term Loans for every $1.00 of principal amount of Interim First Out DIP Term Loans (*i.e.*, $20,000,000), based upon such DIP Term Lender's (or any of its designated Approved Funds) *pro rata* allocation of the First Out DIP Term Loans, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Interim Second Out DIP Term Loans for all purposes under the Interim Order as if originally funded on the Effective Date, *provided*, *however*, that if any DIP Term Lender's *pro rata* share of the Interim Second Out Roll Up exceeds the total amount of Prepetition First Lien Secured Obligations held by such DIP Term Lender as of the Syndication Date (as defined in the Syndication Procedures), such DIP Term Lender's share of Interim Second Out DIP Loans shall be reduced in an amount, and to such an extent, to ensure that the maximum amount of Interim Second Out Roll Up of such DIP Term Lender shall be no greater than such DIP Term Lenders' Prepetition First Lien Secured Obligations, and the total amount of Interim Second Out DIP Loans shall be reduced accordingly; (B) subject to entry of the Final Order providing such relief, the conversion of up to $37,500,000.00 of the Prepetition First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Term Lenders (or any of their respective designated Approved Funds) into a second out tranche of DIP Term Loans (such conversion, the "***Final Second Out Roll Up***", and such converted amounts, the "***Final Second Out DIP Term Loans***" and together with the Interim Second Out DIP Term Loans, the "***Second Out DIP Term Loans***", and together with the First Out DIP Term Loans, the "***DIP Term Loans***"), on a cashless basis of $1.875 of Final Second Out DIP Term Loans for every $1.00 of principal amount of First Out DIP Term Loans (*i.e.*, $20,000,000) funded on or after the entry of the Final Order, based upon such DIP Term Lender's (or any of its designated Approved Funds) *pro rata* share of principal amount of funded First Out DIP Term Loans as of the date of entry of the Final Order, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Final Second Out DIP Term Loans for all purposes under the Interim Order as if originally funded on the Effective Date; *provided, however*, that if any DIP Term Lender's pro rata share of the Final Second Out Roll Up exceeds the total amount of Prepetition First Lien Secured Obligations held by such DIP Term Lender as of the funding date, such DIP Term Lender's share of Final Second Out DIP Loans shall be reduced in an amount, and to such an extent, to ensure that the maximum amount of Final Second Out Roll Up of such DIP Term Lender shall be no greater than such DIP Term Lenders' Prepetition

First Lien Secured Obligations, and the total amount of Final Second Out DIP Loans shall be reduced accordingly, and (C) the Second Out DIP Term Loans shall be subordinate in right of payment from the proceeds of the DIP Collateral to the First Out DIP Term Loans and, solely to the extent that the First Out DIP Term Loans have been Paid in Full, shall be entitled to receive all proceeds of the DIP Collateral until the DIP Term Lenders have received Payment in Full of the Second Out DIP Term Loans;

b.     authorizing the Debtors to obtain postpetition financing on a senior secured super-priority priming basis in the form of a revolving credit facility in an aggregate principal amount of up to $140 million (such facility, the "***ABL DIP Loan Facility***", and together with the DIP Term Loan Facility, the "***DIP Facilities***"; the loans advanced under the ABL DIP Loan Facility, the "***ABL DIP Loans***", and together with the DIP Term Loans, the "***DIP Loans***", the commitments thereunder, the "***ABL DIP Commitments***"), providing, among other things, for the refinancing in full of the Prepetition ABL Secured Obligations under the Prepetition ABL Loan Documents (as defined in the Interim Order), and cash collateralization of outstanding letters of credit thereunder (at 105% the face value thereof) pursuant to a payoff letter in form and substance satisfactory to the Debtors, the Prepetition ABL Lenders and the Prepetition ABL Secured Parties (each as defined below), and the ABL DIP Agent (the "***Prepetition ABL Payoff Letter***"), on the terms and conditions set forth in the Interim Order and that certain $140 Million Senior Secured (a) Debtor-in-Possession Revolving Credit Facility and (b) Exit Revolving Credit Facility Commitment Letter (the "***ABL DIP/Exit Commitment Letter***") and the *Senior Secured Superpriority Debtor-In-Possession Asset-Based Revolving Credit Agreement*, substantially in the form attached to the Interim Order as **Exhibit 3** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***ABL DIP Credit Agreement***", and, together with the ABL DIP/Exit Commitment Letter and all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, filed and/or delivered in connection therewith, including the Loan Documents (as defined in the ABL DIP Credit Agreement) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the ABL DIP Credit Agreement, collectively, the "***ABL DIP Loan Documents***", and together with the DIP Term Loan Documents, the "***DIP Loan Documents***"), by and among The Container Store, Inc., as borrower (in such capacity, the "***DIP ABL Borrower***" and together with the DIP Term Loan Borrower, the "***Borrowers***"), The Container Store Group, Inc., TCS Gift Card Services, LLC, C Studio Manufacturing Inc. and C Studio Manufacturing LLC, as secured guarantors (collectively, in such capacities, the "***DIP ABL Guarantors***", and together with the DIP ABL Borrower, the "***DIP ABL Loan Parties***", and together with the DIP Term Loan Parties, the "***DIP Loan Parties***"), Eclipse Business Capital LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***ABL DIP Agent***", and together with the DIP Term Agents, the "***DIP Agents***"),

the lender party thereto from time to time (the "**ABL DIP Lender**", and together with the DIP Term Lenders, the "**DIP Lenders**", and together with the ABL Agent, the "**ABL DIP Secured Parties**", and together with the DIP Term Secured Parties, the "**DIP Secured Parties**") which shall be available upon entry of the Interim Order and borrowings thereunder shall be available immediately, in each case, subject to the terms and conditions set forth in the Interim Order and the ABL DIP Loan Documents (collectively, the "**ABL DIP Borrowings**", and each, an "**ABL DIP Borrowing**", and together with the DIP Term Borrowings, the "**DIP Borrowings**", and each, a "**DIP Borrowing**");

c.  authorizing the Borrowers to incur, and the DIP Guarantors to jointly and severally, irrevocably and unconditionally, guarantee, on a super-priority basis, the payment in full in cash of all DIP Obligations (as defined below), in each case, in accordance with the Interim Order and the DIP Loan Documents;

d.  (i) authorizing the Borrower to use proceeds of the ABL DIP Loan Facility for the ABL Refinancing[2] and (ii) authorizing the Debtors to enter into cash collateral agreements with each Issuing Bank (as defined in the Prepetition ABL Credit Agreement) to evidence Letter of Credit Cash Collateral (as defined below) and to grant perfected senior first priority security interests and liens in the Letter of Credit Cash Collateral in accordance with the terms of any such cash collateral agreement(s), in each case, pursuant to the terms of the Prepetition ABL Payoff Letter and the Interim Order;

e.  authorizing the Debtors to: (i) execute, deliver, and perform under the DIP Term Credit Agreement and ABL DIP Credit Agreement (together, the "**DIP Credit Agreements**"), and each of the other DIP Loan Documents (and any and all other documents related to the fronting or seasoning of the DIP Term Loans), (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, including without limitation, the Put Option Premium, the Commitment Premium, the Equity Premium, the Fronting Fee and all other "Obligations" as defined in the DIP Term Credit Agreement, whether or not

---

[2]  "ABL Refinancing" means upon entry of the Interim Order and the satisfaction or waiver of all other closing conditions in the ABL DIP Credit Agreement, without any further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to promptly borrow under the ABL DIP Credit Agreement the full amount necessary to fully and immediately cash collateralize all Prepetition ABL Letters of Credit and repay all other Prepetition ABL Secured Obligations in the amounts and in the manner specified in the Prepetition ABL Payoff Letter, (ii) authorized to execute and perform under the Prepetition ABL Payoff Letter, (iii) authorized to contemporaneously cash collateralize all Prepetition ABL Letters of Credit and repay all other Prepetition ABL Secured Obligations in the amounts and in the manner specified in the Prepetition ABL Payoff Letter, (iv) subject to the provisions of paragraph 2(e)(vi), upon the Prepetition ABL Agent's and its advisors' receipt of the Payoff Amount, deeming the Prepetition Intercreditor Agreement to be amended and restated into the DIP Intercreditor Agreement, and (v) subject to the provisions of paragraph 2(e)(vi), upon the Prepetition ABL Agent's and its advisors' receipt of the Payoff Amount (as defined in the Prepetition ABL Payoff Letter), deemed to have fully satisfied and repaid all Prepetition ABL Secured Obligations except to the extent set forth in the Prepetition ABL Payoff Letter.

such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Term Loan Documents and the Interim Order (collectively, the "***DIP Term Obligations***"), (iii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, including, without limitation, all fees set forth in the fee letter among the parties and all "Obligations" as defined in the ABL DIP Credit Agreement, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, in accordance with the ABL DIP Loan Documents and the Interim Order (collectively, the "***ABL DIP Obligations***," and together with the DIP Term Obligations, the "***DIP Obligations***") and (iv) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

f.      contemporaneously with the ABL Refinancing, deeming the DIP ABL Agent and the DIP ABL Secured Parties to be parties to the Prepetition Intercreditor Agreement in all respects, including as ABL Agent and ABL Secured Parties (as each term is used in the Prepetition Intercreditor Agreement) thereunder, and further deeming the Prepetition Intercreditor Agreement to be amended and restated *mutatis mutandis* with such terms as necessary to reflect the foregoing and to give effect to the relationship between the DIP Term Agents, DIP Term Secured Parties, Prepetition First Lien Agent, and Prepetition First Lien Secured Parties and their relative priority on the Term Priority Collateral (as that term is used in the Prepetition Intercreditor Agreement), and the DIP ABL Agent and the DIP ABL Secured Parties and their relative priority on the ABL Priority Collateral (as that term is used in the Prepetition Intercreditor Agreement) (the Prepetition Intercreditor Agreement, as amended to reflect the foregoing, the "***DIP Intercreditor Agreement***", and together with the Prepetition Intercreditor Agreement, the "***Intercreditor Agreements***");

g.      authorizing the DIP Loan Parties to grant to the DIP Agents, for the benefit of themselves and the other applicable DIP Secured Parties, the applicable DIP Liens (as defined below) in all DIP Collateral, as set forth in the Interim Order, subject to the Carve Out, and subject to the relative priorities set forth in the Interim Order;

h.      authorizing the DIP Loan Parties to grant to the DIP Agents, for the benefit of themselves and the other applicable DIP Secured Parties, allowed super-priority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all applicable DIP Obligations, subject in each case to the Carve Out, as set forth in the Interim Order;

i. authorizing the DIP Loan Parties to use the proceeds of the DIP Facilities, the DIP Collateral, the Prepetition Collateral including Cash Collateral (each as defined below) in accordance with the terms and conditions set forth in the Interim Order and the DIP Loan Documents, including the Approved DIP Budget, subject to any variances expressly permitted under the DIP Credit Agreements (the "***Permitted Variances***");

j. granting adequate protection, as and to the extent set forth in the Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Liens (as defined below) in the Prepetition Collateral (including Cash Collateral);

k. modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Loan Documents, as set forth therein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

l. approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, and the DIP Obligations, (ii) subject to paragraph 24 of the Interim Order, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Secured Obligations (each as defined below);

m. subject to entry of the Final Order granting such relief, approving the DIP Loan Parties' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in the Interim Order;

n. subject to entry of the Final Order granting such relief, approving (i) the DIP Loan Parties' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties and, (ii) the DIP Loan Parties' waiver of the equitable doctrine of "marshaling" and the DIP Loan Parties' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, with respect to the Prepetition Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in the Interim Order;

o. scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of the Final Order and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Required DIP Lenders[3] and the DIP Agents; and

---

[3] As used herein, (a) the term "***ABL DIP Required Lenders***" means the "Required Lenders" under the ABL DIP Credit Agreement, (b) the term "***Term DIP Required Lenders***" means the "Required Lenders" under the DIP

p.      granting related relief.

2.      In support of this Motion, the Debtors submit the *Declaration of Chad E. Coben, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***") and the *Declaration of Adam Dunayer in Support of the Debtors' DIP Motion* (the "***Dunayer Declaration***"), each filed concurrently herewith.  The Debtors' initial budget reflecting the anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the sixth (6th) calendar week following the Petition Date is attached as **Exhibit 4** to the Interim Order (the "***Initial Budget***").

