IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

----------------------------------------------------------- x
: 
In re: : Chapter 11
: 
THE CONTAINER STORE GROUP, INC., *et al.*, : Case No. 24-90627 (ARP)
: 
Debtors.[1] : (Joint Administration Requested)
: 
----------------------------------------------------------- x

**DECLARATION OF ADAM DUNAYER IN
SUPPORT OF THE DEBTORS' DIP MOTION**

I, Adam Dunayer, hereby declare as follows:

1. I submit this declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "**Motion**").[2]

2. I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("**Houlihan**"), an investment banking and financial advisory firm. I am based out of Houlihan's Dallas office, located at 2601 Olive Street, Suite 2500, Dallas, Texas 75201.

3. Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations and finances; (b) my review of relevant

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

documents; (c) information provided to me by employees of Houlihan working under my supervision; (d) information provided to me by, or discussions with, members of the above-captioned debtors' (collectively, the "**Debtors**") management team, other employees, or the Debtors' other advisors; (e) records kept in the ordinary course of business by the Debtors and provided by the Debtors or their representatives to Houlihan; and/or (f) my views and beliefs based upon my experience as a restructuring professional. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND & QUALIFICATIONS

4. Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,000 global employees. Houlihan is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies, both in and outside of bankruptcy. Houlihan has been, and is, involved in some of the largest restructurings in the United States, both out of court and in chapter 11 cases. Houlihan has been retained to provide investment banking and financial advisory services in, among other cases: *In re Corsicana Bedding, LLC*, No. 22-90016 (Bankr. N.D. Tex. Aug. 9, 2022); *In re GVS Texas Holdings I, LLC*, No. 21-31121 (Bankr. N.D. Tex. Oct. 31, 2021); *In re Utex Indus., Inc.*, No. 20-34932 (Bankr. S.D. Tex. Dec. 3, 2020); *In re PHI, Inc.*, No. 19-30923 (Bankr. N.D. Tex. May 13, 2019); *In re Walter Inv. Mgmt. Corp.*, No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Ltd.*, No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017).

5. I am a member of Houlihan's Financial Restructuring Group. I have over 30 years of experience consummating transactions and providing strategic advice to companies and

creditors in connection with in- and out-of-court special situations, mergers, acquisitions, and dispositions. I also have extensive experience raising debt and equity capital in public and private markets. My experience spans industries, including energy and oilfield services, consumer products, food, healthcare, building products, general industrial, telecom, and technology.

6. Before joining Houlihan in 2002, I was a Managing Director with Bear, Stearns & Co. In addition, I was an Executive Vice President and Chief Financial Officer with Miller Industries, where I also served as President of the company's largest subsidiary.

## **HOULIHAN RETENTION**

7. Houlihan was retained on September 4, 2024 to provide financial advisory and investment banking services to the Debtors. Since being retained, Houlihan has advised the Debtors in connection with strategic alternatives to manage liquidity, raise additional capital, and de-lever the Debtors' balance sheet.

8. Through its prepetition services to the Debtors, Houlihan has developed institutional knowledge regarding, among other things, the Debtors' operations and capital structure. Houlihan professionals have worked closely with the Debtors' management and other professionals and have become well-acquainted with the Debtors' businesses and operations, debt structure, creditors and related matters, including by (1) working cooperatively with the Debtors' other professionals to explore various strategic alternatives to address the Debtors' liquidity needs; (2) reviewing the Debtors' business plan and operating assumptions; (3) reviewing the Debtors' debt and capital structure; (4) evaluating financing options; and (5) preparing for the commencement of the Chapter 11 Cases.

9. Accordingly, Houlihan has developed significant relevant experience and expertise regarding the Debtors' businesses that will assist Houlihan in providing effective and efficient services in connection with the Chapter 11 Cases.

