**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x

In re:                  :    Chapter 11

THE CONTAINER STORE GROUP, INC., *et al.*, :    Case No. 24-90627 (ARP)

Debtors. [1]          :    (Joint Administration Requested)

---------------------------------------------------------- x

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) CONTINUE TO OPERATE THEIR EXISTING CASH MANAGEMENT SYSTEM,
INCLUDING MAINTENANCE OF EXISTING BANK ACCOUNTS, CHECKS,
AND BUSINESS FORMS, (B) MAINTAIN EXISTING DEPOSIT PRACTICES,
AND (C) PERFORM INTERCOMPANY TRANSACTIONS; (II) WAIVING
CERTAIN U.S. TRUSTEE GUIDELINES; AND (III) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on December 23, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 23, 2024 at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on**

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

> **Judge Perez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.     By this Motion, the Debtors seek entry of an interim (the "***Proposed Interim Order***") and thereafter a final order (the "***Proposed Final Order***," and together with the Proposed Interim Order, the "***Proposed Orders***"), substantially in the forms attached hereto: (i) authorizing, but not directing, the Debtors to (a) continue to maintain and use their existing Cash Management System (as defined below), including maintenance of the Debtors' existing bank accounts, checks, and business forms, (b) continue their existing deposit practices, and (c) continue to perform certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims consistent with historical practice; (ii) granting the Debtors a waiver, on a 45-day conditional basis, of certain bank account requirements set forth in the Bankruptcy Code (as defined below) and certain guidelines of the Office of the United States Trustee (the "***U.S. Trustee***," and such guidelines, the "***U.S. Trustee Guidelines***"), in each case to the extent inconsistent with the Debtors' practices under their existing Cash Management System or other actions described herein; and (iii) granting related relief.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.

3.      Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 345, 363, 503, and 1107 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rule 9013–1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").

## BACKGROUND

5.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in the Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

6.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Chad E. Coben, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith (the "***First Day Declaration***"), which is fully incorporated herein by reference.[2]

7.      Contemporaneously with the filing of the Motion, the Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015(b) requesting joint administration of the Chapter 11 Cases for procedural purposes only.

---

[2]      Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

8.     The Chapter 11 Cases are "prepackaged" cases commenced for the purpose of implementing agreed restructuring and recapitalization transactions among the Debtors and their key stakeholders.  Prior to the Petition Date, the Debtors entered into that certain Transaction Support Agreement, dated as of December 21, 2024 (as may be amended, modified or supplemented, the "***Transaction Support Agreement***") with lenders that collectively hold over 90% of the outstanding principal amount of term loans under the Debtors' Prepetition Term Loan Facility (the "***Consenting Term Lenders***"), including those certain members of an ad hoc term lender group represented by Paul Hastings LLP (the "***Ad Hoc Group***").  The holders of the outstanding principal amount of asset-backed loans under the Debtors' Prepetition ABL Facility (the "***Prepetition ABL Lenders***") are not parties to the Transaction Support Agreement.

9.     Contemporaneously herewith, the Debtors will file a prepackaged chapter 11 plan of reorganization reflecting the terms of the Transaction Support Agreement (as may be amended, modified or supplemented, the "***Plan***"), along with (a) a corresponding disclosure statement (as may be amended, modified or supplemented, the "***Disclosure Statement***") and (b) a motion seeking, among other things, (i) conditional approval of the Disclosure Statement, (ii) approval of the solicitation and notice procedures, and (iii) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan.

10.     The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired and "ride through" the Chapter 11 Cases, and brings in at least approximately $60 million of new liquidity for the Debtors to fund go forward operations.  The Debtors are seeking confirmation of the Plan as quickly as the Court's schedule and requisite notice periods will permit to implement the proposed restructuring and recapitalization transactions under the Transaction Support Agreement and Plan.

