## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **THE CONTAINER STORE GROUP, INC.,** | § | |
| ***et al.*,**[1] | § | **Case No. 24-90627 (APR)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

## THE UNITED STATES TRUSTEE'S OBJECTION TO THE PREPACKAGED JOINT PLAN OF REORGANIZATION OF THE CONTAINER STORE GROUP, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

***Responds to the Plan filed at  [ECF NO. 19]***

TO THE HONORABLE ALFREDO R PÉREZ,
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), submits this objection to the *Prepackaged Joint Plan of Reorganization of the Container Store Group, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code (*the "Plan") filed by the Container Store Group, Inc*, et al*. (collectively referred to as the "Debtors").

## FACTUAL BACKGROUND

1.     On December 23, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing to Consider (A) Final Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Form of Ballot, and (C) Confirmation of the Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and*

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

1

*Notice of Commencement; (IV) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally Waiving Requirement of Filing Schedules of Assets and Liabilities, Statements of Financial Affairs, and 2015.3 Reports; (VI) Conditionally Waiving Requirement to Convent the Section 341 Meeting of Creditors; (VII) Conditionally Approving the Disclosure Statement and (VIII) Granting Related Relief* (the "Emergency Scheduling Motion") (ECF No. 17). On that same day, the Debtors filed the Plan (ECF No. 19).

2.      On December 23, 2024, the Court conducted a hearing on the Emergency Scheduling Motion and other "First Day" motions. Although the Court approved the solicitation procedures and conditionally approved the disclosure statement, the U.S. Trustee stated his opposition to the use of the opt-out forms. The Court noted the U.S. Trustee's objection to the third-party releases and opt out procedures and preserved these matters for plan confirmation.

3.      The U.S. Trustee hereby renews his objection to the third-party releases in the Plan and the use of the opt-out procedures considering the Supreme Court's holding in *Harrington v. Purdue Pharma L.P.,* 144 S. Ct. 2071, 2082-88 (2024).

4.      Articles I.A.74, I.A.155 and I.A.157 of the Plan define "Exculpated Party," "Related Parties," "Released Parties," and "Releasing Parties" as follows:

> 74. "***Exculpated Party***" means, each in its capacity as such, (a) each Debtor, and (b) solely to the extent they are Estate fiduciaries, each of the Debtors' Related Parties.
>
> 153. "***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general

partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

155. "***Released Party***" means, collectively, each of, and in each case in its capacity as such:(a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors, officers, and proxyholders; (e) each Consenting Stakeholder; (f) each Prepetition Agent; (g) each DIP Agent; (h) each DIP Term Lender; (i) the DIP ABL Lender; (j) each Exit Facility Agent; (k) each lender under the Exit Facilities; (l) each Releasing Party; and (m) each Related Party of each Entity in clauses (a) through (l); *provided*, that, in each case, an Entity shall not be a Released Party if it (a) elects to opt out of the Third-Party Release as provided on its respective Release Opt-Out Form, (b) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (c) provides to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; *provided*, *further*, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void *ab initio*.

157. "***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Non-Debtor Affiliate; (b) each of the Debtors' and Non-Debtor Affiliates' current and former directors, officers, and proxyholders; (c) each Consenting Stakeholder; (d) each Prepetition Agents; (e) each DIP Agent; (f) each DIP Term Lender; (g) the DIP ABL Lender; (h) each Exit Facility Agent; (i) each lender under the Exit Facilities; (j) each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively elect to opt out of the Releases contained in this Plan or that does not (i) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (ii) provide to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; and (k) each Related Party of each Entity in clauses (a) through (j); *provided*, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void *ab initio*.