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.

4.      Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532  (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"); and

---

Term Credit Agreement, and (c) the term "***Required DIP Lenders***" means each of the ABL DIP Required Lenders and the Term DIP Required Lenders, individually.

the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").

## BACKGROUND

6.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in the Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

7.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed contemporaneously herewith, which is fully incorporated herein by reference.

8.      Contemporaneously with the filing of the Motion, the Debtors filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) requesting joint administration of the Chapter 11 Cases for procedural purposes only.

9.      The Chapter 11 Cases are "prepackaged" cases commenced for the purpose of implementing agreed restructuring and recapitalization transactions among the Debtors and their key stakeholders.  Prior to the Petition Date, the Debtors entered into that certain Transaction Support Agreement, dated as of December 21, 2024 (as may be amended, modified or supplemented, the "***Transaction Support Agreement***") with lenders that collectively hold over 90% of the outstanding principal amount of term loans under the Debtors' Prepetition First Lien Facility (the "***Consenting First Lien Lenders***"), including those certain members of an ad hoc term lender group represented by Paul Hastings LLP (the "***Ad Hoc Group***").  The holders of the

outstanding principal amount of asset-backed loans under the Debtors' Prepetition ABL Facility (the "***Prepetition ABL Lenders***") are not parties to the Transaction Support Agreement.

10.     Contemporaneously herewith, the Debtors will file a prepackaged chapter 11 plan of reorganization reflecting the terms of the Transaction Support Agreement (as may be amended, modified or supplemented, the "***Plan***"), along with (a) a corresponding disclosure statement (as may be amended, modified or supplemented, the "***Disclosure Statement***") and (b) a motion seeking, among other things, (i) conditional approval of the Disclosure Statement, (ii) approval of the solicitation and notice procedures, and (iii) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan.

11.     The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired and "ride through" the Chapter 11 Cases, and brings in at least approximately $60 million of new liquidity for the Debtors to fund go forward operations.  The Debtors are seeking confirmation of the Plan as quickly as the Court's schedule and requisite notice periods will permit to implement the proposed restructuring and recapitalization transactions under the Transaction Support Agreement and Plan.

## PRELIMINARY STATEMENT

12.     The DIP Facilities are critical to the consensual restructuring under the Transaction Support Agreement and Plan and are integral to the Debtors' ability to operate during the Chapter 11 Cases.  To achieve their chapter 11 objectives, the Debtors require the consensual use of Cash Collateral, new money financing, a replacement ABL facility, and related financial accommodations provided under the DIP Facilities and DIP Orders.  The DIP Facilities will ensure that the Debtors are able to stabilize their business, which in turn, will allow the Debtors to pursue the Plan for the benefit of all stakeholders.  The DIP Facilities also send a crucial message to the Debtors' employees, suppliers, vendors, and customers that the Debtors intend to and will have

the means to maintain ordinary course operations and meet and honor their financial commitments throughout the course of the Chapter 11 Cases.  In addition, the ABL Refinancing is a critical component of the proposed DIP Facilities and transactions contemplated under the Transaction Support Agreement given the difficulty to either (a) seek to maintain the Prepetition ABL Facility only to refinance or pay it off upon emergence or (b) refinance the Prepetition ABL Facility incrementally upon entry of the Interim Order and then Final Order, which would require the Debtors to negotiate with two secured revolving lenders at the same time.

13.     Absent the DIP Facilities, the Debtors' Prepetition First Lien Lenders (as defined below) would be unwilling to agree to the Debtors' use of their Cash Collateral, and the Prepetition First Lien Lenders would not agree to the priming of their prepetition liens that would otherwise be necessary to obtain postpetition financing.  Without access to Cash Collateral or the incremental liquidity provided by the DIP Facilities, the Debtors would face severe, immediate, and irreparable harm, likely resulting in the significant loss of the Debtors' over 3,800 strong workforce, the destruction of key vendor relationships, and materially risk important customer relationships.

14.     In addition, through the DIP Facilities, the DIP Lenders have committed to fund the Debtors' exit facilities by converting their DIP Loans into exit financing facilities ensuring that the Debtors have sufficient liquidity to fund ongoing business operations upon emergence from chapter 11.  As a result, the DIP Facilities lock in long-term exit financing for the Debtors' continued operations at the outset of the Chapter 11 Cases and provide the reorganized Debtors with runway to operate post-emergence.

15.     The Debtors do not believe that any parties in interest are prejudiced by the proposed ABL Refinancing, Interim Second Out Roll Up, or Final Second Out Roll Up because of the prepackaged nature of the Chapter 11 Cases and the fact that allowed general unsecured

claims are being paid in full or otherwise left unimpaired.  Nevertheless, the DIP Orders expressly preserve investigation and challenge rights with respect to the ABL Refinancing, as well as the Interim Second Out Roll Up and Final Second Out Roll Up.

16.    As described in greater detail in the Dunayer Declaration, prior to the Petition Date, the Debtors engaged in good-faith, arm's-length negotiations with the Ad Hoc Group and the Prepetition ABL Lenders, and ran a robust third-party marketing process in an effort to obtain sufficient postpetition financing and consensual use of Cash Collateral to fund operations and administer the Chapter 11 Cases.  These negotiations resulted in the proposed DIP Facilities and agreement on consensual use of Cash Collateral, which will allow the Debtors to pursue the restructuring transaction contemplated by the Plan and ultimately inure to the benefit of all stakeholders.

17.    The terms of the DIP Facilities, including the Approved DIP Budget (subject to permitted variances), interest rate, and fees, were heavily negotiated through an iterative, arm's-length process.  Taken as a whole, the terms of the DIP Facilities are reasonable and fair under the circumstances of the Chapter 11 Cases.  Further, as described in the Dunayer Declaration, the Debtors do not believe that more favorable or comparable financing was or is available in light of (a) their thorough evaluation of potential alternatives, (b) their liquidity position, (c) the lack of unencumbered assets to serve as a third-party lender's collateral, and (d) the Prepetition Secured Parties' refusal to permit third-party priming of their debt, and in the case of the Prepetition ABL Facility, absent the ABL Refinancing (and the benefits of avoiding the cost and uncertainty of a priming fight).  As described in the Dunayer Declaration, no third party was willing to provide financing on a junior or unsecured basis.

18. The DIP Facilities are the best financing package available to the Debtors, and are a key component of the overall restructuring under the Transaction Support Agreement and the Plan. For these reasons and others stated herein, the Debtors respectfully submit that the relief requested in the Motion should be granted.

## CONCISE STATEMENT PURSUANT TO COMPLEX CASE PROCEDURES AND BANKRUPTCY RULE 4001[4]

19. Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Term Loan Facility and/or Interim Order contains the following provisions:[5]

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| **Parties to the DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Term Loan Borrower**: The Container Store, Inc.<br><br>**DIP Term Agents:** Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents and Acquiom Agency Services LLC as collateral agent<br><br>**DIP Term Loan Guarantors**: The Container Store Group, Inc., and each of the other Debtors (other than the DIP Term Loan Borrower)<br><br>**DIP Term Lenders**: The lenders from time to time party to the DIP Term Credit Agreement |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors have an immediate and critical need to use Cash Collateral and to obtain postpetition financing pursuant to the DIP Facilities, in each case, on an interim basis, in order to, among other things, permit the orderly continuation and operation of their businesses, maintain business relationships with customers, vendors and suppliers, make payroll, pay the costs of administering the Chapter 11 Cases, effectuate the ABL Refinancing, and satisfy other working capital and operational needs of the Debtors, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of the Interim Order and the DIP Loan Documents, including the Approved DIP Budget (subject to Permitted Variances). The Debtors' access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facilities and the use of Cash Collateral is necessary and vital to, among other things, preserve and maintain the going concern values of the Debtors. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facilities are not obtained pursuant to the terms of the Interim Order and, as applicable, the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral. Entry of the Interim Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.<br><br>*See* Interim Order ¶ H(b). |

---

[4]   Capitalized terms used in this summary chart but not defined therein have the meanings given to them in the DIP Loan Documents or the Interim Order, as applicable.

[5]   This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, will control. Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim Order or the DIP Credit Documents.

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | An aggregate principal amount of up to $115 million, consisting of (i) $40 million in new money term loans and (ii) (a) subject to entry of the Interim Order, $37,500,000.00 in rolled up Prepetition First Lien Secured Obligations and (b) subject to entry of the Final Order, up to $37,500,000.00 in rolled up Prepetition First Lien Secured Obligations.  The First Out DIP Term Loans shall be made available as follows:<br><br>**Initial Draw**:  $20 million will be made available to be drawn in a single drawing on the Effective Date.<br><br>**Final Draw**:  An additional amount of $20 million shall be funded and made available upon entry of the Final Order.<br><br>*See* Interim Order ¶ 2(b). |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | A copy of the Approved DIP Budget is attached as **<u>Exhibit 4</u>** to the Interim Order. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Term Loan maturity shall be the earliest of:<br><br>(i)    March 31, 2025;<br><br>(ii)    11:59 p.m. New York City Time on the date that is three (3) business days after the Petition Date if the Interim Order has not been entered by the Court prior to such date and time;<br><br>(iii)    11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date if the Final Order has not been entered by the Court prior to such date and time;<br><br>(iv)    the Plan Effective Date;<br><br>(v)    termination of the Transaction Support Agreement;<br><br>(vi)    acceleration as a result of an Event of Default (as such term is defined in the DIP Term Credit Agreement) that has occurred and is continuing,<br><br>(vii)    the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor, and<br><br>(viii)    the closing of any sale of assets pursuant to section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since the Petition Date, constitutes a sale of all or substantially all of the assets of the Debtors.<br><br>*See* DIP Term Credit Agreement § 1.01; definition of "Maturity Date". |
| **Roll-Ups**<br><br>*Complex Case Procedures, ¶ 8(c)* | The DIP Term Loan Facility proposes a roll-up of $75 million of Prepetition First Lien Secured Obligations:  (a) subject to entry of the Interim Order and funding of the initial draw, $37,500,000 in rolled up Prepetition First Lien Secured Obligations and (b) subject to entry of the Final Order and funding of the final draw, $37,500,000 in rolled up Prepetition First Lien Secured Obligations.<br><br>*See* Interim Order ¶ 2(c). |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Term Credit Agreement includes standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Term Lender to make DIP Term Loans under the DIP Term Loan Facility.<br><br>*See* Interim Order ¶ 2(b). |