3

## THE DEBTORS' NEED FOR DIP
## FINANCING AND ACCESS TO CASH COLLATERAL

10. After exploring a substantial number of strategic alternatives (as discussed further below), and engaging in extensive arm's-length, good faith negotiations, the Debtors and their key stakeholders have agreed to the terms of a comprehensive restructuring that: (i) includes up to $115 million of postpetition DIP financing, consisting of (a) $40 million in "new money" DIP Term Loans and (b) up to $75 million in "rolled up" Prepetition First Lien Secured Obligations, which in each case, will convert to committed exit financing upon emergence, (ii) provides for the use of the Prepetition First Lien Lenders' cash collateral on a consensual basis, and (iii) includes a replacement ABL facility in the form of debtor-in-possession ABL financing that will roll into an exit ABL facility at the conclusion of these Chapter 11 Cases. Under the DIP ABL Loan Facility, upon entry of the Interim Order, the Debtors will payoff the outstanding Prepetition ABL Secured Obligations, and the Prepetition ABL Credit Agreement will be terminated. The ABL DIP Lender is agreeing to provide a $140 million revolving credit facility that the Debtors will be able to access during the cases and upon emergence.

11. I believe that access to the DIP Facilities and Cash Collateral will avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest and will enable the Debtors to administer and preserve the value of their estates. Based on my discussions with management and the Debtors' other advisors, my experience in restructuring matters, and my familiarity with the Debtors, I believe the Debtors require immediate access to the proceeds from the DIP Facilities and the ability to use Cash Collateral on an interim basis to continue operations for the benefits of their estates and their creditors, including to honor their financial obligations to employees, customers, and vendors.

12. Based on my knowledge of the Debtors and discussions with the Debtors' management, I understand that the Debtors' ability to maintain business relationships with their vendors, pay their employees, and otherwise finance their operations during the Chapter 11 Cases is dependent on the availability of the proceeds from the DIP Facilities and the use of Cash Collateral. Without access to the proceeds from the DIP Facilities and the ability to use Cash Collateral, the Debtors' going concern value will be jeopardized, to the material detriment of their creditors and all parties-in-interest, putting at risk the value-maximizing restructuring contemplated by the Plan.

13. In addition, it is imperative that the Debtors have sufficient postpetition DIP and exit financing (which the Debtors would receive under the DIP Facilities and the Exit Facilities) in order to send a strong message to the market that the Chapter 11 Cases are well-funded and the Debtors will be well-positioned for long-term growth and success upon emergence. Securing the proposed DIP and, ultimately, exit financing will help ensure the Debtors have the ability to continue operations uninterrupted, which is critical to preserve market share, reputation, and the loyalty and goodwill of their customers, suppliers, and employees. Indeed, it is vital to ongoing operations that the Debtors are able to demonstrate to all parties in interest that they have the means available to operate in the ordinary course.

14. For the reasons described herein, I believe that the Debtors' continued viability and ability to successfully reorganize as a going concern depend heavily on the timely approval of the Motion. Without immediate access to the DIP Facilities, the Debtors simply do not have sufficient funding to support their businesses.

## THE DEBTORS' EFFORTS TO NEGOTIATE A
## RESTRUCTURING AND SECURE POSTPETITION FINANCING

15. Houlihan has been working with the Debtors since September 2024 to assess potential alternatives to generate additional liquidity given macroeconomic uncertainties, overall headwinds in the retail industry, and the Debtors' general liquidity position.

16. Upon being retained, Houlihan initiated a robust outreach process to explore the possibility of new money financing through a "first-in, last-out" loan, asset-based revolving credit facility, or some combination thereof. As part of that process, Houlihan engaged with 17 potentially interested parties, in addition to the Prepetition ABL Lenders. Of these 17 parties, 15 executed nondisclosure agreements, received access to a virtual data room, and conducted due diligence. The Debtors received nine non-binding indications of interests and engaged in negotiations with two of those parties, as well as the Prepetition ABL Agent, on the terms of binding proposals for postpetition financing. Each of these three parties (including the Prepetition ABL Agent) submitted term sheets outlining the material terms of their proposed financings. Ultimately, the Debtors and their advisors engaged in numerous rounds of arm's length negotiation and selected the proposed ABL DIP Loan Facility as the best available option, because, among other things, the proposed ABL DIP Loan Facility enables the Debtors to effectuate the ABL Refinancing, is expected to provide the Debtors with meaningful added borrowing capacity relative to the Prepetition ABL Facility, and locks in an exit ABL facility at the outset of the Chapter 11 Cases.