## THE DEBTORS' BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

### I.     OVERVIEW OF THE CASH MANAGEMENT SYSTEM

11.     The Debtors maintain a complex cash management system (the "***Cash Management System***") that includes, among others, store/depository collection accounts, concentration accounts, various disbursement accounts, and payroll and benefits accounts. The Cash Management System is integral to the operation and administration of the Debtors' highly interrelated businesses that include, *inter alia*, over 100 stores nation-wide, an extensive e-commerce platform, 3,850 employees, as well as two (2) distribution centers. Specifically, the Cash Management System allows the Debtors to (a) monitor and control all of their cash receipts and disbursements, (b) identify their cash requirements, and (c) transfer cash as needed in light of those cash requirements. The Debtors believe that the Cash Management System is similar to those used by other companies of similar size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

12.     The Cash Management System is managed by finance personnel located at the Debtors' executive offices in Coppell, Texas, who oversee the administration of the various bank accounts, including the collection, disbursement, and transfer of cash within the United States and abroad, as well as among and between the Debtors and their non-Debtor affiliates. The Debtors' supervision of the Cash Management System enables the Debtors to, among other things, (a) accurately forecast and report their cash flow requirements and (b) monitor the collection and disbursement of funds to and from the Bank Accounts (as defined below).

13.     The Cash Management System is tailored specifically to meet the Debtors' operating needs—enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of

accurate account balances.  Because of the nature of the Debtors' business, any disruption of the
Cash Management System would be materially detrimental to the Debtors' operations, as their
businesses require prompt access to cash and accurate cash tracking.

## II.    THE BANK ACCOUNTS AND FLOW OF FUNDS

14.    As of the Petition Date, the Debtors maintain 73 accounts (the "***Bank Accounts***"),
a complete listing of which is attached hereto as **Exhibit A**.  A diagram depicting the general flow
of funds through the Bank Accounts is attached hereto as **Exhibit B**.

15.    The Debtors hold all of their cash in the Bank Accounts and maintain no other
accounts holding cash.  As reflected in **Exhibit A**, the vast majority of the Bank Accounts are held
in the name of Debtor The Container Store, Inc. ("***TCS***"),  with the exception of certain accounts
held in the name of Debtor C Studio Manufacturing LLC ("***C Studio***") and Debtor TCS Gift Card
Services, LLC ("***TCS GiftCo***").  As also reflected in **Exhibit A**, the vast majority (i.e., 69) of the
Bank Accounts are held at either JPMorgan Chase Bank, N.A. ("***JPMorgan Chase***") or Wells
Fargo Bank, N.A. ("***Wells Fargo***"), although one (1) Bank Account is maintained at Cornerstone
National Bank & Trust Company ("***Cornerstone***"), one (1) Bank Account is maintained at
Citibank, N.A. ("***Citibank***"), and two (2) Bank Accounts are maintained at Bank of America, N.A.
("***Bank of America***" and  collectively with Citibank, JPMorgan Chase, Wells Fargo and
Cornerstone, the "***Banks***") by Kurtzman Carson Consultants, LLC d/b/a Verita Global for the
benefit of TCS.[3]  All of the Banks are financially stable institutions that are insured by the Federal
Deposit Insurance Corporation ("***FDIC***") (up to an applicable limit per Debtor per institution) and
therefore comply with section 345 of the Bankruptcy Code.  Further, with the exceptions of

---

[3]    References to each of the Banks also includes reference to such Bank's branches, affiliates, and subsidiaries in
each of the jurisdictions where a Bank Account exists, if applicable.

Cornerstone and Citibank, the Banks are party to Uniform Depository Agreements with the U.S. Trustee and are designated as authorized depositories ("**Authorized Depositories**") by the U.S. Trustee pursuant to the U.S. Trustee Guidelines.

16.     The Bank Accounts consist of:

(a)     forty-five (45) depository accounts maintained at Wells Fargo to collect cash receipts for individual Debtor stores (the "**Store Depository Accounts**") and are held in the name of Debtor TCS;

(b)     five (5) regional depository accounts maintained at JPMorgan Chase and held in the name of Debtor TCS which are used to collect the cash receipts from those of the Debtors' stores that do not have their own Store Depository Account  (the "**Regional Depository Accounts**" and together with the Store Depository Accounts, the "**Depository Accounts**");

(c)     two (2) Master Depository Accounts (as defined below) maintained at JPMorgan Chase and Wells Fargo, respectively, into which funds from the Depository Accounts are swept;