5.      The following chart summarizes the Classes of Claims and Interests under the Plan, and whether they are entitled to vote:

| Class | Claim/Equity Interest | Status (Unimpaired or Impaired) | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept | 100% |
| 2 | ABL Claims | Unimpaired | Presumed to Accept | 100% |
| 3 | Term Loan Claims | Impaired | Entitled to Vote | 4.5% to 17.6% |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept | 100% |
| 5 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 6 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A |
| 7 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A |
| 8 | Existing Equity Interests | Impaired | Deemed to Reject | 0% |

6.      The Debtors did not solicit votes from Holders of Claims in Classes 1, 2, 4, 6, and 7 (collectively the "Non-Voting Classes"). Instead, the Debtors sent a Non-Voting Status Notice and Release Opt-Out Form to the Non-Voting Classes.

7.      Based on the definition of "Releasing Party," the Plan would impose third-party releases on all those who fail to affirmatively opt-out of them, either on the ballot or the Non-Voting Notice. *See* Plan, I.A.155. Specifically, the Plan will impose the third-party releases on all those who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) are deemed to accept or reject the Plan; and (iv) abstained from voting on the Plan, unless they opt-out of the third-party releases on the ballot or Non-Voting Notice. *See id.*

8.      Moreover, the third-party releases extend to all claims, even if the Releasing Party does not know or suspect such claims to exist. *See* Plan, IX.C ("…is deemed to have, forever and

unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown…"). As described above, numerous holders of claims are included as Releasing Parties, and as well as "Related Parties" which brings a legion of unidentified parties that are not involved in these cases. Accordingly, it is unreasonable to expect a non-debtor party to affirmatively consent to the releases of unknown claims – if it even "suspected such claims to exist" – possibly held against another unidentified non-debtor party.

9.      The third-party releases are also overbroad and include conduct that is not remotely related to this prepackaged bankruptcy case. Specifically, the third-party releases seek to extinguish claims that arose relating to (1) the management, ownership or operation of the Debtors or the Non-Debtor Affiliates; (2) the purchase, sale, or rescission of any Security of the Debtors or the Non-Debtor Affiliates, and (3) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Entity. *See* Plan, IX.C. While the Bankruptcy Code provides for limitation on liability with respect to the formulation of the plan, *see* 11 U.S.C. § 1125(e), it is not intended to provide broad releases for non-debtor third parties on conduct unrelated to the reorganization.

10.     Additionally, the Exculpated Parties definition at I.A.74 seek to exculpate individuals and entities that are otherwise prohibited by applicable law in the Fifth Circuit. The definition includes an unidentified category of related parties acting as "Estate Fiduciaries." *Id*.

11.     The Plan also contains injunction and gatekeeping provisions in IX.E that provide that (1) liabilities released or exculpated in the Plan shall be permanently enjoined upon the confirmation and if a claim relates or is reasonably likely to relate to a Release, a party must obtain a bankruptcy court determination on the such claims or causes of action are colorable.

12.     Finally, the Plan in XII.A requests waiver of the 14-day stay provided for by Bankruptcy Rule 3020.

## OBJECTION

13.     Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a). 11 U.S.C. § 1129(a). The Bankruptcy Code further requires that the "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

14.     Consistent with the requirements set forth in sections 1125(a) and 1129(a), the U.S. Trustee objects to confirmation of the Plan because the Debtors have failed to show the requisite affirmative consent from all parties subject to the "consensual" third-party releases in the Plan. The opt-out procedures for creditors are insufficient to show the affirmative consent required by law.  As a result, the Debtors are seeking to impose nonconsensual third-party releases on numerous affected parties without their manifested consent. Indeed, the third-party releases contained in the plan includes conduct that are unrelated to these cases and the reorganization. As the Supreme Court in *Purdue* made clear, the Bankruptcy Code does not permit non-consensual third-party releases, and therefore, the Debtors cannot show that they meet the requirements for approval of the Disclosure Statement and ultimately, confirming the Plan.