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Complex Case Procedures, ¶ 8(e)* | A DIP Termination Event includes: (i) the occurrence of an "Event of Default" under, and as defined in, the ABL DIP Credit Agreement or the DIP Term Credit Agreement, unless waived in writing by the ABL DIP Required Lenders and/or the Term DIP Required Lenders, as applicable, (ii) the occurrence of the "Maturity Date" (under, and as defined in, the ABL DIP Credit Agreement or the DIP Term Credit Agreement), (iii) March 31, 2025, (iv) the effective date of a chapter 11 plan of any of the Debtors, (v) any of the Debtors seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, extension of the Interim Order or the DIP Loan Documents without the prior written consent of the Term DIP Required Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Term Secured Parties), (vi) the failure of the Debtors to make any payment required under the Interim Order or the DIP Term Loan Documents to any of the DIP Secured Parties or the Prepetition First Lien Secured Parties as and when due and payable hereunder or thereunder; or (vii) the failure by any of the Debtors to timely perform or comply with any of the other terms, provisions, conditions or other obligations under the Interim Order.<br><br>*See* Interim Order ¶ 21(a). |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Carve Out means an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below), (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below), (iii) to the extent allowed by this Court at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee required to be paid to Houlihan Lokey Capital, Inc. ("***Houlihan***"), solely, when and if earned, on account of any restructuring, sale, success or other transaction fee, as applicable, under and as defined in that certain engagement letter between, *inter alia*, Houlihan and the Debtors, dated as of November 18, 2024 upon the approval by this Court in these Chapter 11 Cases) incurred by persons or firms retained by the Debtors (collectively, the "***Allowed Professional Fees***") pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "***Debtor Professionals***") and the Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***", and together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first day following the date of delivery by the applicable DIP Agent, at the direction of the ABL DIP Required Lenders or the Term DIP Required Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (and in the case of the Committee Professionals, if any, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved DIP Budget) (the amounts set forth in clauses (i) through (iii), the "***Pre-Carve Out Trigger Notice Cap***"), and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $750,000 incurred after the first day following the date of delivery by any DIP Agent, at the direction of applicable the Required Lenders, of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in clause (iv), the "***Post-Carve Out Trigger Notice Cap***"); provided, however, that nothing in the Interim Order shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation described in clauses (i) through (iv) of paragraph 23(a) of the Interim Order on any grounds; provided, further, that, without duplication of any amounts payable under clause (iii), all amounts required to be paid to Houlihan on account of fees earned under the terms of Houlihan's engagement letter after receipt of a Carve-Out Trigger Notice, shall be paid solely out of any transaction (or liquidation) proceeds. The "***Carve Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by any DIP Agent (at the direction of the ABL DIP Required Lenders or the Term DIP Required Lenders), in each case, to counsel to the other DIP Agent, Debtors, the U.S. Trustee and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event (in the case of a Carve Out Trigger Notice delivered by |

| Summary of Material Terms of DIP Term Loan Facility |
|---|
| | any DIP Agent), stating that the Post-Carve Out Trigger Notice Cap has been invoked.  For the avoidance of doubt, the Carve-Out Trigger Notice may be sent during the Remedies Notice Period. <br><br> *See* Interim Order ¶ 23(a). |

| **Priority of Claims and Liens; Collateral** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | <u>DIP Liens</u>.  Effective upon entry of the Interim Order, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreements or other action to take possession or control of any DIP Collateral), (x) as security for the prompt and complete payment and performance of all ABL DIP Obligations when due (whether at stated maturity, by required prepayment, acceleration or otherwise), the ABL DIP Agent, for the benefit of itself and the other ABL DIP Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***ABL DIP Liens***") in all DIP Collateral and (y) as security for the prompt and complete payment and performance of all DIP Term Obligations when due (whether at stated maturity, by required prepayment, acceleration or otherwise), the DIP Term Agent, for the benefit of itself and the other DIP Term Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***Term DIP Liens***", and together with the ABL DIP Liens, the "***DIP Liens***") in all DIP Collateral, in each case of the foregoing <u>clauses (x) and (y)</u>, subject and subordinate to the Carve Out, and subject to the relative priorities and provisions set forth in paragraph 6(c) of the Interim Order, **Exhibit 5** of the Interim Order and the DIP Intercreditor Agreement. <br><br> <u>DIP Collateral</u>.  All assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, and wherever located, including, without limitation, (i) all of the DIP Loan Parties' rights, title and interests in all "Collateral" (as defined in the DIP Credit Agreements), Prepetition Collateral (including Cash Collateral), ABL Priority Collateral and Term Loan Priority Collateral (each as defined in the Prepetition Intercreditor Agreement), (ii) all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory and fixtures, all real property interests, all interests in leaseholds (to the extent permitted in the Interim Order), all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests, capital stock, limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any Cause of Action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing, and (iii) subject to entry of the Final Order, all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement or otherwise, Avoidance Actions ("***Avoidance Action Proceeds***").  Notwithstanding anything to the contrary set forth in the Interim Order, neither (x) Excluded Property (as defined in the DIP Credit Agreements) nor (y) security deposits of landlords with respect to non-residential real property leases shall not be subject to the DIP Liens or Adequate Protection Liens to the extent that |

| Summary of Material Terms of DIP Term Loan Facility |
|---|

| | such deposits sit outside of the DIP Loan Parties' bankruptcy estates; <u>provided</u> that such DIP Liens and Adequate Protection Liens shall attach to any reversionary interest of a DIP Loan Party in such security deposit in accordance with the priorities set forth on **Exhibit 5** to the Interim Order. |
|---|---|
| | <u>DIP Superpriority Claims</u>.  Pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, subject to the Carve Out, (A) the ABL DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases on account of the ABL DIP Obligations, with priority (except as set forth in <u>clause (C)</u> of this paragraph 7) over any and all other administrative expense claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, the Adequate Protection Claims and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***ABL DIP Superpriority Claims***"), (B) the Term DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases on account of the Term DIP Obligations, with priority (except as set forth in <u>clause (C)</u> of this paragraph 7) over any and all other administrative expense claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, the Adequate Protection Claims and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***Term DIP Superpriority Claims***"; together with the ABL DIP Superpriority Claims, the "***DIP Superpriority Claims***") and (C) the priority of the ABL DIP Superpriority Claims shall be *pari passu* with the priority of the Term DIP Superpriority Claims.  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that the Interim Order or any provision thereof is reversed or modified, on appeal or otherwise. |
| | *See* Interim Order ¶¶ 6-7. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)* | The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their respective Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in paragraph 10 of the Interim Order, are collectively referred to herein as the "***Adequate Protection Obligations***"):<br><br>*Adequate Protection for Prepetition ABL Secured Parties*.  Prior to and until the ABL Refinancing Effective Date, the Prepetition ABL Secured Parties are hereby granted the following adequate protection of their Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral):<br><br>• *ABL Adequate Protection Claims*.  The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the DIP Loan Parties in each of their respective Chapter 11 Cases and any Successor Cases (the "***ABL Adequate Protection Claims***"), which shall be payable by each of the DIP Loan Parties, on a joint and several basis, and shall have recourse to all DIP Collateral. The ABL Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and the DIP Superpriority Claims and *pari passu* with the First Lien Adequate Protection Claims (as defined below), (b) subject to the relative priorities set forth in **Exhibit 5** attached to the Interim Order, and (c) senior |

| Summary of Material Terms of DIP Term Loan Facility |
|---|

| | to any and all other administrative expense claims and all other claims against the DIP Loan Parties and their estates, now existing or hereafter arising, of any kind or nature whatsoever. |
|---|---|

- *ABL Adequate Protection Liens*. The Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition ABL Liens in the Prepetition ABL Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral (the "***ABL Adequate Protection Liens***"). The ABL Adequate Protection Liens (a) shall be subject to the Carve Out and Permitted Prior Liens, (b) shall be subject to the relative priorities set forth in **Exhibit 5** attached to the Interim Order, and (c) shall be senior to any and all other liens and security interests in the DIP Collateral.

- *Fees and Expenses*. Solely to the extent set forth in the Prepetition ABL Payoff Letter, following entry of the Interim Order, the Debtors are authorized and directed to pay, without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines, the reasonable and documented out-of-pocket costs and expenses of the Prepetition ABL Agent, whether arising prior to or after the Petition Date, including, without limitation, the reasonable and documented fees and expenses of (A) Simpson Thacher & Bartlett LLP, as counsel to the Prepetition ABL Agent, (B) Berkeley Research Group LLC, as financial advisor to the Prepetition ABL Agent, and (C) one local counsel to the Prepetition ABL Agent (the "***ABL Fees and Expenses***"), in each case, whether arising prior to or after the Petition Date, through and including the ABL Refinancing Effective Date to the extent set forth in the Prepetition ABL Payoff Letter. In the event the ABL Refinancing does not occur or is disgorged or otherwise reversed in whole or in part, the ABL Fees and Expenses shall be subject to the fee review procedures set forth in paragraph 11 of the Interim Order. Notwithstanding the foregoing, if the ABL Refinancing is reversed, disgorged, or does not occur, the ABL Fees and Expenses shall not be limited by the ABL Payoff Letter.

- *Reporting*. Until the repayment in full of the Prepetition ABL Obligations pursuant to the ABL Refinancing or otherwise, the Debtors shall provide the Prepetition ABL Agent and its advisors with all reports, documents and other information required to be delivered to the DIP Secured Parties and the Prepetition ABL Secured Parties under the DIP Loan Documents and the Prepetition ABL Loan Documents, respectively, and the Interim Order contemporaneously with the delivery of such information to the DIP Secured Parties to the Prepetition ABL Secured Parties, as applicable.

*Adequate Protection for Prepetition First Lien Secured Parties*. The Prepetition First Lien Secured Parties are hereby granted the following adequate protection of their Prepetition First Lien Liens in the Prepetition First Lien Collateral (including Cash Collateral):

- *First Lien Adequate Protection Claims*. The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens in the Prepetition First Lien Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the DIP Loan Parties in each of their respective Chapter 11 Cases and any Successor Cases (the "***First Lien Adequate Protection Claims***"), which shall be payable by each of the DIP Loan Parties, on a joint and several basis, and shall have recourse to all DIP Collateral. The First Lien Adequate Protection Claims shall be (a) subject and subordinate to the Carve Out and

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| | the DIP Superpriority Claims, (b) subject to the DIP Intercreditor Agreement and the relative priorities set forth in **Exhibit 5** attached to the Interim Order, and (c) senior to any and all other administrative expense claims and all other claims against the DIP Loan Parties and their estates, now existing or hereafter arising, of any kind or nature. |
| | • *First Lien Adequate Protection Liens.* The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition First Lien Liens in the Prepetition First Lien Collateral, valid, binding, enforceable and perfected post-petition liens on and security interests in all DIP Collateral (the "***First Lien Adequate Protection Liens***", and together with the ABL Adequate Protection Liens, the "***Adequate Protection Liens***"). The First Lien Adequate Protection Liens shall be (a) subject to the Carve Out, the DIP Liens, and Permitted Prior Liens, and with respect to ABL Priority Collateral, the ABL DIP Liens, ABL Adequate Protection Liens and the Prepetition ABL Liens, (b) subject to the relative priorities set forth in **Exhibit 5** attached to the Interim Order, and (c) senior to any and all other liens and security interests in the DIP Collateral. |
| | • The Debtors are authorized and directed to pay, without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines, whether arising prior to or after the Petition Date, (A) the reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition First Lien Agent, including, without limitation, the reasonable and documented fees and expenses of (x) Simpson Thacher & Bartlett LLP, as counsel to the Prepetition First Lien Agent, and (y) a single firm as local counsel to the Prepetition First Lien Agent which shall be the same local counsel retained by the Prepetition ABL Agent (collectively, the "***First Lien Agent Fees and Expenses***"), and (B) the reasonable and documented out-of-pocket fees and expenses of the members of the Ad Hoc Lender Group, including, without limitation, the fees and expenses of the Lender Advisors (collectively, the "***Ad Hoc Lender Group Fees and Expenses***", and together with the First Lien Agent Fees and Expenses, the "***First Lien Fees and Expenses***"), in each case, as follows: (1) promptly following the entry of the Interim Order, the Debtors shall pay in full in cash all First Lien Fees and Expenses arising on or prior to the Petition Date, (2) upon the Effective Date, the Debtors shall pay in full in cash all First Lien Fees and Expenses arising through the Effective Date, and (3) thereafter, subject in the case of professional fees to the procedures set forth in paragraph 11 of the Interim Order, the Debtors shall pay in full in cash all First Lien Fees and Expenses that arise following the Effective Date. |
| | • *Reporting.* The Debtors shall provide the Prepetition First Lien Agent and the Lender Advisors with all reports, documents and other information required to be delivered to the DIP Secured Parties and the Prepetition ABL Secured Parties under the DIP Loan Documents and the Prepetition ABL Loan Documents, respectively, and the Interim Order contemporaneously with the delivery of such information to the DIP Secured Parties to the Prepetition ABL Secured Parties, as applicable. |
| | *See* Interim Order ¶ 10. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | Prepetition ABL Facility.<br><br>• *Prepetition ABL Credit Agreement.* Pursuant to that certain *Credit Agreement*, dated as of April 6, 2012 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the |

| | |
|---|---|
| **Summary of Material Terms of DIP Term Loan Facility** | |

"***Prepetition ABL Credit Agreement***", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Security Agreement and the Pledge Agreement (each as defined in the Prepetition ABL Credit Agreement) and the Prepetition Intercreditor Agreement (as defined below), collectively, the "***Prepetition ABL Loan Documents***"), by and among The Container Store, Inc., as borrower (the "***Prepetition ABL Borrower***"), the parent and certain subsidiaries of the borrower, as guarantors (the "***Prepetition ABL Guarantors***", and together with the Prepetition ABL Borrower, the "***Prepetition ABL Loan Parties***"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "***Prepetition ABL Agent***"), and the lenders party thereto from time to time (collectively, the "***Prepetition ABL Lenders***", and together with the Prepetition ABL Agent, the "***Prepetition ABL Secured Parties***"), the Prepetition ABL Lenders provided a revolving asset-based credit facility (the "***Prepetition ABL Facility***") to the Prepetition ABL Loan Parties. Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition ABL Secured Obligations (as defined below).