17. With respect to the DIP Term Loan Facility, based on my experience, I believe that (a) given the current state of the debt markets, the Debtors' liquidity needs, and my discussions with the First Lien Lenders and their advisors, I believe that the Prepetition First Lien Lenders would not agree to being primed, and (b) alternative, third-party sources of financing are not

readily available to the Debtors (whether unsecured or secured) on better or comparable terms than the proposed DIP Term Loan Facility provided by the DIP Term Lenders. In particular, with few, if any, unencumbered assets, no third party is likely to be willing to provide financing on a junior or unsecured basis.

18. Accordingly, the Debtors and their advisors focused on negotiating with the Ad Hoc Group, and between September and December 2024, the Debtors engaged with the Ad Hoc Group on the terms of an overall consensual restructuring transaction, including the terms of DIP and exit financing. These discussions were highly iterative, extensively negotiated, and proceeded in good faith, with each party agreeing to certain concessions, as discussed further below, in order to facilitate a resolution and provide for a value-maximizing and job-saving restructuring of the Debtors.

19. I believe that the DIP Facilities, which ensure access to necessary Cash Collateral and provide $40 million in new money term loans and access to up to $140 million in access to incremental asset-based revolving loans for the Debtors' estates, represent, on the whole, the best postpetition financing option currently available to the Debtors. It is my belief that the proposed DIP Facilities will allow the Debtors to expeditiously consummate the restructuring set forth in the Transaction Support Agreement and Plan, which will pay in full, or otherwise leave unimpaired, all Allowed General Unsecured Claims.

## FEES UNDER THE DIP FACILITIES

### 1. Fees Under the DIP Term Loan Facility

20. In connection with the DIP Term Loan Facility, as described in the Motion and set forth in the DIP Term Loan Documents, the Debtors have agreed, subject to Court approval, to pay interest and certain fees. Specifically, the Debtors have agreed to pay an interest rate equal to (i) SOFR (subject to a 2.0% floor) plus 6.50% per annum, to be paid monthly in cash on account

of the First Out DIP Term Loans, provided that up to 5.50% per annum of such interest may be payable in kind, unless the DIP Term Loan Borrower elects to pay all or any portion thereof in cash, and (ii) SOFR plus 5.00% per annum to be paid semi-annually in cash for the Second-Out DIP Term Loans; *provided*, that interest payable on Second-Out DIP Term Loans up to 4.00% per annum may be paid in kind, in the form of additional Second-Out DIP Term Loans.

21. The Debtors have also agreed to pay a fee of 5.00% of the aggregate amount of First Out DIP Term Loans (the "**Put Option Premium**") to the DIP Backstop Parties in exchange for their agreement to backstop the entire amount of the First Out DIP Term Loans. The Put Option Premium shall be fully earned upon entry of the Interim Order and due and payable in kind upon the initial funding of the First Out DIP Term Loans.

22. The Debtors have also agreed to pay each applicable First Out DIP Term Lender a Commitment Premium equal to 2.00% of First Out DIP Term Loans (the "**Commitment Premium**"). Any interest on additional DIP Term Loans payable as part of the Commitment Premium shall be payable in kind. The Commitment Premium will be fully earned upon entry of the Interim Order and due and payable in kind upon the initial funding of the First Out DIP Term Loans.

23. Finally, the Debtors have also agreed to pay an Equity Premium to the DIP Term Lenders equal to 64% of the equity in the Reorganized Debtors, subject to dilution on account of a management incentive plan. The Equity Premium will be earned upon entry of the Final Order and due and payable upon the Plan Effective Date, solely to the extent the Debtors exercise the Roll Option to convert the DIP Term Loan Facility into the Exit Term Loan Facility provided by the DIP Term Lenders.

24. In addition, the DIP Term Loan Facility includes customary agent, loan fronting, and similar fees.

25. I believe that under the circumstances, the fees payable under the DIP Term Loan Facility are reasonable and necessary in order to induce the DIP Term Lenders to provide the DIP Term Loan Facility, particularly in light of the DIP Term Lenders' commitment to provide the Exit Term Loan Facility.