(d)     six (6) separate accounts that are maintained at JPMorgan Chase and are used to collect amounts charged by the Debtors' customers on different credit cards and through other payment processors (collectively, the "**Payment Processor Depository Accounts**");[4]

(e)     a main operating account maintained at JPMorgan Chase and held in the name of Debtor TCS (the "**TCS Operating Account**") which is used as a concentration account to collect funds from the Master Depository Accounts, the Payment Processor Depository Accounts, and various other accounts;

(f)     six (6) assorted disbursement accounts maintained at JPMorgan Chase and are used to disburse funds for varying purposes described in greater detail below (the "**Disbursement Accounts**");

(g)     two (2) Gift Card Accounts (as defined below) that are maintained at JPMorgan Chase and are used to process gift card funds;

(h)     an account maintained at JPMorgan Chase that will receive proceeds from the proposed DIP Facility (as further described in the DIP Motion[5]) (the "**DIP Proceeds Account**");

---

[4]     The Debtors' payment processors include AfterPay, American Express, Mastercard, Mobius, PayPal, Synchrony, Paymentech, LLC and Visa (the "**Payment Processing Companies**").

[5]     The "**DIP Motion**" is the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II)*

(i)     a segregated, interest-bearing account maintained at Bank of America intended to hold adequate assurance deposits for the Debtors' utility service providers (as further described in the Utilities Motion[6]) (the "***Utilities Deposit Account***");

(j)     a segregated, interest-bearing account maintained at Bank of America intended to hold the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Retained Professionals have incurred or shall incur in rendering services in connection with the Chapter 11 Cases (as further described in the Plan) (the "***Professional Fee Escrow Account***");

(k)     a preferred custody account maintained at Citibank used for disbursing escrow funds in connection with the Debtors' 2022 acquisition of Closet Works, LLC (the "***Escrow Account***");

(l)     a Bank Account maintained at Cornerstone by Debtor C Studio that serves as an operating and checking account for Debtor C Studio (the "***C Studio Account***"); and

(m)     a depository account that is currently unused, held in the name of Debtor TCS at JPMorgan Chase, (the "***SEK Demand Deposit Account***").

17.     Certain of the Bank Accounts are subject to deposit account control agreements (each, a "***DACA***") between the applicable Debtor named on the account and JPMorgan Chase, in its capacity as Prepetition ABL Agent under the Debtors' ABL Facility and in its capacity as Prepetition Term Loan Agent under the Debtors' Term Loan Facility.  The ABL Facility provides for cash dominion upon the occurrence and continuance of certain specified events of default.

18.     A chart summarizing the purpose of the different Bank Accounts is attached as **Exhibit C**, and what follows is intended to provide a more fulsome overview of the Debtors' different accounts.

---

*Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief.  The DIP Motion is filed contemporaneously herewith.*

[6]     The "***Utilities Motion***" is the *Emergency Motion of Debtors for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance, and (IV) Granting Related Relief.  The Utilities Motion is filed contemporaneously herewith.*

### A.       The Depository Accounts

19.      As part of their daily operations, the Debtors collect funds in connection with the Debtors' retail and online transactions (a) directly from customers, (b) from several credit card companies and other payment processors, and (c) from certain third parties (such as gift card vendors).  These funds are deposited into different Bank Accounts as described below.

20.      *Store Depository Accounts and Regional Depository Accounts*.  As noted above, Debtor TCS maintains forty-five (45) Store Depository Accounts at Wells Fargo, each of which is used to collect proceeds of cash sales generated by a specific store.  Certain of the Debtors' stores, however, do not have their own Bank Account and instead deposit proceeds generated by their cash sales into one of five Regional Depository Accounts maintained at JPMorgan Chase that service a particular region (including the regions of Texas, Illinois, Colorado, New York and Ohio).[7]  The Store Depository Accounts are swept on a daily basis into a Master Depository Account maintained in the name of Debtor TCS at Wells Fargo (the "***Wells Fargo Master Depository Account***") and the Regional Deposit Accounts are swept on a daily basis into a Master Depository Account maintained in the name of Debtor TCS at JPMorgan Chase (the "***JPMorgan Master Depository Account***"[8] and together with the Wells Fargo Master Depository Account, the "***Master Depository Accounts***").  The JPMorgan Master Depository Account is swept into the TCS Operating Account on a daily basis and the Wells Fargo Master Depository Account is swept into the TCS Operating Account on a weekly basis.