**A.      The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases.**

15.      Nonconsensual third-party releases are not authorized under the United States Bankruptcy Code. *Purdue,* 144 S. Ct. at 2082–88.  This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

16.      The Supreme Court in *Purdue* did not decide what constitutes consent to a non-debtor release. For the reasons discussed below, a creditor's failure to check an opt-out box on a ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.  As explained below, state contract law should govern whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.  The cases in this district that have approved non-debtor releases based on a failure to opt out did not apply state law. Instead, they bound creditors to non-debtor releases based on a failure to opt out because they treated the creditors' silence as a form litigation default or analogized to class actions.  But as explained below, neither of those theories supports disregarding applicable state law.

**B.      State Law Governs Whether a Release Is Consensual**

17.      Whether parties have reached an agreement—including an agreement not to sue—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule

of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471–72 (1965)).

18.     No federal law applies to the question of whether the nondebtor Releasing Parties have agreed to release the non-debtor Released Parties.  The Bankruptcy Code does not apply to agreements between non-debtors.  And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law.  Nor does 11 U.S.C. § 105(a) confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Thus, the state-law definition of consent is not diluted or transformed by the Bankruptcy Code.

19.     Indeed, "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  Thus, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo*

*Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

20.     Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual.  *See, e.g., Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (holding that after *Purdue*, "in the absence of some sort of affirmative expression of consent that would be sufficient as a matter of contract law, the creditor's silence in the face of a plan and form of ballot can no longer be sufficient."); *Patterson et al. v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id*. at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law."  *Id*.

21.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights.

**C.     Under State law, silence does not confer consent in contract, except in limited circumstances not applicable here**

22.     The "general rule of contracts is that silence cannot manifest consent." *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022).

23.     "Acceptance by silence is exceptional.  Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

24.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

25.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out).  Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981).  *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted).

26.     Texas state law, as a point of reference, is in accord.  Under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

27.     Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact contract." *Id*. (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted). 2008)); *see also Beverick v. Koch Power, Inc., 186 S.W.3d 145, 152* (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

11

28.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .   While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'"  *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

29.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out).  Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981).  *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance." (quotation marks omitted).

**D.**     **The Debtors Cannot Impose Releases by Treating a Failure to Opt Out as a Form of Default**

30.     Applicable state contract law cannot be disregarded on a procedural default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors because they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.  In *re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex. Aug. 16, 2024), the Court cited *In re Arsenal Intermediate Holdings, LLC* for the proposition that "there is nothing improper with an opt-out feature for consensual Third-Party Release in a chapter 11 plan."  These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

31.     This is wrong.  Forfeiture principles do not apply to consent, which requires an affirmative manifestation of assent, not a mere failure to object.  As the court in *Smallhold* recently explained, "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested.[2]  *Smallhold, Inc.*, 2024 WL 4296938, at *2; *see also id.* at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those

---

[2] As discussed further below, *infra* ¶ 54, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."). But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id.* "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id.* Because a nonconsensual non-debtor release is "per se unlawful . . . it is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id.* That is because, unlike for a creditor's claims against the Debtors, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. "It is reasonable to require creditors to pay attention to what the Debtor is doing in bankruptcy as it relates to the creditor's rights against the Debtor. But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the Debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12

33.     The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the Debtors. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution. *Id*. at *2.

33.     None of the cases that imposed a non-debtor release based merely on a creditor's failure to object or opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan." *Id*. Thus, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at *10.

34.     Because *Purdue* establishes that a nonconsensual third-party release is "*per se* unlawful*,*" it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at *2.  Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at *11 (emphasis added).[3]

**E.     Failing to Opt Out Does Not Provide the Required Affirmative Consent**

35.     The Plan provides that all holders of claims who do not opt out will provide broad non-debtor third-party releases to numerous known and unknown third parties on conduct that may not be related to the bankruptcy cases or the reorganization. This would deprive creditors of their legal rights under the pretense of consent.  Indeed, the Plan's inclusion of a wide class of related parties[4] is so broad that it would be impossible to provide notice to all parties affected by the third-

---

[3] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

[4] The Plan defines Related Parties as – "***Related Parties*** means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her

15

party releases. This Court should not approve the third-party releases in the Plan because there is not sufficient evidence of manifested consent from creditors to release with their legal rights against non-debtors.