- *Prepetition ABL Secured Obligations.* As of the Petition Date, the Prepetition ABL Loan Parties were justly and lawfully indebted to the Prepetition ABL Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $80 million on account of principal amounts outstanding under the Prepetition ABL Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* $7.533 million under the letters of credit (the "***Prepetition ABL Letters of Credit***") issued and outstanding thereunder, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition ABL Credit Agreement), and all other amounts that may be due or owing under the Prepetition ABL Loan Documents (collectively, the "***Prepetition ABL Secured Obligations***").

- *Prepetition ABL Liens.* Pursuant to the Prepetition ABL Loan Documents, each of the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, valid and properly perfected continuing liens on and security interests in (the "***Prepetition ABL Liens***") substantially all of the assets of the Prepetition ABL Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition ABL Credit Agreement) (collectively, the "***Prepetition ABL Collateral***") and the "ABL Priority Collateral" (as defined in the Prepetition Intercreditor Agreement).

*See* Interim Order ¶ F(a).

Prepetition First Lien Facility.

- *Prepetition First Lien Credit Agreement.* Pursuant to that certain *Credit Agreement*, dated as of April 6, 2012 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition First Lien Credit Agreement***", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Loan Documents (as defined in the Prepetition First Lien Credit Agreement) and the Prepetition Intercreditor Agreement (as defined below), collectively, the "***Prepetition First Lien Loan Documents***", and together with the Prepetition ABL Loan Documents, the "***Prepetition Loan Documents***"), by and among The Container Store, Inc., as borrower (the "***Prepetition First Lien Borrower***"), the parent and

| Summary of Material Terms of DIP Term Loan Facility |
|---|

certain subsidiaries of the Prepetition First Lien Borrower, as guarantors (collectively, the "***Prepetition First Lien Guarantors***", and together with the Prepetition First Lien Borrower, collectively, the "***Prepetition First Lien Loan Parties***", and together with the Prepetition ABL Loan Parties, the "***Prepetition Loan Parties***"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "***Prepetition First Lien Agent***", and together with the Prepetition ABL Agent, the "***Prepetition Agents***"), and the lenders party thereto from time to time (collectively, the "***Prepetition First Lien Lenders***", and together with the Prepetition First Lien Agent, the "***Prepetition First Lien Secured Parties***", and together with the Prepetition ABL Secured Parties, the "***Prepetition Secured Parties***"), the Prepetition First Lien Lenders provided a term loan credit facility (the "***Prepetition First Lien Facility***") to the Prepetition First Lien Loan Parties. Pursuant to the Prepetition First Lien Loan Documents, each of the Prepetition First Lien Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition First Lien Secured Obligations (as defined below).

- *Prepetition First Lien Secured Obligations.* As of the Petition Date, the Prepetition First Lien Loan Parties were justly and lawfully indebted to the Prepetition First Lien Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of not less than $165 million on account of principal amounts (including capitalized interest added thereto) outstanding under the Prepetition First Lien Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition First Lien Credit Agreement) and all other amounts that may be due or owing under the Prepetition First Lien Loan Documents (collectively, the "***Prepetition First Lien Secured Obligations***", and together with the Prepetition ABL Secured Obligations, the "***Prepetition Secured Obligations***").

- *Prepetition First Lien Liens.* Pursuant to the Prepetition First Lien Loan Documents, the Prepetition First Lien Loan Parties granted to the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, properly perfected continuing liens on and security interests in (collectively, the "***Prepetition First Lien Liens***", and together with the Prepetition ABL Liens, the "***Prepetition Liens***") substantially all of the assets of the Prepetition First Lien Loan Parties, including, without limitation, all "Collateral" (as defined in the Prepetition First Lien Credit Agreement) (the "***Prepetition First Lien Collateral***", and together with the Prepetition ABL Collateral, the "***Prepetition Collateral***") and the "Term Priority Collateral" (as defined in the Prepetition Intercreditor Agreement).

Validity and Enforceability of Prepetition Secured Obligations and Prepetition Liens.

- As of the Petition Date, (i) the Prepetition Liens in the Prepetition Collateral (A) have been properly recorded and were valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral, (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, and (C) are senior with priority over any and all other liens on or security interests in the Prepetition Collateral, subject only to (1) liens and security interests that were expressly permitted to be incurred under the Prepetition Loan Documents (solely to the extent such permitted liens and security interests were (x) in existence on the Petition Date, (y) valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (z) senior in priority

| Summary of Material Terms of DIP Term Loan Facility |
|---|

to the Prepetition Liens (such liens described in this paragraph F(c)(i)(C)(1), the "**Permitted Prior Liens**")), and (2) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement; (ii) the Prepetition Secured Obligations constitute legal, valid, non-avoidable and binding obligations of each of the Prepetition Loan Parties, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (iii) no portion of the Prepetition Liens or the Prepetition Secured Obligations, and no payments made at any time to any of the Prepetition Secured Parties, is subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including, without limitation, any Avoidance Action or any claim or Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other claim or Cause of Action of any nature or description, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, in each case, that may be asserted by the Debtors, their respective estates or any other person or entity; and (iv) the Prepetition Secured Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Loan Parties and their respective estates.

Cash Collateral.  Any and all of the DIP Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located (including, without limitation, all cash, cash equivalents and other amounts on deposit or maintained by the DIP Loan Parties in any accounts with any depositary institution), whether as original Prepetition Collateral, arising from the sale or other disposition of Prepetition Collateral, or proceeds of other Prepetition Collateral, or cash, rents, income, offspring, products, proceeds or profits generated from the Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"); provided that "Cash Collateral" shall not include any cash constituting Letter of Credit Cash Collateral; provided, further, that the Borrower's reversionary interest pursuant to the terms of any cash collateral agreements with each Issuing Bank in any Letter of Credit Cash Collateral, or any proceeds therefrom, shall constitute DIP Collateral in accordance with the terms of the Interim Order.

Intercreditor Agreements.

- The Prepetition ABL Agent and the Prepetition First Lien Agent are party to that certain *Intercreditor Agreement*, dated as of April 6, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "**Prepetition Intercreditor Agreement**"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition ABL Secured Parties, on the one hand, and the Prepetition First Lien Secured Parties, on the other hand, with respect to "Shared Collateral" (as defined in the Prepetition Intercreditor Agreement).  Pursuant to the Prepetition Intercreditor Agreement, the parties thereto agreed, among other things: (a) that the Prepetition ABL Liens on the ABL Priority Collateral are senior to the Prepetition First Lien Liens on such collateral, and (b) that the Prepetition First Lien Liens on the Term Loan Priority Collateral are senior to the Prepetition ABL Liens on such collateral.

- Pursuant to section 510(a) of the Bankruptcy Code, the Prepetition Intercreditor Agreement, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents, (A) shall remain in full force and effect, (B) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (C) shall not be deemed to be amended, altered, or modified by the terms of the Interim Order except to the extent expressly set forth in the Interim Order.

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| | *See* Interim Order ¶ F. |
| | <u>No Control</u>.  None of the DIP Secured Parties control the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Interim Order, the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder. |
| | *See* Interim Order ¶ E. |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Upon the occurrence and during the continuation of a DIP Termination Event that has not been waived by ABL DIP Required Lenders and/or the Term DIP Required Lenders, as applicable, and following delivery by either or both of the DIP Agents (in each case at the direction of the ABL DIP Required Lenders and/or the Term DIP Required Lenders, as applicable) of written notice (a "***Remedies Notice***") (including by e-mail), on not less than five (5) business days' notice (such five (5) business day period, the "***Remedies Notice Period***") to (w) if either but not both of the DIP Agents should deliver the Remedies Notice, the other DIP Agent, (x) lead restructuring counsel for the Debtors, (y) counsel for any Official Committee, and (z) the U.S. Trustee, (the "***Remedies Notice Parties***"), the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the ABL DIP Agent, acting at the request of the ABL DIP Required Lenders and the DIP Term Agents, acting at the request of the Term DIP Required Lenders, subject to the Intercreditor Agreements (if applicable), to (i) deliver to the applicable Borrower a notice declaring the occurrence of a DIP Termination Event, (ii) declare the termination, reduction or restriction of the commitments under the applicable DIP Facility (to the extent any such commitment remains), (iii) declare the Term DIP Obligations or the ABL DIP Obligations, as applicable, then outstanding to be due and payable, (iv) declare the termination of the applicable DIP Facility and the applicable DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens or the DIP Obligations, (v) declare the reduction or restriction on the applicable DIP Facility or the applicable DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, and (vii) charge interest at the default rate under the DIP Facilities. As soon as reasonably practicable following receipt of a Remedies Notice, the Debtors shall file a copy of same on the docket.  Prior to the expiration of the Remedies Notice Period, the Debtors and/or any Official Committee shall be entitled to request an emergency hearing (solely to the extent such hearing is requested on an expedited basis) with the Court.  If a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto.  During the Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, and the Carve Out Reserves. |
| | *See* Interim Order ¶ 21(b). |
| **Challenge Period**<br><br>*Fed. R. Bankr. R. 4001(c)(1)(B)(iii), (viii)* | The Debtors' Stipulations contained in paragraph F of the Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of the Interim Order. The Debtors' Stipulations shall be binding upon any Official Committee, all other creditors, and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, unless (i) the Official Committee or such party-in-interest (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) obtains requisite standing pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "***Challenge Proceeding***") by no later than the Challenge |

| Summary of Material Terms of DIP Term Loan Facility |
|---|

| | |
|---|---|
| | Deadline, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, or otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations, (B) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Loan Documents, and (C) asserting or prosecuting any other claim or Cause of Action of any nature or description whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their Representatives (clauses (A)-(C), collectively, the "***Challenges***", and each, a "***Challenge***"), and (ii) there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding; <u>provided</u>, <u>however</u>, that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; <u>provided</u>, <u>further</u>, <u>however</u>, that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred. Notwithstanding anything to the contrary in the Interim Order, Challenges may be brought against the Second Out DIP Term Loans and the ABL Refinancing, and the Court may order appropriate relief in the event of any successful Challenge to the Second Out DIP Term Loans or the ABL Refinancing. <br><br> The "***Challenge Deadline***" means the date that is the earlier of (i) confirmation of any chapter 11 plan of reorganization in these bankruptcy cases, (ii) as to any Official Committee only, sixty (60) calendar days after the appointment of such Official Committee, as to all other parties in interest, seventy-five (75) calendar days after the entry of the Interim Order, (iii) as to each of the Prepetition Loan Documents, such later date as has been agreed to, in writing, by the requisite Prepetition Secured Parties, as applicable, under the applicable Prepetition Loan Documents solely respect to the Challenges pertaining to such Prepetition Loan Document, and (iv) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served within the time period set forth in clause (i) of paragraph 24(d) of the Interim Order. <br><br> *See* Interim Order ¶ 24. |
| **Milestones** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(vi);* <br><br> *Complex Case Procedures, ¶ 8(a)* | The DIP Term Credit Agreement shall contain the following milestones (as may be extended and/or waived in writing (email from counsel being sufficient) by the Required Consenting Term Lenders): <br><br> a) no later than 1 Business Day following the TSA Effective Date (as defined in the Transaction Support Agreement), and in any event prior to the Petition Date, the Debtors shall, in accordance with sections 1125 and 1126 of the Bankruptcy Code, commence solicitation of the votes necessary to approve the Plan and effectuate the Transactions (as defined in the Transaction Support Agreement), including by distributing the Plan, Disclosure Statement (as defined in the Transaction Support Agreement), and Solicitation Materials (as defined in the Transaction Support Agreement) to holders of Company Claims/Interests (as defined in the Transaction Support Agreement) (the "***Launch***"); <br><br> b) no later than 3 Business Days following the Launch, the Petition Date shall have occurred; <br><br> c) no later than 1 day following the Petition Date, the Debtors shall have filed the First Day Pleadings, the DIP/Cash Collateral Motions, the Plan, Disclosure Statement, and Disclosure Statement Motion (in each case as defined in the Transaction Support Agreement) seeking |