26. In addition, the DIP Term Loan Facility (a) will be broadly offered to all members of the Ad Hoc Group Prepetition Term Loan Lenders who were not previously members of the Ad Hoc Group and offered the opportunity to participate in the DIP Term Loan Facility, (b) is sized to meet the significant liquidity needs of the Debtors in the Chapter 11 Cases and beyond, (c) will provide the Debtors with adequate time to implement a value-maximizing restructuring as contemplated under the Transaction Support Agreement, and (d) subject to confirmation of the Plan, allows the Debtors to convert the DIP Term Loan Facility into committed exit financing, which ensures the Debtors will not have to obtain alternative financing in order to emerge from the Chapter 11 Cases.

27. Further, despite the fact that the transaction significantly impairs the Prepetition Term Loan Lenders' prepetition secured claims that are otherwise senior in priority to general unsecured creditors ("**GUCs**"), the DIP Backstop Parties and the DIP Term Lenders have agreed to allow the funds they are advancing through the DIP Term Loan Facility to be used to pay or otherwise satisfy claims held by GUCs in full and in the ordinary course of business pursuant to the Transaction Support Agreement and the Plan. Based on my experience as a restructuring professional and my knowledge of the market for DIP and exit financing facilities, and given the cash position of the Debtors, the timing and cost of administering the Chapter 11 Cases, the

challenge in filling the commitments under the DIP Term Loan Facility, and the lack of viable alternatives, taken as a whole, the fees and interest contemplated by the DIP Term Loan Facility represent the best financing option available to the Debtors.

### 2. Fees Under the ABL DIP Loan Facility

28. In connection with the ABL DIP Loan Facility, as described in the Motion and set forth in the ABL DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay interest and certain fees. Specifically, the Debtors have agreed to pay an interest rate equal to Term SOFR plus 4.25% per annum, to be paid monthly in cash.

29. The Debtors have also agreed to pay a fee of $1,750,000 as a closing fee, which fee shall be earned at the closing of the ABL DIP Loan Facility and payable at the initial funding of the ABL DIP Loan Facility. In addition, the Debtors have agreed to a 0.50% per annum fee on the daily unused portion of the commitments under the ABL DIP Loan Facility, to be paid monthly. The Debtors have agreed to pay the ABL DIP Agent a collateral monitoring fee of $10,000 for each month during the term of the ABL DIP Loan Facility, to be paid monthly. Finally, the Debtors have also agreed to certain other fees, including a termination fee equal to 1.75% of the ABL DIP Loan Facility in the event the commitments under the ABL DIP Loan Facility are permanently reduced or terminated; however, upon emergence, such fees are waived in the event the ABL DIP Loan Facility is rolled into an exit ABL facility with the ABL DIP Lenders, as contemplated under the Plan, and such exit ABL facility includes a closing fee of at least 0.25% of such exit ABL facility.

30. With respect to the ABL DIP Loan Facility, Houlihan and the Debtors ran a comprehensive third-party marketing process as described above and could not secure the necessary funding on better terms than the proposed ABL DIP Loan Facility. The Debtors were able to secure a replacement ABL facility to consummate the ABL Refinancing and lock in an exit

ABL facility, which is necessary for the Debtors' go forward operations and payment of creditors in full. The proposed DIP Facilities, including the payment of fees and expenses thereunder, are the result of an extensive, good faith, and highly iterative negotiation process that is described more fully below. Such process involved each of the Debtors and their key stakeholders agreeing to certain concessions in order to facilitate a resolution and pave the way to a value-maximizing and job-saving restructuring.