---

[7]    All new stores opened after 2021 deposit proceeds generated by their cash sales into one of the Regional Depository Accounts regardless of geography.

[8]    The JPM Master Depository Account also directly receives ACH deposits to be used in connection the Debtors' business-to-business retail transactions.

21.    *Payment Processor Depository Accounts*.   There are six (6) Payment Processor Depository Accounts each of which are maintained in the name of TCS at JPMorgan Chase.  The Payment Processor Depository Accounts receive funds collected by several credit card companies (such as American Express and Visa/Mastercard) and other payment processors (like PayPal and Square) that collectively process sales transactions on the Debtors' behalf.[9]   The Payment Processor Depository Accounts, in turn, are swept into the TCS Operating Account on a daily basis.

22.    *Gift Card Accounts*.   TCS GiftCo maintains a zero balance account at JPMorgan Chase (the "**Gift Card Services Depository Account**"), which receives, on a daily basis, deposits for issuances of TCS gift cards.  Such deposits are then transferred from the Gift Card Services Depository Account to a separate operating account maintained by TCS GiftCo at JPMorgan Chase (the "**Gift Card Services Operating Account**" and together with the Gift Card Services Depository Account, the "**Gift Card Accounts**")[10] on a daily basis.  Transfers from the Gift Card Services Operating Account, in turn, are initiated to the TCS Operating Account approximately three (3) times annually.

23.    *SEK Demand Deposit Account.*   Debtor TCS has historically maintained a demand deposit account, which is primarily used to settle foreign currency forward contracts ("**Forward Contracts**") denominated in Swedish Krona ("**SEK**").[11]   The SEK funds are deposited into the

---

[9]    To process these credit card payments, the Debtors are party to certain agreements (the "**Payment Processing Agreements**") with the Payment Processing Companies.  The Debtors' continued acceptance of credit card payments is essential to the administration of the Debtors' estates because the majority of the Debtors' sales are made using credit card payments.  To avoid disrupting these vital payment processing services, the Debtors seek authority to continue honoring the Payment Processing Agreements in the ordinary course.

[10]    One third-party gift card seller also deposits cash proceeds from the sale of gift cards to the Gift Card Services Operating Account.  TCS also has the ability to disburse funds from the TCS Operating Account to the Gift Card Services Operating Account.

[11]    TCS has also historically used the SEK Demand Deposit Account to receive Elfa dividend payments, denominated in SEK, to TCS.  TCS has not utilized this account for this purpose since March 2022.

SEK Demand Deposit Account upon settlement of the applicable contract and then payment is remitted to Elfa (as defined below) for payment of invoices.  While the Debtors do not plan on closing this account, the Debtors have not utilized this account (or Forward Contracts) since June 2022.

**B.      The TCS Operating Account**

24.      All funds received by TCS and TCS GiftCo (including loan proceeds, store receipts, physical checks received from customers, revenue received through the aforementioned payment processors, and miscellaneous payments) are concentrated in the TCS Operating Account.  In addition, funds disbursed to TCS from the ABL Facility are deposited into the TCS Operating Account.  Payments needed to repay obligations under the ABL Facility and Term Loan Facility are also made directly through the TCS Operating Account.  Substantially all cash is kept in the TCS Operating Account until needed elsewhere.

**C.      The Disbursement Accounts**

25.      *ACH Wire Account.*  Debtor TCS maintains a zero-balance account at JPMorgan Chase, which is typically used to pay vendors via automatic clearing house ("***ACH***") payments (the "***ACH Wire Account***").  Funds from the TCS Operating Account are deposited into the ACH Wire Account as-needed with transferred amounts corresponding exactly to anticipated disbursements and are typically paid out twice weekly (on Tuesdays and Thursdays).[12]

26.      *Accounts Payable Account*.  Debtor TCS also maintains a zero-balance account at JPMorgan Chase to issue checks to pay vendors (the "***Accounts Payable Account***") on account of the goods and services they supply to the Debtors.  Funds are deposited into the Accounts Payable

---

[12]    Certain payments may occur on other days including, but not limited to, rent payments and certain special payments.