36.     An affirmative agreement—something more than the failure to opt out or object—is required to support a consensual third-party release. *See Patterson*, 636 B.R. at 686; *Tonawanda Coke Corp.*, 662 B.R. at 222–23.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits.  ). For example, the *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11, found that contract law does not support consent by failure to opt out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688 (emphasis added).

37.     The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-

---

capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees." Plan, I.A.153

free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

38.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not a contract to resolve claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the Debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors.... [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

39.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law and the question was not whether one could opt out of a class action—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty*., 52 S.W.3d 128, 132–33 (Tex. 2000). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the

17

customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286 (quotation marks and citation omitted).

40.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

41.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them. If confirmed, the Plan would impose broad non-debtor releases on every type of creditor who does not affirmatively opt out. Plan, Art. IX.C.

42.     *First*, those voting to reject a plan have not affirmatively consented to a non-debtor release by failing to opt out of it. To the contrary, they have affirmatively rejected the Plan. It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

43.     Merely casting a vote on a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release

18

claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

While the *Smallhold* court was to correct to apply "ordinary contract principles," *In re Smallhold,*

*Inc.*, No. 14-10267, 2024 WL 4296938, at *3 (Sept. 25, 2024), in concluding that voting on a plan

without opting out can be deemed consent, it erred by failing to consider whether any of the

exceptions to the rule that silence is not consent apply in this context.  They do not.

44.    Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that

silence may operate as acceptance" of an offer to release claims against non-debtors.

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Creditors have no affirmative

obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing

that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors

have no duty to speak regarding a plan that would allow a court to infer consent from silence).

And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors

such that their silence can be understood as consent, nor have they any prior course of dealing with

the released nondebtors that would impose such a duty.  A claimant's failure to respond with an

affirmative acceptance of a non-debtor release thus does not fit within the exception to the general

rule that consent cannot be inferred from silence.

45.    Nor are creditors who cast a vote on a plan without checking an opt-out box

"silently tak[ing] offered benefits" from the released non-debtors, such that consent may be

inferred.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received

are through distributions from the debtor's chapter 11 plan.  Because creditors are entitled to

whatever distributions the Plan allocates them regardless of whether they opt out of the nondebtor

releases, consent to the nondebtor release cannot be inferred from acceptance of those benefits.

*See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied

regardless of failure to opt out). Further, acceptance of a "benefit"—distributions under the plan—that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

46.     All this is made clearer by the circumstance where a creditor casts his vote on a plan by *rejecting* that plan but neglects, for reasons unknown, to also check an opt out box.   In *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the United States Bankruptcy Court for the Southern District of New York explained why the independent consent to a third-party release required under contract law cannot be inferred from a vote to reject a chapter 11 plan:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*Id.* at 79 (emphasis added).

47.     *Second*, even more obviously, the releases cannot be imposed on those who do not vote and do not opt out—whether because they abstain from voting or are ineligible to vote. *See Smallhold,* 2024 WL 4296938. This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. In either case, the creditor has not manifested affirmative consent to a nondebtor release by failing to return an opt out form or by failing to object to the Plan. *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (holding failing to return a ballot is not a sufficient manifestation of consent to a third-party release"); *SunEdison*, 576 B.R. at 458–61 (holding that, under principles of New York contract

20

law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result); *Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place).  *Wash. Mut.*, 442 B.R. at 355.

48.     Even where there are conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to convert a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan. And creditors who have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.  *SunEdison*, 576 B.R. at 461.

49.     Thus, the court in *SunEdison* rejected the Debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id.* at 460–61. The court found that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id.*

50.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release."  *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *Wash. Mut., Inc.*, 442 B.R. at 355.