| Summary of Material Terms of DIP Term Loan Facility |
|---|

| | |
|---|---|
| | conditional entry of the Disclosure Statement Order (as defined in the Transaction Support Agreement); |
| | d) no later than 3 Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order; |
| | e) as soon as reasonably practicable, but in no later than 34 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; |
| | f) as soon as reasonably practicable, but in no event later than 34 days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order (as defined in the Transaction Support Agreement) (on a final basis) and the Confirmation Order (as defined in the Transaction Support Agreement) (which may be combined with the Disclosure Statement Order); and |
| | g) as soon as reasonably practicable, but in no event later than 14 days after the entry of the Confirmation Order, the Transactions (as defined in the Transaction Support Agreement) shall have been consummated and the Plan Effective Date shall have occurred. |
| | *See* Transaction Support Agreement ¶ 4. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The Debtors shall indemnify and hold harmless the "Indemnitees" (as defined in the DIP Credit Agreements) in respect of the indemnification obligations under the DIP Loan Documents.<br><br>*See* Interim Order ¶ 2(f). |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition ABL Secured Parties, respectively, upon the DIP Collateral, the Prepetition First Lien Collateral, or the Prepetition ABL Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties, the Prepetition First Lien Collateral as to the Prepetition First Lien Secured Parties or the Prepetition ABL Collateral as to the Prepetition ABL Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code, any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the Required DIP Lenders with respect to the DIP Collateral, the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents with respect to the Prepetition First Lien Collateral or the requisite Prepetition ABL Secured Parties under the Prepetition ABL Loan Documents with respect to the Prepetition ABL Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties, any of the Prepetition First Lien Secured Parties, or any of the Prepetition ABL Secured Parties; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.<br><br>*See* Interim Order ¶ 26.<br><br>In no event shall the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition ABL Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition First Lien Collateral, the Prepetition First Lien Secured Obligations, the Prepetition ABL Collateral, or the Prepetition ABL Secured Obligations (as applicable), and all proceeds of the DIP Collateral, the Prepetition First Lien Collateral, and the Prepetition ABL Collateral shall be received and applied in accordance with the Interim Order, the DIP Loan Documents, the DIP Intercreditor Agreement, the Prepetition First Lien Loan Documents, and the Prepetition ABL Loan Documents, as applicable; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief. Each of the Prepetition First Lien Secured Parties and each of the Prepetition ABL Secured Parties shall be |

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| | entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition First Lien Secured Parties or the Prepetition First Lien Collateral, the Prepetition ABL Secured Parties, or the Prepetition ABL Collateral.<br><br>*See* Interim Order ¶ 27. |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi);*<br><br>*Complex Case Procedures, ¶ 8(d)* | Subject to entry of the Final Order, the DIP Collateral includes all proceeds of and property that is recovered from or becomes unencumbered as a result of, whether by judgment, settlement or otherwise, Avoidance Actions ("***Avoidance Action Proceeds***").<br><br>*See* Interim Order ¶ 6(b). |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)* | *Put Option Premium*:  In consideration for providing the DIP Backstop, the Debtors shall pay to the Fronting Lender for the ratable account of each DIP Backstop Parties the Put Option Premium (5.00% of the aggregate amount of First Out DIP Term Loans) in accordance with the Transaction Term Sheet (as defined in the Transaction Support Agreement).<br><br>*Commitment Premium*:  In consideration for providing commitments to fund the First Out DIP Term Loans under the DIP Term Loan Facility, the Debtors shall pay to the First Out DIP Term Lenders a non-refundable payment equal to 2.00% of the aggregate principal amount of the First Out DIP Term Loans (the "***Commitment Premium***"), which shall be fully earned upon entry of the Interim Order and due and payable in kind at the initial funding of First Out DIP Term Loans in the form of additional First Out DIP Term Loans.<br><br>*Equity Premium*:  In lieu of payment in full in cash of their DIP Term Loan Claims, each DIP Term Lender, shall receive its pro rata share of 64% of the New Equity Interests, subject to dilution by the MIP.  The Equity Premium shall be earned on the entry of the Final Order and payable upon the Plan Effective Date, solely to the extent the Debtors exercise the Roll Option.<br><br>*See* DIP Credit Agreement Section 2.07. |
| **Cross-Collateralization**<br><br>*Complex Case Procedures, ¶ 8(b)* | No provision of the DIP Term Credit Agreement, the Interim Order, or the Final Order grants cross-collateralization protection. |
| **Releases of Claims**<br><br>*Complex Case Procedures, ¶ 8(f)* | Effective as of the date of entry of the Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Secured Parties and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the DIP Secured Parties and their respective Representatives for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Interim Order, in each case, arising under, in connection with or related to the Interim Order, the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any claim or Cause of Action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise ("***Avoidance Actions***"), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, |

| Summary of Material Terms of DIP Term Loan Facility |
|---|
| recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder; provided, however, that nothing contained in this subparagraph (c) shall relieve the DIP Secured Parties from fulfilling any of their commitments under, and in accordance with, the DIP Loan Documents.

*See* Interim Order ¶ E(c).

Effective as of the date of entry of the Interim Order, the Debtors, on behalf of themselves and their respective estates, to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the Prepetition First Lien Secured Parties, the Prepetition ABL Secured Parties, and each of their respective Representatives (in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the DIP Secured Parties, the Prepetition Secured Parties and their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Interim Order, in each case, arising under, in connection with or related to the Interim Order, the ABL Refinancing, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations or the Prepetition Loan Documents, the Adequate Protection Liens (as defined below), the Adequate Protection Claims (as defined below), the Adequate Protection Obligations (as defined below), the Prepetition Loan Documents, or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any Avoidance Actions, (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations or the Prepetition Loan Documents, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the ABL Refinancing, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Collateral or the Prepetition Loan Documents.

*See* Interim Order ¶ F(f). |

| **Limitations on Use of Cash Collateral or DIP Proceeds**<br><br>*Complex Case Procedures, ¶ 8(g)* | Notwithstanding anything contained in the Interim Order or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds may be used (nor shall any professional fees, costs, or expenses be paid or applied in connection therewith) by any of the Debtors, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly:<br><br>(a) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, initiate, assert, commence, support or prosecute (or finance the initiation or prosecution of) any claim, counterclaim, cross-claim, Cause of Action, suit, arbitration, proceeding, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any nature or description (whether for monetary, injunctive, affirmative relief or otherwise) against any of the DIP Secured |

| | Summary of Material Terms of DIP Term Loan Facility |
|---|---|
| | Parties or the Prepetition Secured Parties or their respective Representatives, including, without limitation, (i) any objection or challenge to the amount, validity, enforceability, extent, perfection or priority the DIP Loan Documents, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Equity Premium and the Fronting Fee), the DIP Liens, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, (ii) any Avoidance Actions, (iii) any so-called "lender liability" claims, (iv) any claim or Cause of Action seeking the invalidation, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery with respect to the DIP Liens, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Equity Premium and the Fronting Fee), the DIP Loan Documents, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Collateral, (vi) any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives; |

<div style="margin-left:2em">

(b) objecting to, appealing or otherwise challenging the Interim Order, the DIP Facility, the DIP Obligations (including, for the avoidance of doubt, the Backstop Premium, the Commitment Premium, the Equity Premium and the Fronting Fee), the DIP Liens, the DIP Loan Documents or the transactions contemplated hereunder or thereunder;

(c) objecting to or seeking to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties or the Prepetition Secured Parties under the Interim Order or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred and is continuing);

(d) objecting to or seeking to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties', Prepetition First Lien Secured Parties' or the Prepetition ABL Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral or Prepetition Collateral (as applicable) in accordance with the Interim Order, the DIP Loan Documents or the Prepetition Loan Documents (as applicable) (other than to contest whether a DIP Termination Event has occurred and is continuing);

(e) seeking or requesting authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code, or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations and Prepetition Secured Obligations contemporaneously with the closing of such financing (or as otherwise agreed in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties, as applicable);

(f) seeking or requesting authorization to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations unless all DIP Obligations and Prepetition Secured Obligations have been Paid in Full (or as

</div>

| Summary of Material Terms of DIP Term Loan Facility | |
|---|---|
| | otherwise agreed in writing by the Required DIP Lenders or the requisite Prepetition Secured Parties, as applicable); or<br><br>(g) seeking or requesting to use Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the Required DIP Lenders) other than as provided in the Interim Order and in the DIP Loan Documents;<br><br>(h) seeking to pay any amount on account of any claims arising prior to the commencement of these Chapter 11 Cases, unless such payments are agreed to in writing by the Required DIP Lenders (or are otherwise included in the Approved DIP Budget);<br><br>*provided, however,* that no more than $50,000 of the DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds may be used for allowed fees and expenses incurred by any Official Committee prior to the Challenge Deadline to investigate (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, Cause of Action or Challenge, including by way of discovery, with respect to), the validity, enforceability, extent, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations and the Prepetition Loan Documents; provided further that nothing in the Interim Order shall prohibit the Debtors' use of the DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out or any other funds to respond to investigations by the Official Committee.<br><br>*See* Interim Order ¶ 25. |
| **Non-Consensual Priming Liens**<br><br>*Complex Case Procedures, ¶ 8(h)* | None. |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>*Complex Case Procedures, ¶ 8(i)* | N/A. |

20.     Pursuant to paragraph 8 of the Complex Case Procedures, the proposed ABL DIP

Loan Facility and/or Interim Order contains the following provisions:[6]

| Summary of Material Terms of ABL DIP Loan Facility | |
|---|---|
| **Parties to the DIP Facility** | **DIP ABL Borrower**:  The Container Store, Inc. |

---

[6]     This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, will control.  Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim Order or the DIP Credit Documents.

| Summary of Material Terms of ABL DIP Loan Facility | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP ABL Guarantors**: The Container Store Group, Inc., and each of the other Debtors (other than the DIP Term Loan Borrower)<br><br>**DIP ABL Agent:** Eclipse Business Capital LLC<br><br>**ABL DIP Lender**:  Eclipse Business Capital SPV, LLC |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | See above "Purpose" in "Summary of Material Terms of DIP Term Loan Facility" |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | An aggregate principal amount of up to $140 million.<br><br>*See* Interim Order ¶ 2(b). |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | A copy of the Approved DIP Budget is attached as **Exhibit 4** to the Interim Order. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP maturity shall be the earliest of: (i) twenty (24) months from the closing date of the ABL DIP Loan Facility, (ii) the date of consummation of a sale and/or other disposition of all or substantially all of the working capital assets of the Debtors under section 363 of the Bankruptcy Code, (iii) 45 days after the Petition Date if the Final Order has not been entered, (iv) the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Loan Facility in accordance with the ABL DIP Credit Agreement or (v) the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Loan Facility in accordance with the ABL DIP Credit Agreement.<br><br>*See* ABL DIP Credit Agreement 2.07. |
| **Repayment Features / Roll-Up**<br><br>*Complex Case Procedures, ¶ 8(c)* | Upon entry of the Interim Order and the satisfaction or waiver of all other closing conditions in the ABL DIP Credit Agreement, without any further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to promptly borrow under the ABL DIP Credit Agreement the full amount necessary to fully and immediately cash collateralize all Prepetition ABL Letters of Credit and repay all other Prepetition ABL Secured Obligations in the amounts and in the manner specified in the Prepetition ABL Payoff Letter, (ii) authorized to execute and perform under the Prepetition ABL Payoff Letter, (iii) authorized to contemporaneously cash collateralize all Prepetition ABL Letters of Credit and repay all other Prepetition ABL Secured Obligations in the amounts and in the manner specified in the Prepetition ABL Payoff Letter, (iv) subject to the provisions of paragraph 2(e)(vi) of the Interim Order, upon the Prepetition ABL Agent's and its advisors' receipt of the Payoff Amount, deeming the Prepetition Intercreditor Agreement to be amended and restated into the DIP Intercreditor Agreement, and (v) subject to the provisions of paragraph 2(e)(vi) of the Interim Order, upon the Prepetition ABL Agent's and its advisors' receipt of the Payoff Amount (as defined in the Prepetition ABL Payoff Letter), deemed to have fully satisfied and repaid all Prepetition ABL Secured Obligations except to the extent set forth in the Prepetition ABL Payoff Letter (clauses (i), (ii), (iii), (iv) and (v), together, the "***ABL Refinancing***"); provided, however, for the avoidance of doubt, solely for purposes of the Intercreditor Agreements, the ABL Refinancing shall be deemed to be a refinancing and replacement of the Prepetition ABL Secured Obligations with the ABL DIP Obligations and shall not constitute a "Discharge of ABL Obligations" thereunder for the purposes of the DIP Obligations.  subject to the provisions of paragraph 2(e)(iv) and paragraph 2(e)(vi) of the Interim Order, immediately and automatically, upon the ABL Refinancing Effective Date, (1) all Prepetition ABL Secured Obligations and Adequate Protection Obligations (including, without limitation, the ABL Adequate Protection Claims) owing to the Prepetition ABL Secured Parties shall |