31. In my opinion, the DIP Fees are critical pieces of the overall comprehensive restructuring transaction reflected in the Transaction Support Agreement and, based on highly iterative negotiations with the Ad Hoc Group and the ABL DIP Lenders, each component serves as an important part of the package of incentives needed for the DIP Lenders to provide the Debtors with sufficient liquidity to successfully navigate and emerge from chapter 11. The DIP Fees to be paid under the proposed DIP Facilities (a) were the subject of arm's-length and good faith negotiations between the Debtors, the applicable DIP Lenders, and their respective advisors, (b) are an integral component of the overall terms of the proposed DIP Facilities, and (c) were critical to induce the applicable DIP Lenders to provide financing of this magnitude, including the incremental liquidity necessary to finalize the DIP Facilities, under the expedited timeline necessitated by the challenges facing the Debtors' businesses. In my view, based on my role in the marketing process and negotiations with potential interested parties, the proposed DIP Facilities, including the payment of the DIP Fees, represent the best currently available postpetition financing option for the Debtors.

## THE TERMS OF THE DIP FACILITIES ARE NECESSARY UNDER THE CIRCUMSTANCES

32. The Ad Hoc Group expressly conditioned their DIP proposal, on, among other things, customary forms of adequate protection and standard stipulations regarding their liens and

claims (which will be subject to a challenge period as set forth in the Interim Order). The Ad Hoc Group (on behalf of the DIP Term Lenders) also insisted on postpetition priming liens (priming the Prepetition First Lien Lenders' prepetition liens) on the Prepetition Collateral as part of the collateral package securing the DIP Term Loan Facility (subject to Prepetition Permitted Liens and as further outlined in the Interim Order).

33. Notably, the ABL DIP Loan Facility allows the Debtors to avoid any fight with the Prepetition ABL Lenders because the proceeds of the ABL DIP Loan Facility will be used to pay off such facility. The ABL Refinancing upon entry of the Interim Order is a requirement of the ABL DIP Loan Facility and I believe is the most efficient means of addressing the Prepetition ABL Facility and will allow the Debtors to avoid negotiating with the Prepetition ABL Lenders regarding further forms of adequate protection and stipulations regarding usage of the Cash Collateral.

34. Further, I do not believe that any parties in interest are prejudiced by the ABL Refinancing, Interim Second Out Roll Up, or Final Second Out Roll Up because of the prepackaged nature of the Chapter 11 Cases and the fact that allowed general unsecured claims are being paid in full or otherwise left unimpaired. Even so, I understand that the DIP Orders preserve investigation and challenge rights with respect to the ABL Refinancing, as well as the Interim Second Out Roll Up and Final Second Out Roll Up.

35. In summary, the DIP Facilities were the product of good faith, arm's-length negotiations, and will help maximize the value of the Debtors and save over 3,800 jobs. For all of the reasons set forth in this Declaration and based on my experience, I believe that the Debtors' agreement to the terms of the DIP Facilities is necessary under the unique facts and circumstances

of the contemplated restructuring and the Chapter 11 Cases and represents a reasonable exercise of the Debtors' business judgment.

## INTERIM RELIEF IS WARRANTED

36. I believe that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the estates. Specifically, I believe that, absent the interim relief requested by the Motion, the Debtors will suffer significant, and potentially irreparable and permanent, impairment to their business operations, including insufficient liquidity to meet payroll and other operational obligations and to fund the administrative expenses associated with the Chapter 11 Cases, to the material detriment of their stakeholders. It is my view that access to the Cash Collateral is insufficient for the Debtors to maintain their near-term business operations, and interim access to $20 million under the DIP Term Loan Facility and availability under the ABL DIP Loan Facility is necessary. Conversely, approval of the relief requested in the Motion on an interim basis will facilitate the uninterrupted operation of the Debtors' business, the maintenance of ordinary course relationships with essential vendors and customers, and the Debtors' ability to meet their working capital needs in the ordinary course.

## CONCLUSION

37. Based on the circumstances and facts presented here, I believe that (a) the DIP Facilities should address the Debtors' liquidity needs, (b) the process to obtain debtor-in-possession financing produced the best financing option available to the Debtors at this time, (c) the terms of the DIP Facilities, taken as a whole, are necessary under the unique circumstances of this restructuring, and (d) the relief requested in the Motion is in the best interests of the Debtors and their estates and represents a reasonable exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 22, 2024

/s/ *Adam Dunayer*
Adam Dunayer
Managing Director
Houlihan Lokey Capital, Inc.