Account on an as-needed basis in amounts corresponding to the anticipated disbursements. Pay runs occur weekly (on Thursdays).

27.     _Payroll Account_.  Debtor TCS additionally maintains a zero-balance disbursement account at JPMorgan Chase which is used exclusively for workforce-related purposes (the "**Payroll Account**").  The Payroll Account receives deposits from the TCS Operating Account and is used to fund payroll, which is administered through UKG, Inc. ("**UKG**").  As described in greater detail in the Wages Motion[13], UKG remits funds received from the Payroll Account to salaried employees on a bi-weekly basis and to hourly employees on a weekly basis as well as associated taxes.

28.     _Benefits Accounts_.  Debtor TCS additionally maintains three (3) special purpose Bank Accounts at JPMorgan Chase.   As to these accounts, specified third-party benefit administrators with whom the Debtors contract are authorized to debit such accounts to fulfill the Debtors' obligations to specific benefit providers (together, the "**Benefit Accounts**").  The first of the three Benefit Accounts is a Benefits Flex Account pursuant to which WEX Health Inc. ("**WEX**"), in its capacity as the third-party benefits administrator, is authorized to facilitate debits to cover the Debtors' flex spending obligations.  _Second_, there is the Benefits Health Account pursuant to which WEX, in its capacity as a third-party benefits administrator, is authorized to facilitate debits to cover the Debtors' COBRA health coverage obligations.  _Third_, there is the Benefits PT Health Account[14] pursuant to which VPay, in its capacity as a third-party benefits administrator, is authorized to facilitate debits to cover the Debtors' obligations for part time

---

[13]   The "**Wages Motion**" is the _Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Contracted Labor; (II) Granting Relief From Automatic Stay With Respect To Workers' Compensation Claims; and (III) Granting Related Relief_.  The Wages Motion is filed contemporaneously herewith.

[14]   The Debtors' current part time health plans are Hooray Health and WebTPA (collectively, the "**PT Health Plan**").

benefits under the Debtors' PT Health Plan.  Funds are deposited into each of these Benefit Accounts from the TCS Operating Account on an as-needed basis in amounts which correspond exactly to anticipated disbursements.

### D.  The C Studio Account

29.     Debtor C Studio maintains a single operating checking account at Cornerstone, which receives fund deposits from sales to TCS on a weekly basis.[15]  The C Studio Account disburses (a) ACH payments and checks to employees of C Studio on account of C Studio's payroll obligations, (b) payments to vendors of C Studio for materials, (c) payments associated with manufacturing and selling, general, and administrative expenses of C Studio, and (d) payments to TCS in connection with certain intercompany transactions on an as-needed basis.

### E.  The Escrow Account

30.     The Debtors maintain the Escrow Account for disbursing escrow funds in connection with the Debtors' 2022 acquisition of Closet Works, LLC.  The Debtors have already disbursed the majority of the amounts in the Escrow Account and are working to disburse the small balance that remains in calendar year 2024 and then closing the account in short order thereafter.

## III.      BANK FEES

31.     The Debtors pay the Banks ordinary course fees and expenses in connection with maintaining and operating the Bank Accounts (the "***Bank Fees***").  The Bank Fees are accrued monthly and paid on a quarterly basis.  The Bank Fees average approximately $30,000 each month. The Debtors estimate that they owe approximately $83,000.00 in Bank Fees as of the Petition Date, which represents Bank Fees accrued through December 2024.  To ensure continued access to the Bank Accounts without disruption, the Debtors seek authority to pay any such due and owing Bank

---

[15]     The C Studio Account also has the ability to send funds back to TCS on an as-needed basis.

Fees, including prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with past practices.