51.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed Third-Party Release, and implying a 'consent' to the Third-Party Release based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings*, 533 B.R. 64 at 81 It is reasonable to require creditors to pay attention to what the Debtors is doing in bankruptcy as it relates to the creditor's rights against the Debtors.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the Debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As the court in *Emerge Energy Services, LP,* similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

52.     In addition, Judge Scott W. Everett in the Northern District of Texas found that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release," courts should look at Texas law to determine whether opt-out provisions are effective to confer consent to a third party. *In re 4 W. Holdings, Inc.*, Case No. 18-30777, ECF No. 2086 (Bankr. N.D. Tex. Oct. 18, 2022). In examining Texas state law, Judge Everett held in *4 West Holdings, Inc.* that silence does not equate to consent under Texas contract law and that none of the three exceptions to that principle applied to the opt-

out provisions. *Id.* Based on these holdings, the U.S. Trustee submits that evidence of affirmative consent, is required by applicable law for the third-party releases to be effective.

53.     Here, the Court should apply state law by not construing that the inaction of an abstaining party to mean that they consent to the broad third-party releases in the Plan. Instead, the releasing parties should be limited to those parties that affirmatively manifested their consent to grant a release. Accordingly, the Court should not approve imposition of the third-party releases on parties that abstained from acting in these cases.

**F.     The Debtors Have Not Provided Notice to Procure Affirmative Consent from All Parties Affected by the "Consensual" Third-Party Releases**

54.     Finally, there is no evidence in the Plan or the solicitation materials that the Debtors provided notice of their deemed consent to the third-party release to the unusually broad number of parties included in the definition of "Related Parties," which includes a laundry list of myriad categories of unidentified parties.

55.     Indeed, the record is devoid of any evidence showing that the Debtors made efforts to (1) identify the parties referenced above that are affected by the Third-Party Release; (2) provide notice to the parties referenced above of the Third-Party Release; and (3) provide an opportunity for them to manifest their affirmative consent to the Third-Party Release in the Plan. Because these affected parties were not even provided notice of the non-debtor release, much less an opportunity to consent or even opt out, imposing non-debtor releases on them is inarguably nonconsensual and in violation of the Supreme Court's recent ruling in Purdue.

56.     There is no acceptance of an offer when there is insufficient notice of the alleged contractual terms. *See Norcia*, 845 F.3d at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he

was unaware, contained in a document whose contractual nature is not obvious.") (quotation marks omitted).

### G.   Opt-Outs in Class Actions are Distinct from Opt-Outs in a Chapter 11 Plan

57.     The court in *Robertshaw* referenced opt outs in class actions as support for deeming a failure to opt out as consent to a non-debtor release. *In re Robertshaw*, 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024). That analogy to class-action procedure is inapt.

58.     Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here.  Fed. R. Bankr. P. 7023.  Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

59.     And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out. Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *Chassix Holdings*, 533 B.R. at 78.  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id.*  Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

60.     Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release.  28 U.S.C. § 2075.  That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

24

61.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[5] 636 B.R. at 686.

62.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.   For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

63.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is

---

[5] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out."  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible."  *Id.*

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Opt-out procedures are only available in class actions under Rule 23(b)(3), not those under Rule 23(b)(1) and 23(b)(2). *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").

64.     Class action procedures also entail additional procedural safeguards. A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

65.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)). And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)). "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

66.     None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party." *Id*.  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Id*.  "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[6] *Id*.

67.     Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although non-debtors may receive a distribution under the plan for their claims against a debtor, non-debtors lose their claims against the non-debtor and any corresponding compensation forever if they (1) are unaware of the release and (2) fail to take affirmative action to opt out or object.  Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

68.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out.  *See* Tex. R. Civ. P. 42.  But outside of that class-action context, ordinary contract principles apply, and a person cannot force a contract on someone

---

[6] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here.  *See supra* ¶¶ 11-23.

## H.      Rule 9019 Cannot Be Used to Evade *Purdue*

69.      Given that it is a rule, Bankruptcy Rule 9019(a) cannot be read as superseding a party's right to consent as defined by state law.  And Rule 9019(a) does not purport to do anything of the sort.