| Summary of Material Terms of ABL DIP Loan Facility | |
|---|---|
| | be deemed fully repaid and satisfied in full; <u>provided</u> that any Prepetition ABL Secured Obligations constituting "Other Liabilities" (as defined in the Prepetition ABL Credit Agreement) shall not be so deemed fully repaid and satisfied in full, (2) all liens and security interests in favor of the Prepetition ABL Secured Parties or in respect of the Prepetition ABL Secured Obligations (including, without limitation, the Prepetition ABL Liens and the ABL Adequate Protection Liens, but excluding liens on the Letter of Credit Cash Collateral) shall be deemed released and terminated and (3) all Prepetition ABL Loan Documents (other than the Prepetition Intercreditor Agreement, the Prepetition ABL Payoff Letter and any documents governing the Letter of Credit Cash Collateral, including, without limitation, provisions incorporated by reference therein) shall be deemed terminated.<br><br>*See* Interim Order ¶ 2(e). |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The ABL DIP Credit Agreement includes standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the ABL DIP Lender to make ABL DIP Loans under the ABL DIP Loan Facility.<br><br>*See* Interim Order ¶ 2(b). |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Complex Case Procedures, ¶ 8(e)* | See above "Events of Default" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | See above "Carve-Out" in "Summary of Material Terms of DIP Term Loan Facility" |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | See above "Priority of Claims and Liens; Collateral" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)* | See above "Adequate Protection / Identity of Each Entity with Interest in Cash Collateral" in "Summary of Material Terms of DIP Term Loan Facility |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | See above "Debtors' Stipulation" in "Summary of Material Terms of DIP Term Loan Facility" |
| **Waiver or Modification of Automatic Stay** | See above "Waiver or Modification of Automatic Stay" in "Summary of Materials Terms of DIP Term Loan Facility" |

| Summary of Material Terms of ABL DIP Loan Facility | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | |
| **Challenge Period**<br><br>*Fed. R. Bankr. R. 4001(c)(1)(B)(iii), (viii)* | N.A. |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi);*<br><br>*Complex Case Procedures, ¶ 8(a)* | None. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | See above "Indemnification" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | See above "Section 506(c) Waiver / Section 552(b) Waiver" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi);*<br><br>*Complex Case Procedures, ¶ 8(d)* | See above "Liens on Avoidance Actions" in "Summary of Material Terms of DIP Term Loan Facility" |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)* | • *Closing Fee.* A Closing Fee of $1,750,000, which shall payable at the initial funding and treated as creating original issue discount on the loans under Treasury Reg. section 1.1273-2(g)(2) for US federal income tax purposes.<br><br>• *Unused Line Fee.* 0.50% of the daily unused portion of the maximum ABL DIP Loan Facility, payable monthly in arrears.<br><br>• *Collateral Monitoring Fee.* A Collateral Monitoring Fee equal to $10,000 for each month, or part thereof during the term of the DIP ABL Loan Facility, payable monthly in advance.<br><br>• *Letter of Credit Fee.* A Letter of Credit Fee of 2.125% times the average Letter of Credit Usage during the immediately preceding calendar month (or portion there), payable monthly in arrears.<br><br>• *Termination Fee:* A Termination Fee, whereby the ABL DIP Lender shall receive a prepayment termination fee equal to 1.75% of the ABL DIP Loan Facility in the event the commitments under the ABL DIP Loan Facility are permanently reduced or terminated, however, upon emergence, such fee will be waived in the event the ABL DIP Loan Facility |

| Summary of Material Terms of ABL DIP Loan Facility | |
|---|---|
| | is rolled into an the ABL Exit Facility as contemplated under the Plan, and the ABL Exit Facility includes a closing fee of at least 0.25% of the ABL Exit Facility.<br><br>*See* ABL DIP Credit Agreement Section 2.09. |
| **Cross-Collateralization**<br><br>*Complex Case Procedures, ¶ 8(b)* | No provision of the DIP ABL Facility, the Interim Order, or the Final Order grants cross-collateralization protection. |
| **Releases of Claims**<br><br>*Complex Case Procedures, ¶ 8(f)* | See above "Release of Claims" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Limitations on Use of Cash Collateral or DIP Proceeds**<br><br>*Complex Case Procedures, ¶ 8(g)* | See above "Limitations on Use of Cash Collateral or DIP Proceeds" in "Summary of Materials Terms of DIP Term Loan Facility" |
| **Non-Consensual Priming Liens**<br><br>*Complex Case Procedures, ¶ 8(h)* | None. |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>*Complex Case Procedures, ¶ 8(i)* | N/A. |

## THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

21.     As of the Petition Date, the Debtors had approximately $243 million of funded debt (inclusive of accrued and unpaid interest), consisting of (a) an asset-based revolving lending facility and (b) a secured term loan facility.  The Debtors' prepetition funded debt obligations are summarized in the below table:

| Facility | Governing Document | Borrower | Maturity | Outstanding Principal |
|---|---|---|---|---|
| Prepetition ABL Facility | Prepetition ABL Credit Agreement | The Container Store, Inc. | November/October 2025 | $80,000,000[7] |
| Prepetition First Lien Facility | Prepetition Term Loan Credit Agreement | The Container Store, Inc. | January 2026 | $163,125,321.74[8] |
| **Total Secured Debt** | | | | **$243,125,321.74** |

### A.       The Prepetition ABL Facility.

22.      On April 6, 2012, Debtor The Container Store, Inc. ("**Debtor TCS**"), as borrower, Debtor The Container Store Group, Inc. ("**TCSG**"), Debtor TCS Gift Card Services, LLC ("**TCS Gift**"), and TCS Installation Services, LLC, in their capacities as guarantors thereunder, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "**Prepetition ABL Agent**"), and the other lenders and issuers party thereto (the "**Prepetition ABL Lenders**" and together with the Prepetition ABL Agent, the "**Prepetition ABL Secured Parties**") entered into that certain Credit Agreement (as amended by that certain Amendment No. 1 on April 8, 2013, that certain Amendment No. 2 on October 8, 2015, that certain Amendment No. 3, dated as of May 20, 2016, that certain Amendment No. 4, dated as of August 18, 2017, that certain Amendment No. 5, dated as of November 25, 2020, and that certain Amendment No. 6, dated as of May 22, 2023, the "**Prepetition ABL Credit Agreement**"), pursuant to which the Prepetition ABL Lenders provided an asset-based revolving credit facility (the "**Prepetition ABL Facility**") in a current aggregate principal amount of up to $100 million.   In addition, the Prepetition ABL Facility includes an uncommitted incremental revolving facility in the amount of $50 million, which is subject to satisfaction of specified conditions.   The Prepetition ABL Facility

---

[7]   This amount excludes letters of credit issued under the Prepetition ABL Facility.

[8]   This amount excludes accrued prepetition interest that has been accelerated and capitalized into the principal balance of the Prepetition First Lien Secured Obligations as of the Petition Date.

matures on (a) November 25, 2025 or (b) October 31, 2025 if any portion of the Prepetition Term Loan Obligations (as defined below) remains outstanding on such date and the maturity date of the Prepetition First Lien Facility is not extended.  As of the Petition Date, there was approximately $80 million in principal outstanding under the Prepetition ABL Facility (excluding letters of credit issued and outstanding thereunder).

23.     The obligations arising under the Prepetition ABL Facility (collectively, the "***Prepetition ABL Secured Obligations***") are guaranteed by TCSG, TCS Gift, Debtor C Studio Manufacturing Inc., and Debtor C Studio Manufacturing LLC and, as outlined in that certain ABL Facility Security Agreement dated as of April 6, 2012 (as amended by that certain Amendment No. 1 to Security Agreement and Pledge Agreement, dated as of October 28, 2024), are secured by security interests in, and liens upon, substantially all assets of Debtor TCS and such other guarantors, including first priority security interests in, and liens upon, the following assets of the Debtors (other than certain assets and proceeds thereof which constitute collateral of the Prepetition First Lien Lenders):  (a) all accounts; (b) all chattel paper; (c) all deposit accounts, securities accounts, and (for each, excluding accounts referenced in clause (c) of the definition of "Prepetition Term Loan Priority Collateral" found in paragraph 25 below); (d) all inventory; and (e) documents, general intangibles, instruments, and commercial tort claims, supporting obligations, letter-of-credit rights, books and records, and collateral security and guarantees evidencing, governing, or relating to any of the items referred to in the preceding clauses (a) through (d) (collectively, the "***Prepetition ABL Priority Collateral***").  Pursuant to the Prepetition Intercreditor Agreement, the Prepetition ABL Lenders hold second priority security interests in and liens upon the Prepetition Term Loan Priority Collateral (as defined herein).

B.       **The Prepetition First Lien Facility.**

24.       On April 6, 2012, Debtor TCS, as borrower, TCSG, TCS Gift, and TCS Installation Services, LLC, in their capacities as guarantor thereunder, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "***Prepetition First Lien Agent***" and together with the Prepetition ABL Agent, the "***Prepetition Agents***"), and the other lenders party thereto (the "***Prepetition First Lien Lenders***," and together with the Prepetition First Lien Agent, the "***Prepetition First Lien Secured Parties***," and together with Prepetition ABL Secured Parties, the "***Prepetition Secured Parties***") entered into that certain Credit Agreement (as amended by that certain Amendment No. 1 on April 8, 2013, that certain Amendment No. 2 on November 27, 2013, that certain Amendment No. 3 on May 20, 2016, that certain Amendment No. 4 on August 18, 2017, that certain Amendment No. 5 on September 14, 2018, that certain Amendment No. 6 on October 8, 2018, that certain Amendment No. 7 on November 25, 2020, that certain Amendment No. 8 on June 14, 2023, and that certain Amendment No. 9 on October 8, 2024, the "***Prepetition First Lien Credit Agreement***"), pursuant to which the Prepetition First Lien Lenders provided a senior secured term loan facility in an initial principal amount of $275 million (the "***Prepetition First Lien Facility***"). The Prepetition First Lien Facility matures on January 31, 2026. As of the Petition Date, there was approximately $163.1 million (plus accrued prepetition interest accelerated and paid in kind) in principal outstanding under the Prepetition First Lien Facility.