## IV.        INTERCOMPANY TRANSACTIONS

32.        In the ordinary course of business, the Debtors engage in routine business relationships with each other and with certain non-Debtor affiliates (the "***Intercompany Transactions***"), which may result in intercompany receivables and payables (the "***Intercompany Balances***").  These Intercompany Transactions, which relate primarily to payments for goods and services, occur as part of the routine operation of the Cash Management System, and at any given time there may be Intercompany Balances owing by one Debtor to another Debtor or, to a non-Debtor affiliate.  The Debtors have historically reflected Intercompany Balances as journal entry receivables and payables, as applicable, in the respective Debtor's accounting system.

### A.        Inter-Debtor Transactions

#### 1.        C Studio

33.        Debtor C Studio is a wholly-owned subsidiary of Debtor TCS.  In the ordinary course of business, C Studio functions as a supplier of goods and services, akin to an independent vendor, to TCS.  Specifically, C Studio designs and manufactures goods related to TCS's "Preston" brand.  TCS is the sole customer of C Studio and it is therefore crucial to maintain the continuity of these inter-debtor transactions.  The uninterrupted flow of goods and services from C Studio to TCS is vital for sustaining the Debtors' overall operations and maximizing the value of the bankruptcy estates.

### B.        Transactions Between Debtors and Non-Debtor Affiliates

34.        As explained in greater detail in the First Day Declaration, the Debtors have nine (9) non-Debtor affiliates, all of which are wholly-owned subsidiaries of Elfa International AB ("***Elfa***").  Elfa, in turn, is a wholly-owned subsidiary of TCS.

14

### 1.    *Transactions with Elfa*

35.    In the ordinary course of business, Elfa functions as a supplier of goods to TCS. Specifically, Elfa supplies goods for TCS's Custom Spaces brands, including Avera, Elfa Classic, Elfa Décor+, and Elfa Garage+.  Sales of Elfa goods account for a significant portion of TCS's annual revenue, with TCS serving as the sole distributor of Elfa products in the United States.

36.    The Debtors closely track all fund transfers in their respective accounting systems and, therefore, can ascertain, trace, and account for all Intercompany Transactions.  The Intercompany Transactions are essential to the Debtors' maintenance of their normal business and operational cadence, and they intend to continue to track postpetition Intercompany Transactions in the ordinary course of business.  Any interruption of the Intercompany Transactions would not only severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders, but would also disrupt the operations of the non-Debtor subsidiaries. Accordingly, the Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice, and for any claims in respect of Intercompany Balances accrued in connection therewith to be accorded administrative expense priority status.

## THE DEBTORS' BUSINESS FORMS

37.    In the ordinary course, the Debtors use checks, invoices, letterhead, purchase orders, and other forms and correspondence (the "***Business Forms***").  The Debtors' existing Business Forms are not marked with any designation referencing the Debtors' status as debtors in possession.  To minimize expense and avoid potential operational issues with their employees, customers, vendors, and other parties during this critical time, the Debtors seek authority to continue to use the existing Business Forms, notwithstanding any applicable U.S. Trustee Guidelines.

**BASIS FOR RELIEF**

I.     **THE DEBTORS SHOULD BE AUTHORIZED TO CONTINUE TO USE THEIR EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS**

38.     Pursuant to the U.S. Trustee Guidelines, debtors-in-possession are required to, among other things: (a) close all existing bank accounts and open new debtor-in-possession accounts, (b) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes, and (c) maintain a separate debtor-in-possession account for cash collateral.  These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

39.     The continuation of a debtor's existing (i.e., prepetition) cash management system is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Bankruptcy courts routinely grant requests for authority to continue utilizing existing cash management systems in the ordinary course.  *See, e.g.*, *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part,* 997 F.2d 1039, 1061 (3d Cir. 1993).  The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

40.     Here, requiring the Debtors to adopt a new cash management system during the Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  The Cash Management System provides the Debtors with the ability to instantaneously track and report the location and amount of funds which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  Any disruption of the Cash Management System could have a negative effect on the Debtors' restructuring efforts.  Indeed, absent the relief requested herein, requiring the Debtors to adopt a new cash management system would needlessly reduce the value of the Debtors' business enterprise.  By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Finally, maintaining the Cash Management System will allow those treasury and accounting employees that manage the Cash Management System to focus on their daily responsibilities at a critical time in the Chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court authorize the continued use of the existing Cash Management System and Bank Accounts to facilitate the Debtors' orderly transition into chapter 11.