70.      Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *In re Washington Mutual, Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).  The purpose of Bankruptcy Rule 9019 is thus not to determine the existence or validity of consent to a proposed settlement (which remains a question of state contract law), but instead to ensure that the proposed settlement is fair.

71.      Nothing in Bankruptcy Rule 9019 permits bankruptcy courts to impose nonconsensual non-debtor releases.  The Rule is limited to approvals of a debtor's "compromise or settlement."  Fed. R. Bankr. P. 9019(a).  But a debtor lacks standing to pursue its creditors' direct claims against third parties.  *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 426-29 (1972).  Moreover, a compromise or settlement is, by definition, consensual. *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added) (defining a "settlement" as "an *agreement ending a dispute* or lawsuit," and defining an "agreement" as "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons") (emphasis added).  By

its plain terms, Bankruptcy Rule 9019 does not authorize the imposition of non-consensual releases between non-debtors.

72.     Nor could Bankruptcy Rule 9019 authorize the imposition of nonconsensual releases, even if, counterfactually, it purported to do so.  Because 28 U.S.C. § 2075 commands that bankruptcy rules shall not abridge substantive rights, Bankruptcy Rule 9019 cannot authorize bankruptcy courts to approve something the Supreme Court held in *Purdue* no Bankruptcy Code provision permits.  *Purdue*, 144 S. Ct. at 2088 ("[T]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

73.     Nor can such a "settlement" be included in a chapter 11 plan.  A plan and a settlement are not one and the same thing.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code. *See, e.g., In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011) (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the Debtors' estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).  Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to propose "the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).  Thus, under section 1123(b)(3)(A), the Plan may only provide for the settlement of claims or interests belonging to the Debtor or the estate—not the settlement of claims held by third parties.  *Purdue*, 144 S. Ct. at 2084 ("[P]recisely nothing in § 1123(b)

suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property.").

I.     **The Exculpation Provisions in the Plan Violate Fifth Circuit Law**

74.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provisions are overly broad in violation of Fifth Circuit precedent. The Fifth Circuit in 2022 affirmed that, following its prior decision in *Bank of New York Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)* 584 F.3d 229 (5th Cir. 2009), "any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437 (5th Cir. 2022).

75.     The Fifth Circuit in Highland Capital also analyzed whether the independent directors who were specifically appointed by the Official Committee of Unsecured Creditors in the Highland Capital bankruptcy case, pursuant to an order entered by the bankruptcy court to act together as the bankruptcy trustee, could be exculpated and concluded:

> That leaves one remaining question:  whether the bankruptcy court can exculpate the Independent Directors under Pacific Lumber.  We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital.  Like a Debtors-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee.  See 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01.  It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence.  See In re Hilal, 534 F.3d at 501.  Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

*In re Highland Cap. Mgmt., L.P.,* 48 F.4th at 437.

76.     The Debtors, the creditors' committee and its members, and trustees are the only parties for which the Fifth Circuit has allowed exculpation.  Under *Highland Capital*, neither "(b)

the Reorganized Debtors," nor "(d) such Released Parties that are fiduciaries of the Debtors'
Estates," as those terms are defined in the Plan, are entitled to exculpation unless they fall within
these categories.    Indeed, the Court in *Highland* Capital struck from the definition of exculpated
parties numerous parties, including professionals retained by the Debtors and the Claimant Trust,
among others.  *In re Highland Cap. Mgmt., L.P.,* 48 F.4th at 438. Thus, to be consistent with
*Pacific Lumber* and *Highland Capital*, the definition of "Exculpated Party" in the Plan must
exclude (b) the Reorganized Debtors, and (d) such Released Parties that are fiduciaries of the
Debtors' Estates.

77.    Accordingly, the exculpation should be tailored to comport with the Fifth Circuit's
direction in *Highland*, because a Plan containing an exculpation clause exceeding the limits of that
decision cannot be confirmed in this Circuit.