25.       The obligations arising under the Prepetition First Lien Facility (the "***Prepetition First Lien Secured Obligations***" and together with the Prepetition ABL Secured Obligations, the "***Prepetition Secured Obligations***") are secured by security interests in, and liens upon, substantially all assets of the Debtors, including first priority security interests in, and liens upon, the following assets of the Debtors: (a) all equipment, fixtures, real property, intellectual property

and investment property (other than any investment property described as Prepetition ABL Priority Collateral); (b) all instruments, documents, and general intangibles (other than any instruments, documents, and general intangibles described as Prepetition ABL Priority Collateral); (c) all "Term Loan Priority Accounts" (as defined in the Prepetition Intercreditor Agreement); (d) all other collateral other than Prepetition ABL Priority Collateral; and (e) all collateral security and guarantees with respect to the foregoing and all cash, money, insurance proceeds, instruments, securities, financial assets, and deposit accounts received as proceeds of the foregoing, other than the Prepetition ABL Priority Collateral (collectively, the "**_Prepetition Term Loan Priority Collateral_**").[9] Additionally, the Prepetition Term Loan Obligations are secured by second priority security interests in, and liens upon, the Prepetition ABL Priority Collateral.

### C.    Prepetition Intercreditor Agreement.

26.     The rights of the Prepetition ABL Lenders and the Prepetition First Lien Lenders with respect to their shared collateral are governed by that certain Intercreditor Agreement, dated as of April 6, 2012, by and between the Prepetition ABL Agent and the Prepetition First Lien Agent (as amended by that certain Amendment No. 1 on April 8, 2013, the "**_Prepetition Intercreditor Agreement_**"). The Prepetition Intercreditor Agreement governs, among other things, the division of collateral into Prepetition ABL Priority Collateral and Prepetition Term Loan Priority Collateral and the priority of claims with respect thereto, as well as the respective rights of the Prepetition ABL Lenders and the Prepetition First Lien Lenders in connection with certain bankruptcy matters, such as the provision of postpetition financing.

---

[9]     The Prepetition Term Loan Priority Collateral also includes the equity pledge of Elfa, which was increased from 65.0% to 100.0% pursuant to that certain Amendment No. 1 to Security Agreement and Pledge Agreement, dated as of October 28, 2024.

## LIQUIDITY NEEDS AND FINANCING EFFORTS

I.    THE DEBTORS HAVE AN IMMEDIATE NEED TO ACCESS THE DIP FACILITIES AND USE CASH COLLATERAL

27.    As set forth in the First Day Declaration and the Dunayer Declaration, the Debtors require immediate access to the proposed DIP Facilities to fund ongoing business operations, near-term working capital needs, and the costs of administering the Chapter 11 Cases.  The Debtors had approximately $11.8 million in funds on hand as of the Petition Date.  Without immediate access to the proceeds of the proposed DIP Facilities, the Debtors will lack sufficient liquidity to maintain their business operations during the pendency of these cases.  Indeed, the Debtors anticipate having negative cash flow during the Chapter 11 Cases, and the liquidity provided by the DIP Facilities is needed in order for the Debtors to meet their operating and non-operating needs and administer these Chapter 11 Cases.  Thus, the Debtors do not believe it would be prudent, or even possible, to administer the Chapter 11 Cases solely on a "cash collateral basis."

28.    The disbursements shown in the Approved DIP Budget include, among other critical payments, payroll and benefits, merchandise, rent, shipping/freight, customs, and payments contemplated by the Debtors' proposed "first day" orders.  The Debtors believe that these disbursements are necessary to prevent irreparable harm to the Debtors and their estates and to maximize enterprise value.  Any disruption in the Debtors' ability to pay employees and vendors will result in the loss of the Debtors' workforce and the destruction of key vendor relationships, which will put at risk important customer relationships to the detriment of all parties in interest.

29.    In addition, the Debtors, in consultation with their advisors, believe it is imperative for the Debtors to demonstrate to the market, customers, employees, and vendors that they are well-capitalized and have substantial liquidity to fund the Chapter 11 Cases, meet their financial obligations, and continue to operate in the ordinary course during the pendency of these Chapter

11 Cases.  Access to the DIP Facilities will enable the Debtors to consummate a swift and successful restructuring transaction while avoiding the negative impacts to the business, vendors and customers that would otherwise result in connection with the filing of these cases.

30.     Furthermore, the ABL DIP Loan Facility allows for the full refinancing of the Prepetition ABL Facility through consummating the ABL Refinancing upon entry of the Interim Order, which is a requirement under the ABL DIP Loan Facility.  The Debtors require access to a revolving financing facility to operate their businesses, and the ability to effectuate the ABL Refinancing with the proceeds from the ABL DIP Loan Facility is the most efficient manner under the circumstances to secure such facility both during the pendency of the Chapter 11 Cases and upon emergence from Chapter 11.

## II.     THE PROPOSED DIP FACILITIES ARE THE BEST POSTPETITION FINANCING OPTION CURRENTLY AVAILABLE

31.     As described in the Dunayer Declaration, given the Debtors' prepetition capital structure and the facts and circumstances of the Chapter 11 Cases, the DIP Facilities are the best available postpetition financing option to the Debtors.

32.     As described in the Dunayer Declaration, Houlihan Lokey, Inc. ("***Houlihan***") ran a robust process seeking to obtain third-party ABL financing.  As part of that process, Houlihan reached out to 17 parties, including the Prepetition ABL Lenders to gauge interest in providing a debtor-in-possession revolving credit facility.  Of these 17 parties, 15 executed NDAs, received access to a virtual data room, and conducted due diligence.  The Debtors received nine non-binding indications of interests and engaged in negotiations with two of those parties, as well as the Prepetition ABL Agent, on the terms of binding proposals for postpetition financing.  Each of these three parties (including the Prepetition ABL Agent) submitted proposals in the form of term sheets outlining the material terms of proposed financings.  Ultimately, the Debtors engaged in numerous

rounds of arm's-length negotiation and selected the proposed ABL DIP Loan Facility as the best available option, because, among other things, the proposed ABL DIP Loan Facility enables the Debtors to effectuate the ABL Refinancing, is expected to provide the Debtors with meaningful added borrowing capacity relative to the Prepetition ABL Facility, and locks in an exit ABL facility at the outset of the Chapter 11 Cases.

33.     With respect to the DIP Term Loan Facility, as described in the Dunayer Declaration, (a) given the current state of the debt markets, the Debtors' liquidity needs, and the Debtors' discussions with the First Lien Lenders and their advisors, the Debtors believe that the Prepetition First Lien Lenders would not agree to being primed, and (b) alternative, third-party sources of financing are not readily available to the Debtors (whether unsecured or secured) on better or comparable terms than the proposed DIP Term Loan Facility provided by the DIP Term Lenders.  In particular, with few, if any, unencumbered assets, no third party was likely to be willing to provide financing on a junior or unsecured basis or provide senior financing that would potentially require a priming fight with the Prepetition First Lien Lenders.  As detailed in the Dunayer Declaration, the Debtors understood that the Prepetition First Lien Lenders did not consent to any senior financing by any other party that would result in priming liens on the Prepetition Collateral.

34.     Accordingly, the Debtors focused on negotiating with the Ad Hoc Group, and over a period of months through September and into December 2024, the Debtors engaged with the Ad Hoc Group and its advisors on the terms of an overall consensual restructuring transaction, including the terms of Ad Hoc Group provided debtor-in-possession and exit financings.  These discussions were highly iterative, hard fought, and proceeded in good faith, with each party agreeing to certain concessions in order to facilitate a restructuring and recapitalization of the

Debtors' balance sheet that maximizes value for all stakeholders, including the preservation of jobs across the debtors' existing workforce.

35.     Based on the foregoing efforts, the Debtors, in consultation with their advisors, believe that the DIP Facilities, which provide $255 million in aggregate for the Debtors' estates, access to necessary Cash Collateral, avoid a costly priming fight, and are, on the whole, the best postpetition financing option currently available to the Debtors.  The proposed DIP Facilities will allow the Debtors to expeditiously consummate the restructuring set forth in the Transaction Support Agreement and Plan, which will pay in full, or otherwise leave unimpaired, all Allowed General Unsecured Claims.  Accordingly, the DIP Facilities are in the best interests of the Debtors' estates and should be approved.

## BASIS FOR RELIEF REQUESTED

## I.     THE DEBTORS SHOULD BE AUTHORIZED TO ACCESS THE DIP FACILITIES

36.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

37.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(A)  the [debtor] is unable to obtain credit otherwise; and

(B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

38.    For the reasons discussed herein, including the terms of the DIP Facilities, as well as the inferior alternative sources of financing, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

### A.    Entry into the DIP Loan Documents Reflects the Debtors' Reasonable Business Judgment

39.    Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

40.    Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

41.     For the reasons set forth above, entry into the DIP Facilities is a reasonable exercise of the Debtors' business judgment.   The Debtors' determination (in consultation with their advisors) was made following a careful and thorough evaluation of all restructuring and financing alternatives.   The terms and conditions of the DIP Facilities are favorable to the Debtors and in the best interests of their estates.   Specifically:

    i.    the DIP Term Loan Facility is being funded by a group of the Debtors' Prepetition First Lien Lenders who have a vested interest in the success of the Chapter 11 Cases;

    ii.    the ABL DIP Loan Facility effectuates the ABL Refinancing on terms most favorable to the Debtors;

    iii.    the DIP Term Lenders will roll the DIP Term Loans into an exit facility, which provides the Debtors with a clear path to emergence, sets the stage for a successful restructuring, minimizes costs associated with potential business disruption due to a lack of (or significant delay in obtaining) exit financing, and allows the reorganized Debtors with runway to flexibly operate post-emergence;

    iv.    the ABL Lenders will roll the ABL DIP Loans into an exit facility (the "***ABL Exit Facility***"), which will similarly provide the Debtors' with liquidity post-emergence; and

    v.    the DIP Facilities avoid additional costs that would be incurred on account of an exit financing marketing process that would otherwise be due if the Debtors separately sought exit financing at a later date.

42.     The DIP Facilities will provide the Debtors with sufficient liquidity necessary to maintain their business operations, and the terms of the DIP Facilities, which are the result of good faith, arm's length negotiations, are the best available to the Debtors.

B.     **The ABL Refinancing, Interim Second Out Roll Up, and Final Second Out Roll Up Reflect the Debtors' Reasonable Business Judgement and Are Appropriate Under the Circumstances**

43.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where doing so maximizes going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

44.     Here, the refinancing of the Prepetition ABL Facility through the ABL Refinancing with the proceeds from the ABL DIP Loan Facility upon entry of the Interim Order is also an exercise of the Debtors' reasonable business judgment due to the specific facts and circumstances of these Chapter 11 Cases.  The Debtors were unable to find postpetition financing on similar terms that did not provide for the ABL Refinancing upon entry of the Interim Order (not emergence). Further, the ABL Refinancing is a requirement of the ABL DIP Loan Facility and the Transaction Support Agreement and will allow the Debtors to avoid negotiating with the Prepetition ABL Lenders regarding further forms of adequate protection and stipulations regarding usage of the Cash Collateral.  The ABL Refinancing also locks in an ABL exit facility that will support the Debtors go-forward business operations and allow for a successful emergence from bankruptcy upon confirmation of the Plan.  Moreover, notwithstanding that it is unlikely that a committee of unsecured creditors will be appointed given that allowed general unsecured claims are being paid in full or otherwise left unimpaired, the DIP Orders contain typical challenge rights with respect to the repayment of the Prepetition ABL Secured Obligations.

45.     Further, the roll up of the Prepetition First Lien Secured Obligations is similarly an exercise of the Debtors' reasonable business judgment due to the specific facts and circumstances of these Chapter 11 Cases.  The Interim Second Out Roll Up and Final Second Out Roll Up are strict requirements of the DIP Term Lenders to provide the DIP Term Loan Facility.  Because the Chapter 11 Cases are prepackaged, unsecured creditors will not be prejudiced by the Interim Second Out Roll Up or Final Second Out Roll Up.  Moreover, investigation and challenge rights with respect to the Interim Second Out Roll Up and Final Second Out Roll Up are expressly preserved under the proposed DIP Orders, so parties in interest are not prejudiced by the proposed roll up.

46.     The ABL Refinancing, Interim Second Out Roll Up, and Final Second Out Roll Up are critical components of the DIP Facilities and the result of arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  Accordingly, the Court should authorize the ABL Refinancing, Interim Second Out Roll Up, and Final Second Out Roll Up as reasonable exercises of the Debtors' business judgment.