## II.     MAINTENANCE OF EXISTING BUSINESS FORMS AND DISBURSEMENT PRACTICES IS WARRANTED

41.     The U.S. Trustee Guidelines, among other things, require debtors in possession to obtain checks that bear the designation "Debtor in Possession" and reference the bankruptcy case number and type of account on such checks.  The U.S. Trustee Guidelines further require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  As discussed above, in the ordinary course of business, the Debtors conduct transactions through checks, wires, ACH transactions, credit cards, and other

similar methods.  If the Debtors' ability to conduct transactions by these methods is impaired, the
Debtors may be unable to perform under certain contracts, their business operations may be
unnecessarily disrupted, and their estates will incur additional costs.  Accordingly, the Debtors
request that they be authorized to (a) continue using their existing Business Forms, substantially
in the form existing immediately before the Petition Date, without reference to their status as
debtors in possession and (b) continue to disburse funds in accordance with existing practices
under the Cash Management System, subject to any reasonable changes the Debtors may
implement to the Cash Management System.  If the Debtors exhaust their existing supply of checks
during the Chapter 11 Cases, the Debtors will print or order checks with the designation "Debtor
in Possession" and the corresponding bankruptcy case number.

## III.    THE BANKS SHOULD BE AUTHORIZED TO MAINTAIN, SERVICE, AND ADMINISTER THE BANK ACCOUNTS IN THE ORDINARY COURSE OF BUSINESS

42.    The Debtors respectfully request that the Court authorize the Banks to continue to
maintain, service, and administer the Bank Accounts, without interruption and in the ordinary
course of business.  The Banks should be authorized to receive, process, honor, and pay any and
all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on
such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue
instructions with respect thereto.

43.    The Debtors further request that the Court authorize the Banks to accept and honor
all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be
honored or dishonored consistent with any order of the Court and governing law, whether such
checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date.  The
Debtors also request that, to the extent the Banks honor a prepetition check or other item drawn on
any account either (a) at the direction of the Debtors or (b) in a good-faith belief that the Court has

authorized such prepetition check or item to be honored, the Banks will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition.  The Debtors believe that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

44.     Moreover, the Debtors request that the Court authorize the Banks to (a) continue to charge the Bank Fees (as applicable) and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.  The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over Bank Fees.

## IV.    CAUSE EXISTS TO WAIVE CERTAIN DEPOSIT REQUIREMENTS UNDER THE U.S. TRUSTEE GUIDELINES AND SECTION 345(b) OF THE BANKRUPTCY CODE

45.     To the extent the Cash Management System does not strictly comply with the U.S. Trustee Guidelines and section 345 of the Bankruptcy Code, the Debtors seek a waiver of the deposit requirements set forth therein.  Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. §345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345 requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the Court "for cause" orders otherwise.  11 U.S.C. §345(b).  In addition, the U.S. Trustee Guidelines require, among other things, chapter 11 debtors to deposit

all estate funds in an account with an Authorized Depository that agrees to comply with the U.S. Trustee's requirements.  The Debtors will provide notice of any new bank account, including the account number and applicable Bank as well as the purpose for such bank account, to counsel to the DIP Lenders, within fifteen (15) business days of opening such bank account.

46.     As discussed above, each of the Bank Accounts are insured by the FDIC and, therefore, the Debtors' funds are insured up to applicable FDIC limits.  In addition, the Debtors have determined in their business judgment that it is prudent and desirable to continue their existing cash management practices.  First, the Debtors achieve significant risk reduction by maintaining their Bank Accounts at large and sophisticated financial institutions, including primarily JPMorgan Chase and Wells Fargo.  Second, it is likely impossible for the Debtors to bond their deposits without incurring considerable costs to the detriment of the Debtors' estates and creditors.  Third, in light of the regular deposits to, and disbursements from, the various Bank Accounts, it would be especially disruptive, unnecessary, and wasteful to require the posting of a bond to the extent that the balance of the Bank Accounts exceed the applicable FDIC insurance limits at a given time.  Finally, the Debtors' deposit practices are consistent with the objectives of section 345(b) by maintaining funds in checking and savings accounts, which protect against downside risk to principal.  *See In re Serv. Merch. Co.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999) (noting that some of the factors to consider in determining whether cause exists "for relief from the strictures of § 345(b)" are whether benefits to the debtors outweigh the harm, if any, to the estate and the bank ratings of the financial institutions where the debtor in possession funds are held).