**J.    The Plan Cannot Be Confirmed Because There Is No Authority for the Injunction
Against Bringing Claims Against Non-Debtors**

78.    This Court also may not approve the injunction enforcing the third-party release by
barring claims against non-debtors.  *Purdue* stands for the proposition that non-consensual third-
party releases and injunctions are generally not permitted by the Bankruptcy Code.  *See Purdue*,
144 S. Ct. at 2088.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an
injunction in support of a non-consensual, third-party release in exactly one context: asbestos-
related bankruptcies, and these cases are not asbestos-related.  *See Purdue*, 144 S. Ct. at 2085
(citing 11 U.S.C. § 524(e)).

79.    Even if releases between non-debtors are consensual, there is no Bankruptcy Code
provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce
them.  Further, such an injunction is not warranted by the traditional factors that support injunctive
relief.  Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable

injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id.* (noting that an injunction is an "extraordinary remedy").  The Debtors have made no attempt to show that any of these factors are met.  Nor could they.  If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties.  A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third-party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those state-law releases.  Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

K.     **The Plan Cannot Be Confirmed Because It Contains a Gatekeeping Provision**

80.     The Plan also includes a Gatekeeping Provision that forces a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action is released.  By specifying that this Court "shall determine" whether a claimant can proceed, the Plan's Gatekeeping Provision effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors.  The Gatekeeping Provision would apply even after the

Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

81.     The procedure proposed by the Gatekeeping Provision is unlawful.  The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal. *See, e.g.,* Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008.  Affirmative defenses cannot be adjudicated prior to the filing of the action to which they relate.  Moreover, as to claims between non-debtors, there is no reason why the court in which the relevant action has been filed cannot determine whether the claim was released under the Plan.  This is not unlike the concurrent jurisdiction of non-bankruptcy courts to determine whether a claim has been discharged in bankruptcy.  *See, e.g., Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021); *Eden v. Robert A. Chapski, Ltd.*, 405 F.3d 582, 588 (7th Cir. 2005).

82.     Unsurprisingly, a similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed."  *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18–23.

83.     In light of the foregoing, the Gatekeeping Provision should be stricken from the Plan.

**L.     The Plan Should Clarify that Claims of Government Entities Are Not Released under the Third-Party Releases and Exculpation Provisions**

84.     The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015).

85.     The Debtors should modify the Disclosure Statement and Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters. The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## M.     The Court Should Not Waive the Rule 3020 Stay

86.     The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *Id*. The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.

34

## CONCLUSION

87.     The Court should not confirm the Plan because it will impermissibly impose third-party releases on non-debtor parties who have not affirmatively and unambiguously consented to broad releases. The Debtors' use of the opt-out provisions in the ballots and Plan is not sufficient to confer a party's manifested consent to third-party releases. Further, the individuals and entities included as Releasing Parties include affected parties that have not been identified or provided notice of the third-party releases and the Debtors have provided no evidence that such creditors have consented. Absent the Debtors showing appropriate consent from all parties affected by the third-party releases in the Amended Plan, the Court should not confirm the Plan.

Date: January 21, 2025                              Respectfully Submitted,


                                                    KEVIN M. EPSTEIN
                                                    UNITED STATES TRUSTEE
                                                    REGION 7, SOUTHERN AND WESTERN
                                                    DISTRICTS OF TEXAS

                                                    By: */s/ Ha M. Nguyen*
                                                         Ha Nguyen, Trial Attorney
                                                         CA Bar #305411
                                                         FED ID NO. 3623593
                                                         United States Department of Justice
                                                         Office of the United States Trustee
                                                         515 Rusk Street, Suite 3516
                                                         Houston, Texas 77002
                                                         E-mail: Ha.Nguyen@usdoj.gov
                                                         Cell: 202-590-7962

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2025 a copy of the foregoing *The United States Trustee's Objection to the Prepackaged Joint Plan of Reorganization of the Container Store Group, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, was served by electronic means for all Pacer system participants requesting notice.

<u>/s/ Ha M. Nguyen</u>
Ha Nguyen