**C.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders**

47.      The Debtors propose to obtain financing under the DIP Facilities, in part, by granting superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including liens on previously unencumbered property and "priming" liens on other property (subject to the terms of the DIP Orders).

48.     Section 364(c) provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court:

> May authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind

46

> specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c)).

49.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may "prime" the liens of the Prepetition Secured Parties if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

50.     As set forth above and in the Dunayer Declaration, the Debtors are unable to obtain unsecured or junior secured credit. The Debtors submit that the proposed DIP Facilities are the best available financing option available under the circumstances. Additionally, the DIP Lenders were not willing to provide postpetition financing on an unsecured or junior basis, nor has any third party presented such a proposal. Following extended negotiations with the Prepetition Secured Parties, the Debtors were able to negotiate the proposed DIP Facilities and obtain concessions that materially improved the terms of the proposed financing. Thus, as a result of

these negotiations and the DIP marketing process, the Debtors determined that the DIP Facilities are the best actionable alternative available to fund these cases under the circumstances.

51.     Furthermore, the parties to the Transaction Support Agreement have consented to their prepetition liens and claims being primed on the terms set forth in the DIP Orders as part of the comprehensive restructuring.  The negotiated adequate protection package includes: (a) replacement liens on the DIP Collateral in accordance with the priorities set forth in the Interim Order, (b) allowed, superpriority administrative expense claims in accordance with the priorities set out in the Interim Order, and (c) the reasonable and documented fees and expenses of counsel and other professionals, as set forth in the Interim Order.  Additionally, the DIP Facilities are necessary for the Debtors to continue operating in the ordinary course and to administer the Chapter 11 Cases, including the comprehensive reorganization set forth in the Transaction Support Agreement.  The Debtors understand that their prepetition secured lenders are unwilling to consent to priming liens on their collateral outside of the DIP Facilities.  Absent such consent, the Debtors risk a potentially costly and difficult nonconsensual priming dispute at a time when the Debtors' liquidity is severely limited.  Any such dispute would erode the value of the Debtors' estates to the detriment of all stakeholders.

**D.      The Debtors Should Be Authorized to Pay the Fees and Payments Required by the DIP Agents and the DIP Lenders Under the DIP Loan Documents**

52.     In addition to the various Adequate Protection Payments and other reimbursement obligations, in each case, specified under the DIP Loan Documents and the DIP Orders, the Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Agents and the DIP Lenders.  In particular, under the DIP Term Loan Documents, the Debtors have agreed to pay:

> i.      an interest rate of (i) Term SOFR (subject to a 2.0% floor) + 6.50% per annum to be paid in cash for the First-Out DIP Term Loans; *provided*, that interest payable

on First-Out DIP Term Loans up to 5.50% per annum may be paid in kind, in the form of additional First-Out DIP Term Loans and (ii) Term SOFR (subject to a 2.0% floor) + 5.00% per annum, payable semi-annually in cash for the Second-Out DIP Term Loans; *provided*, that interest payable on Second-Out DIP Term Loans up to 4.00% per annum may be paid in kind, in the form of additional Second-Out DIP Term Loans;

ii.   the Put Option Premium, whereby each DIP Backstop Party shall receive its pro rata share of a put option premium comprising 5.00% of the aggregate amount of the commitments to fund the First Out DIP Term Loans under the DIP Term Loan Facility; which shall be fully earned upon entry of the Interim Order and due and payable in kind upon the initial funding of the First Out DIP Term Loans;

iii.   the Commitment Premium, whereby each First Out DIP Term Lender shall receive a commitment premium equal to 2.00% of First Out DIP Term Loans; which shall be fully earned upon entry of the Interim Order and due and payable in kind upon the initial funding of the First Out DIP Term Loans; and

iv.   the Equity Premium, whereby in connection with the Final Second Out Roll Up, each DIP Term Lender shall receive its pro rata share of 64% of the New Equity Interests, subject to dilution by the MIP. The Equity Premium shall be earned on the entry of the Final Order and due and payable upon the Plan Effective Date, solely to the extent the Debtors exercise the Roll Option and subject to the terms and conditions of the Plan (collectively, the "***DIP Term Loan Fees***").

53.   Under the ABL DIP Loan Documents, the Debtors have agreed to pay:

i.   an interest rate of Term SOFR + 4.25% per annum, payable monthly;

ii.   the Closing Fee, whereby each ABL DIP Lender shall receive a closing fee of $1,750,000, which shall be earned at the closing of the ABL DIP Loan Facility and payable upon the initial funding of the ABL DIP Loan Facility;

iii.   the Unused Line Fee, whereby the ABL DIP Lender shall receive 0.50% of the daily unused portion of the ABL DIP Loan Facility, payable monthly;

iv.   the Collateral Monitoring Fee, whereby the ABL DIP Lender shall receive a collateral monitoring fee of $10,000 for each month during the term of the ABL DIP Loan Facility, payable monthly; and

v.   the Termination Fee, whereby the ABL DIP Lender shall receive a termination fee equal to 1.75% of the ABL DIP Loan Facility in the event the commitments under the ABL DIP Loan Facility are permanently reduced or terminated, however, upon emergence, such fee will be waived in the event the ABL DIP Loan Facility is rolled into an the ABL Exit Facility as contemplated under the Plan, so long as such ABL Exit Facility includes (i) commitments of at least $140.0 million and (ii) a closing fee of at least 0.25% of the ABL Exit Facility

(collectively, the "**ABL DIP Fees**", and together with the DIP Term Loan Fees, the "**DIP Fees**").

54.     It is understood and agreed by all parties, including the Debtors, that the DIP Term Loan Fees are an integral component of the overall terms of the DIP Term Loan Facility and were required by the DIP Term Loan Agent and DIP Term Lenders as consideration for the extension of postpetition financing after arm's-length, good faith negotiations, and substantial negotiations through which the Debtors successfully obtained meaningful concessions.  Moreover, as set forth in the Dunayer Declaration, the interest rates and fees when, taken as a whole with the economics of the DIP Term Loan Facility, are reasonable, appropriate, and necessary under the circumstances.

55.     The DIP Term Loan Fees do not prejudice any stakeholder or party in interest. *First*, the DIP Term Loans were broadly offered to all members of the Ad Hoc Group and, following entry of the Interim Order, will be offered to all holders of Term Loan claims through the syndication process that are not or were not previously members of the Ad Hoc Group, who opt to participate in the DIP Term Loan Facility, thereby minimizing any prejudice.  *Second*, the DIP Term Loan Fees do not prejudice unsecured parties as the DIP Term Loan Facility will be used to pay Allowed General Unsecured Claims in full and in the ordinary course of business pursuant to the Plan.  *Third*, the fees payable in equity of the reorganized entity (if the Plan is confirmed) preserve liquidity that provides additional runway for the Debtors to consummate the Plan.

56.     Similarly, the ABL DIP Fees do not prejudice any parties in interests.  *First*, the Debtors and their advisors ran a comprehensive third-party marketing process as described above, and as described in the Dunayer Declaration, the ABL DIP Fees are reasonable, appropriate, and a critical component of the overall terms of the ABL DIP Loan Facility.  *Second*, the ABL DIP Loan Facility is being used to consummate the ABL Refinancing, which benefits the Debtors and

their estates, for among other reasons, it secures financing for the Debtors to ensure that the Debtors are able to pay creditors in full and in the ordinary course of business pursuant to the Plan and the relief sought in the Debtors' "first day" motions. The benefits to the Debtors and their estates provided by the ABL DIP Loan Facility significantly outweigh the fees incurred by the Debtors thereunder.

57.     In light of the marketing and negotiation process described herein and in the Dunayer Declaration, the proposed DIP Facilities package is the Debtors' best currently available postpetition financing option.  As a result, the Debtors determined that, in their business judgment, incurring the DIP Fees to secure the DIP Facilities, which will guarantee a smooth transition into Chapter 11 and lock-in exit financing, was in the best interests of the Debtors, their estates, and all of their stakeholders.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

## II.     APPROVAL OF USE OF CASH COLLATERAL IS APPROPRIATE

58.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

59.     In general, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case.  *See In re Timbers of Inwood Forest* Assocs., Ltd., 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696-97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection").  Adequate protection is designed to shield a secured

creditor from diminution in value of its interest in collateral during the period of a debtor's use of the collateral. *See Timbers*, 793 F.2d at 1412 (citing to Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.")).

60.     Substantially all of the Debtors' cash constitutes the Cash Collateral under section 363(a) of the Bankruptcy Code.  The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Loan Documents.  The Debtors need the Cash Collateral to fund their businesses and operations, as well as to fund the Chapter 11 Cases so they can pursue a value-maximizing restructuring under the terms of the Transaction Support Agreement and the Plan.  Indeed, absent such relief, the Debtors' businesses will likely be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

61.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Furthermore, the Prepetition First Lien Lenders have consented to the Debtors' use of the Cash Collateral, subject to the terms and conditions of the DIP Loan Documents and the DIP Orders.  The Debtors do not need the consent of the Prepetition ABL Lenders as a result of the ABL Refinancing.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Loan Documents.

## III.    THE DIP LENDERS SHOULD BE DEEMED GOOD-FAITH LENDERS

62.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

63.     As explained herein and in the Dunayer Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable business judgment that the DIP Lenders provided the best postpetition financing option available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lenders (through the Ad Hoc Group). The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.     MODIFICATION OF AUTOMATIC STAY

64.     The Interim Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to permit the DIP Agents (at the direction of the Required DIP Lenders) to exercise, upon the occurrence and during the continuation of any Event of Default under the applicable DIP Loan Documents, all rights and remedies provided in the DIP Loan Documents and the DIP Credit Documents without further order of or application to the Court. However, the DIP Agents must provide the Debtors and various other parties with five business days' notice before exercising such enforcement rights or remedies in respect of their collateral.

During such period, the Debtors and other parties in interest may seek an emergency hearing to contest whether an Event of Default has occurred and is continuing.

65.     Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Loan Documents and the DIP Orders.

## V.     APPROVAL OF INTERIM RELIEF

66.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2); (c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing." Complex Case Procedures, ¶ 5.

67.     As described above, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, customers, and other parties, to make capital expenditures, and to satisfy other working capital and operational needs and otherwise finance their operations and the Chapter 11 Cases.  Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the

Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in this Motion.

## VI.   REQUEST FOR A FINAL HEARING

68.     The terms of the DIP Facilities set forth in the Transaction Support Agreement require that a Final Order approving this Motion be entered within 34 days after the Petition Date. As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 34 days following the Petition Date, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

<p align="center"><strong><u>EMERGENCY CONSIDERATION</u></strong></p>

69.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i), the Complex Case Procedures, and Bankruptcy Rule 6003, which authorizes a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of the Chapter 11 Cases. As discussed in detail above and in the Dunayer Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Debtors believe that emergency consideration is necessary and respectfully request that this Motion be heard on an emergency basis.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

70.     Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not otherwise satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

## RESERVATION OF RIGHTS

71.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) satisfied pursuant to the Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the

Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

72.    Nothing in the Proposed Order or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

73.    Nothing in the Proposed Order or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

## NOTICE

74.    Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Term Agents; (c) counsel to the ABL DIP Agent; (d) counsel to the Ad Hoc Group and DIP Lenders; (e) counsel to the Prepetition First Lien Agent; (f) counsel to the Prepetition ABL Agent; (g) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (h)  any party known after a reasonable inquiry to have asserted a lien against the Debtors' assets; (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; and  (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

75.    A copy of the Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global, at https://www.veritaglobal.net/thecontainerstore.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed DIP Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: December 22, 2024
      Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@HuntonAK.com
      ashleyharper@HuntonAK.com
      pguffy@HuntonAK.com

- and -

**LATHAM & WATKINS LLP**
George A. Davis (NY Bar No. 2401214)
Hugh Murtagh (NY Bar No. 5002498)
Tianjiao (TJ) Li (NY Bar No. 5689567)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  george.davis@lw.com
      hugh.murtagh@lw.com
      tj.li@lw.com
      jon.weichselbaum@lw.com

Ted A. Dillman (CA Bar No. 258499)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Email:  ted.dillman@lw.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 22, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

<div align="right">

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

</div>