47.     In light of the foregoing, the Debtors believe that cause exists to waive the requirements of section 345(b) of the Bankruptcy Code.  Further, to the extent such requirements

are inconsistent with the Debtors' current deposit practices, the U.S. Trustee has agreed to afford

the Debtors an initial 45-day period to come into compliance with the U.S. Trustee Guidelines,

without prejudice to the Debtors' right to seek an extension of such period. Accordingly, the

Debtors' failure to technically comply with each of the U.S. Trustee Guidelines should not serve

as an impediment to the relief requested herein.

## V.    THE DEBTORS SHOULD BE AUTHORIZED TO CONTINUE INTERCOMPANY TRANSACTIONS AND CERTAIN INTERCOMPANY CLAIMS SHOULD BE GRANTED ADMINISTRATIVE PRIORITY STATUS

48.    As described above, the Debtors routinely engaged in Intercompany Transactions

before the Petition Date. Intercompany Transactions are entered into in the ordinary course and

as part of the Cash Management System.[16] The Debtors track all payments, including

Intercompany Transactions, in their accounting system and will continue to maintain records of

such Intercompany Transactions postpetition. If the Intercompany Transactions were to be

discontinued, certain of the Debtors would be unable to satisfy ordinary course obligations,

including payroll, taxes and vendor obligations, and/or operate their business without access to

personnel. The Debtors respectfully request the authority to continue conducting the Intercompany

Transactions in the ordinary course of business without the need for further Court order.

49.    In addition, to ensure each individual Debtor will not fund, at the expense of its

creditors, the operations of another entity, out of an abundance of caution, the Debtors respectfully

request that all claims against a Debtor by another Debtor arising after the Petition Date, as a result

of ordinary course Intercompany Transactions (the "**Intercompany Claims**"), be accorded

---

[16]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions are integral to ensuring the Debtors' ability to operate their business.

administrative expense status pursuant to section 503(b) of the Bankruptcy Code.  If Intercompany Claims are accorded administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.[17]

## **EMERGENCY CONSIDERATION**

50.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i), the Complex Case Procedures, and Bankruptcy Rule 6003, which authorizes a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of the Chapter 11 Cases.  As discussed in detail above, immediate and irreparable harm would result if the relief requested herein is not granted. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Debtors believe that emergency consideration is necessary and respectfully request that this Motion be heard on an emergency basis.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)**

51.     Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not otherwise satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to

---

[17]     Under the Plan, general unsecured creditors are unimpaired and will be paid in full, thus, the treatment of Intercompany Claims proposed herein will not prejudice general unsecured creditors.

operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

### **RESERVATION OF RIGHTS**

52.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) satisfied pursuant to the Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

53.     Nothing in the Proposed Order or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of

the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

54.     Nothing in the Proposed Order or this Motion shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

### NOTICE

55.     Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Term Loan Agents; (c) counsel to the DIP ABL Loan Agent; (d) counsel to the Ad Hoc Group and DIP Lenders; (e) counsel to the Prepetition Term Loan Agent; (f) counsel to the Prepetition ABL Agent; (g) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (h) the Banks; (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

56.     A copy of the Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global, at https://www.veritaglobal.net/thecontainerstore.


*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: December 22, 2024
Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@HuntonAK.com
        ashleyharper@HuntonAK.com
        pguffy@HuntonAK.com

- and -

**LATHAM & WATKINS LLP**
George A. Davis (NY Bar No. 2401214)
Hugh Murtagh (NY Bar No. 5002498)
Tianjiao (TJ) Li (NY Bar No. 5689567)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: george.davis@lw.com
        hugh.murtagh@lw.com
        tj.li@lw.com
        jon.weichselbaum@lw.com

Ted A. Dillman (CA Bar No. 258499)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: ted.dillman@lw.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

## **CERTIFICATE OF SERVICE**

I certify that on December 22, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II