# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------------ x
                                                 :

In re:                                   :    Chapter 11
                                                   :

THE CONTAINER STORE GROUP, INC., *et al.*, :    Case No. 24-90627 (ARP)
                                                   :

             Debtors.[1]                     :    (Jointly Administered)
                                                   :

------------------------------------------------------------ x

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
## (I) APPROVAL OF THE DISCLOSURE STATEMENT AND
## (II) CONFIRMATION OF THE FIRST AMENDED PREPACKAGED JOINT
## PLAN OF REORGANIZATION OF THE CONTAINER STORE GROUP, INC. AND
## <u>ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

---

[1]     The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...............................................................................1

I.     Background ....................................................................................................3

    A.     The Transaction Support Agreement ........................................................3

    B.     The Solicitation Process and Voting Results. ...........................................4

    C.     Non-Voting Classes ...................................................................................7

    D.     Service of Combined Notice and Publication ...........................................8

    E.     Plan Supplement and Proposed Combined Order .....................................8

II.    OVERVIEW OF THE PLAN .........................................................................9

III.   LIMITED OBJECTIONS RECEIVED .......................................................12

ARGUMENT ....................................................................................................12

I.     Approval of the Disclosure Statement is Warranted ...................................13

    A.     Creditors Received Sufficient Notice of the Hearing and Objection
            Deadline for Approval of the Disclosure Statement. ..............................13

    B.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy
            Code and Should Be Approved. ..............................................................15

    C.     The Debtors' Prepetition Solicitation of Votes Complied With the
            Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures
            Order. .....................................................................................................17

         1.     The Disclosure Statement Demonstrates That the Debtors
                 Complied With Applicable Non-bankruptcy Law With Respect to
                 the Prepetition Solicitation. ..........................................................18

         2.     The Ballot Used to Solicit Holders of Claims Entitled to Vote on
                 the Plan Complied with the Bankruptcy Rules. ...........................19

         3.     The Voting Record Date Complied with the Bankruptcy Rules and
                 the Solicitation Procedures Order. ...............................................20

         4.     The Debtors' Solicitation Period Complied with Bankruptcy Rule
                 3018 and the Solicitation Procedures Order. ...............................21

i

                                                                                        **Page**

        5.      The Debtors' Vote Tabulation Was Appropriate and Complied
                with the Solicitation Procedures Order. ...................................................21

        6.      Waiver of Certain Solicitation Package Mailings Is Reasonable and
                Appropriate and Complied with the Solicitation Procedures Order. .........21

        7.      Solicitation of the Plan Complied with the Bankruptcy Code and
                Was in Good Faith. ...................................................................................22

II.     The Plan Meets the Requirements For Confirmation Under Section 1129 of the
        Bankruptcy Code. .........................................................................................................23

        A.      The Plan Complies with All Applicable Provisions of the Bankruptcy
                Code – 11 U.S.C. § 1129(a)(1). ..............................................................23

                1.      The Classification of Claims and Interests in the Plan Satisfies the
                        Classification Requirements of Section 1122 of the Bankruptcy
                        Code. ...........................................................................................24

                2.      The Plan Satisfies the Requirements of Section 1123(a)............................26

                3.      The Plan Complies With the Discretionary Provisions of Section
                        1123(b) of the Bankruptcy Code..................................................................31

                4.      The Assumption or Rejection of Executory Contracts and
                        Unexpired Leases Under the Plan Are Appropriate Pursuant to
                        Section 365 and Section 1123(b)(2) of the Bankruptcy Code. .................32

                5.      Assumption of the Transaction Support Agreement and Payment of
                        the Premiums and Fees Thereunder Is Appropriate...................................35

                6.      The Plan Complies With Section 1123(d) of the Bankruptcy Code. .........36

                7.      The Plan's Release, Exculpation, and Injunction Provisions
                        Comply With the Bankruptcy Code............................................................37

                        a.      The Debtor Release Complies With the Bankruptcy Code
                                and Is Appropriate.........................................................................37

                        b.      *The Consensual Third-Party Release Complies With the
                                Bankruptcy Code and Is Appropriate.* ............................................42

                        c.      The Exculpation Provision Complies With the Bankruptcy
                                Code and is Appropriate. ..............................................................50

                        d.      The Injunction Provision and Gatekeeping Provision
                                Comply With the Bankruptcy Code and is Appropriate................52

**Page**

B. The Debtors Have Complied With the Applicable Provisions of the
Bankruptcy Code – 11 U.S.C. § 1129(a)(2)......................................................53

C. The Plan Has Been Proposed in Good Faith and Not by Any Means
Forbidden by Law – 11 U.S.C. § 1129(a)(3). ...................................................54

D. The Plan Provides That Payments Made by the Debtors for Services or
Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4)...............56

E. The Debtors Have Disclosed All Necessary Information Regarding the
Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5). ..............57

F. The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction
of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)............59

G. The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)..............59

H. Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8). ..........................60

I. The Plan Provides for Payment in Full of All Allowed Priority Claims –
11 U.S.C. § 1129(a)(9).........................................................................................61

J. At Least One Impaired Class Has Accepted the Plan –
11 U.S.C. § 1129(a)(10).......................................................................................62

K. The Plan is Feasible – 11 U.S.C. § 1129(a)(11). ....................................................62

L. All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12)...........64

M. The Debtors Do Not Have Any Retiree Benefit Obligations – 11 U.S.C.
§ 1129(a)(13). .......................................................................................................65

N. Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable. .............65

O. Section 1129(b):  The Plan Satisfies the "Cramdown" Requirements .................65

   1. The Plan Does Not Discriminate Unfairly.................................................66

   2. The Plan Is Fair and Equitable..................................................................69

P. The Plan Is Not an Attempt to Avoid Tax Obligations –
11 U.S.C. § 1129(d). ............................................................................................70

Q. The Waiver of a Stay of the Combined Order Is Appropriate. .............................70

III. The Objections Should Be Overruled..................................................................................71

A. The Objectors' Reliance on *Purdue* is Misplaced ...................................................71

**Page**

B.    The Scope of the Third-Party Release is Appropriate ...........................................75

C.    The Exculpation Provision, Injunction Provision and Gatekeeping
Provision Are Each Consistent with Fifth Circuit Law and Plans
Confirmed in this District ........................................................................................76

CONCLUSION..................................................................................................................................78

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) ................................................................................................................66

*In re 11,111, Inc.*,
   117 B.R. 471 (Bankr. D. Minn. 1990) .........................................................................66

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*,
   701 F.3d 1031 (5th Cir. 2012) ....................................................................................42

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) ...........................................................................1

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) .......................................................................................66

*In re Apex Oil Co.*,
   118 B.R. 683 (Bankr. E.D. Mo. 1990) .........................................................................57

*In re Applegate Prop., Ltd.*,
   133 B.R. 827 (Bankr. W.D. Tex. 1991) .......................................................................15

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) .......................................................................................45

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) .....................................................................66

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ...............................................................................................58, 69

*Bank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ..................................................................................42, 51

*In re Beyond.com Corp.*,
   289 B.R. 138 (Bankr. N.D. Cal. 2003) ........................................................................57

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) ..................................................................37

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985).....................................................................66

*Brite v. Sun Country Dev. (In re Sun Country Dev.)*,
    764 F.2d 406 (5th Cir. 1985) ................................................................................54

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990).....................................................................67

*Cadle Co. v. Mims (In re Moore)*,
    608 F.3d 253 (5th Cir. 2010) ................................................................................37

*In re Camp Arrowhead, Ltd.*,
    451 B.R. 678 (Bankr. W.D. Tex. 2011)...................................................42, 51, 76

*In re CJ Holding Co.*,
    597 B.R. 597 (S.D. Tex. 2019) ....................................................................42, 76

*Cole v. Nabors Corporate Servs., Inc. (In re CJ Holding Co.)*,
    597 B.R. 608-09 (S.D. Tex. 2019)........................................................................71

*In re Conseco Inc.*,
    301 B.R. 525 (Bankr. N.D. Ill. 2003) ..............................................................49, 73

*In re Davis Offshore, L.P.*,
    644 F.3d 259 (5th Cir. 2011) ................................................................................22

*In re Diamond Sports Grp., LLC*,
    No. 23-90116 (CML) (Bankr. S.D.Tex. Nov. 18, 2024) ......................................72

*In re Drexel Burnham Lambert Grp. Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)...........................................................53, 59

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound*
    *Lines (In re Eagle Bus. Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993) .........................23, 33

*In re Energy & Expl. Partners, Inc.*,
    No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) ...................................43, 45

*Feld v. Zale Corp. (In re Zale Corp.)*,
    62 F.3d 746 (5th Cir. 1995) ................................................................................42

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ...........................................................................54, 62, 63

*Floyd v. Hefner*,
No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006).............................15

*FOMPuerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
255 Fed. App'x 909 (5th Cir. 2007) ......................................................................45

*In re Food City, Inc.*,
110 B.R. 808 (Bankr. W.D. Tex. 1990)..................................................................54

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ...................................................................................41

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................66

*In re General Homes Corp.*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ..............................................................37, 38

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................68

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)....................................................................69

*In re Great Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................63

*Harrington v. Purdue Pharma L.P.*,
144 S. Ct. 2071 (2024) ...........................................................................................71

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
994 F.2d 1160 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993).............22, 24, 62

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................37

*Hernandez v. Larry Miller Roofing, Inc.*,
628 Fed. App'x 281 (5th Cir. 2016) .......................................................................45

*In re Hunt*,
146 B.R. 178 (Bankr. N.D. Tex. 1992)...................................................................13

*In re Idearc, Inc.*,
   423 B.R. 138 (Bankr. N.D. Tex. 2009) ............................................................................23, 33

*In re Independence Contract Drilling, Inc.*,
   No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ...................71, 73, 76

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ...............................................................................49, 73

*In re Intrum AB et al.*,
   No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] ...........................72

*In re Invitae Corp. et al.*,
   No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) ............................................................73

*In re J.D. Mfg., Inc.*,
   2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008) ............................................................15

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) .............................................................................66, 67

*In re Lakeside Global II Ltd.*,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) ............................................................................12, 62

*In re Landing Assocs.*,
   157 B.R. 791 (Bankr. W.D. Tex. 1993) ...........................................................................57, 62

*In re Landmark at Plaza Park, Ltd.*,
   7 B.R. 653 (Bankr. D.N.J. 1980) ......................................................................................63

*In re Lone Star Utils. LLC*,
   2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014) ..........................................................12

*Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*,
   756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) .......................................33

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................15, 54, 56

*In re Mayer Pollock Steel Corp.*,
   174 B.R. 414 (Bankr. E.D. Pa. 1994) .................................................................................62

*In re McCommas LFG Processing Partners, LP*,
   2007 Bankr. LEXIS 4053 (Bankr. N.D. Tex. 2007) ..............................................................56

*In re Metrocraft Publ'g Servs., Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) .................................................................................16

viii

*In re Mirant Corp.*,
   2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007)............................................24

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006)..........................................................37, 39

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652 (2019)........................................................................................33

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)............................................................................................13

*NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland
   Capital Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022) ..........................................................................52, 77

*NLRB v. Bildisco & Bildisco (In re Bildisco)*,
   465 U.S. 513 (1984)........................................................................................33, 54

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)............................................................................................39

*In re Nuverra Env't Sols., Inc.*,
   590 B.R. 75 (D. Del. 2018)..................................................................................68

*In re Nuverra Env't Sols., Inc.*,
   No. 17-10949 (KJC) (Bankr. D. Del. July 24, 2017)..........................................68

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun
   Elec. Power Coop.)*,
   119 F.3d 349 (5th Cir. 1997) ..............................................................................37

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III
   Joint Venture)*,
   995 F.2d 1274 (5th Cir. 1991) ............................................................................23

*In re Phx. Petroleum*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................16

*In re Pilgrim's Pride Corp*,
   2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010)...........................................51

*In re Placid Oil Co.*,
   753 F.3d 151 (5th Cir. 2014) ..............................................................................13

*In re Prussia Assocs.*,
   322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................................63

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)........................................................................50

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) .................................................................45

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) .................................................................33

*In re Rivera Echevarria*,
    129 B.R. 11 (Bankr. D.P.R. 1991)...........................................................67

*In re Robertshaw US Holding Corp.*,
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................43, 71, 73

*In re Robertshaw US Holding Corp.*,
    No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) ...................72

*In re Rusty Jones, Inc.*,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ......................................................57

*Sequa Corp. v. Christopher (In re Christopher)*,
    28 F.3d 512 (5th Cir. 1994) .......................................................................13

*In re Sherwood Square Assoc.*,
    107 B.R. 872 (Bankr. D. Md. 1989) ........................................................57

*In re Star Ambulance Serv. LLC*,
    540 B.R. 251 (Bankr. S.D. Tex. 2015) ..........................................12, 59

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) .......................................................57

*In re Temple Zion*,
    125 B.R. 910 (Bankr. E.D. Pa. 1991) ......................................................63

*In re Tex. Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988) .................................................................15

*In re Tex. Tamale Co., Inc.*,
    219 B.R. 732 (Bankr. S.D. Tex. 1998) ....................................................13

*Toibb v. Radloff*,
    501 U.S. 157 (1991)......................................................................................54

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984).............................................57, 63

*In re Transcon. Energy Corp.*,
    764 F.2d 1296 (9th Cir. 1985) ..............................................................41

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .......................................15, 16

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) ..............................................................................54

*In re Vroom, Inc.*,
    No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025)....................72, 73

*In re Wesco Aircraft Holdings, Inc.*,
    No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025)............................72

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007).........................................42, 45

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ......................................................54

## STATUTES

11 U.S.C.
    § 157(b)(2)(L) .......................................................................................50
    § 365(a) ..................................................................................................32
    § 365(b)(1) ......................................................................................35, 36
    § 510(b) ..................................................................................................39
    § 1122(a) .................................................................................23, 24, 25
    § 1123(a) ................................................................................................25
    § 1123(a)(1) ...........................................................................................25
    § 1123(a)(2) ...........................................................................................25
    § 1123(a)(3) ...........................................................................................26
    § 1123(a)(4) ...........................................................................................26
    § 1123(a)(5) .............................................................................26, 27, 28
    § 1123(a)(6) ....................................................................................28, 29
    § 1123(a)(7) ....................................................................................29, 30
    § 1123(b) .................................................................................30, 31, 36
    § 1123(b)(1)-(3) ....................................................................................30
    § 1123(b)(2) ...........................................................................................31
    § 1123(b)(3)(A) .....................................................................................37
    § 1123(b)(6) ....................................................................................30, 31
    § 1123(d) ................................................................................................35
    § 1125(a)(1) ...........................................................................................15
    § 1125(e) ................................................................................................22
    § 1125(g) ................................................................................................17
    § 1126(c) ................................................................................................60
    § 1126(f)................................................................................................60

§ 1127(a) ..........................................................................................................1
§ 1129(a)(1) ...........................................................................................23, 52
§ 1129(a)(2) ...........................................................................................52, 53
§ 1129(a)(3) .........................................................................50, 53, 54, 55
§ 1129(a)(4) ...........................................................................................55, 56
§ 1129(a)(5) ...........................................................................................56, 57
§ 1129(a)(5)(A)(i) ........................................................................................56
§ 1129(a)(5)(A)(ii) ................................................................................57, 58
§ 1129(a)(5)(B) .............................................................................................56
§ 1129(a)(6) ..................................................................................................58
§ 1129(a)(7) ...........................................................................................58, 59
§ 1129(a)(8) ..................................................................................................60
§ 1129(a)(9) ..................................................................................................61
§ 1129(a)(10) .......................................................................................61, 62
§ 1129(a)(11) .......................................................................................62, 64
§ 1129(a)(12) ...............................................................................................64
§ 1129(a)(13) ...............................................................................................64
§ 1129(b) .......................................................................................................65
§ 1129(b)(1) ...............................................................................22, 65, 66
§ 1129(b)(2)(B)(ii) .......................................................................................69
§ 1129(b)(2)(C)(ii) .......................................................................................69
§ 1129(d) .......................................................................................................69

15 U.S.C. § 77d(a)(2) ..................................................................................18

## RULES

Fed. R. Bankr. P.
2002(b) .........................................................................................................13
3017(a) .........................................................................................................13
3017(d) .........................................................................................................19
3018(b) .........................................................................................................20
3018(c) .........................................................................................................19
3019(a) ...........................................................................................................1

## TREATISES

7 Collier on Bankruptcy (16th ed.) ......................................................53, 57, 69

## REGULATIONS

17 C.F.R.
§ 230.501 *et seq.* ........................................................................................18
§ 230.506 .....................................................................................................18
§ 230.901 *et seq.* ........................................................................................18
§ 230.903 .....................................................................................................18

## OTHER AUTHORITIES

H.R. REP. No. 95-595 (1977) ........................................................................................23, 53

S. REP. No. 95-989 (1978) .........................................................................................23, 53

The Container Store Group, Inc. ("***TCSG***") and the other above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") hereby submit this memorandum of law in support of (i) final approval of the *Disclosure Statement for Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 18] (the "***Disclosure Statement***") and (ii) confirmation of the *First Amended Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 23, 2025 [Docket No. 165] (the "***First Amended Plan***" and as may be amended, modified or supplemented from time to time, the "***Plan***"),[2] pursuant to Section 1129 of title 11 of the United States Code (the "***Bankruptcy Code***").[3]

## PRELIMINARY STATEMENT

1.     The Debtors seek confirmation of a consensual plan of reorganization to implement a global restructuring of the Debtors' funded debt obligations that has the overwhelming support of key stakeholders.  Confirmation of the Plan will enhance the Debtors' long-term growth prospects and allow the Debtors to emerge from these chapter 11 cases (the "***Chapter 11 Cases***")

---

[2]     On December 23, 2024, the Debtors filed the *Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated December 21, 2024 [Docket No. 19] (the "***Original Plan***"), which was the same version that had been used to solicit votes from Holders of Class 3 Prepetition Term Loan Claims (as such terms are defined in the Plan) on December 21, 2024. The First Amended Plan filed on January 23, 2025 addresses certain Objections (as defined below) and incorporates non-substantive corrections and clarifications to the Original Plan.  None of the modifications materially adversely affect the treatment of Holders of Claims that voted to accept the Plan.  Thus, the modifications do not require the Debtors to re-solicit acceptances of the Original Plan. *See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan."); Fed. R. Bankr. P. 3019(a); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not materially impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (internal citation omitted).

[3]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

as reorganized entities better positioned to succeed in the highly competitive retail storage market in which the Debtors operate. Specifically, the Plan will (a) leave the Debtors' business intact and substantially de-levered, (b) refinance and providing ongoing access to additional capital through the DIP Facilities and Exit Facilities, and (c) leave general unsecured creditors unimpaired.

2. The Plan is the result of the Debtors' extensive negotiations with certain lenders of Prepetition Term Loans (the "***Consenting Term Lenders***") and certain key shareholders of the equity in TCSG (the "***Consenting Stockholder Parties***," and together with the Consenting Term Lenders, the "***Consenting Stakeholders***"), regarding a comprehensive restructuring of the Debtors' capital structure. The Plan is supported by the overwhelming majority of the Holders of Claims entitled to vote on the Plan, which consist of the Holders of Claims in Class 3 Prepetition Term Loan Claims (the "***Voting Class***"). As set forth in the Vote Certification (as defined below), the Debtors have received votes in favor of the Plan from 100% in amount of the Class 3 Prepetition Term Loan Claims that voted and 100% in number of Holders of Class 3 Prepetition Term Loan Claims that voted.[4] The remarkable support for the Plan—which leaves General Unsecured Claims unimpaired—speaks volumes as to its fairness for all stakeholders involved.

3. Further and tellingly, the Debtors have received only three objections to the Plan. The first two objections – one from the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") and the other from the Securities and Exchange Commission (the "***SEC***") – primarily focus on the opt-out mechanism employed by the Debtors with respect to the Plan's Third-Party Release (as defined below). As explained in greater detail below, each of these

---

[4]   Holders of Claims in the Voting Class that participated in the DIP Term Loan Facility had a portion of their Prepetition Term Loan Claims converted into DIP Roll-Up Term Loan Claims (such Holders, "***Converted Holders***"). However, as set forth in Exhibit B of the Vote Certification (as defined below) irrespective of whether the voting amounts of Converted Holders are excluded from the voting, the Voting Class still voted to accept the Plan by the requisite number of Holders and amounts under Section 1126(c) of the Bankruptcy Code.

objections lack merit as the mechanism employed by the Plan is consistent with the mechanisms approved by this Court in other complex chapter 11 cases and, indeed, the Court has overruled similar objections from these same parties in other recent cases.  Similarly, the other objections raised by these two parties also lack merit and/or are addressed in the First Amended Plan or the Modified Proposed Combined Order (defined below), as more fully set forth in Section III of this memorandum, have been overruled in similar cases, and should be overruled here as well.  The third objection is a limited objection filed on behalf of three landlords and focuses solely on specific language in the First Amended Plan and Modified Proposed Combined Order that these parties incorrectly claim exceed the limits of what is permissible in the context of contract assumption as also more fully set forth in Section III of this memorandum.[5]

## I.      BACKGROUND

### A.      The Transaction Support Agreement

4.      The Debtors entered into the Transaction Support Agreement, dated as of December 21, 2024 (as amended, modified, or supplemented, the "***Transaction Support Agreement***"), with (a) Holders of over 90% of the aggregate principal amount of the Class 3 Prepetition Term Loan Claims and (b) the Consenting Stockholders.  The Plan incorporates the terms of the Transaction Support Agreement, which has provided a roadmap for the Debtors' restructuring process.  The restructuring and recapitalization transactions contemplated by the Transaction Support Agreement provide for, among other things:  (a) $40 million in additional financing and related financial accommodations through the DIP-to-Exit Term Loan Facility, which, together with any payable-in-kind interest and Prepetition Term Loan Obligations that are "rolled-up" into the DIP-to-Exit Term Loan Facility, will convert into committed exit financing

---

[5]     The two landlords are Inland Commercial Real Estate Services LLC as managing agent, Century City Mall, LLC and Southcenter Owner LLC (collectively, the "***Objecting Landlords***").

upon confirmation and effectiveness of the Plan; (b) the refinancing of the Prepetition ABL Facility, which occurred on December 24, 2024, via a replacement DIP ABL Credit Facility providing incremental borrowing availability and liquidity; and (c) the equitization of a significant portion of the Prepetition Term Loan Obligations.  As noted above, upon the occurrence of the Effective Date, the Debtors will significantly de-lever their balance sheet while keeping their operations intact and paying all general unsecured creditors in full or otherwise rendering them unimpaired.

**B.      The Solicitation Process and Voting Results.**

5.      On December 21, 2024, prior to commencing the Chapter 11 Cases, and as more fully described in the Solicitation Procedures Motion,[6] the Debtors commenced the solicitation of votes on the Plan from Holders of Class 3 Prepetition Term Loan Claims.  Specifically, the Debtors, through their claims, balloting, and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global (the "***Notice and Claims Agent***"), transmitted copies of a solicitation package (the "***Solicitation Package***")[7] to Holders of Class 3 Prepetition Term Loan Claims via electronic mail.  The Solicitation Package contained the Disclosure Statement, including the Plan and other exhibits thereto, and the Class 3 Ballot.[8]

---

[6]      *See Emergency Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing to Consider (A) Final Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Form of Ballot, and (C) Confirmation of Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally Waiving Requirement of Filing Schedules of Assets and Liabilities, Statements of Financial Affairs, and 2015.3 Reports; (VI) Conditionally Waiving Requirements to Convene the Section 341 Meeting of Creditors; (VII) Conditionally Approving the Disclosure Statement and (VIII) Granting Related Relief* [Docket No. 17] (the "***Solicitation Procedures Motion***").  The facts and the legal arguments set forth in the Solicitation Procedures Motion are incorporated herein by reference in their entirety.

[7]      *See Certificate of Service of Solicitation Materials*, dated December 23, 2024 [Docket No. 51] (the "***Prepetition Certificate of Service***").

[8]      The form of ballot is annexed as Exhibit 2 to the Solicitation Procedures Order (as defined below) (the "***Ballot***").

6.     On December 23, 2024, the Court entered an order granting the Solicitation Procedures Motion [Docket No. 81] (the "***Solicitation Procedures Order***") which, among other things, (a) scheduled a combined hearing (the "***Combined Hearing***") for January 24, 2025, to (i) consider approval of the adequacy of the Disclosure Statement on a final basis and (ii) consider confirmation of the Plan; (b) established January 21, 2025 at 4:00 p.m. (Prevailing Central Time), as the deadline to file objections to the adequacy of the Disclosure Statement or confirmation of the Plan (the "***Objection Deadline***"); (c) approved the Solicitation Procedures (as defined in the Solicitation Procedures Motion) with respect to the Plan, including the form of Ballot; (d) approved the form and manner of the Notice of Non-Voting Status and Release Opt-Out Forms;[9] (e) approved the form and manner of the Combined Notice[10] of (i) the commencement of the Chapter 11 Cases, (ii) the Combined Hearing, and (iii) the Objection Deadline; (f) conditionally approved the Disclosure Statement; (g) so long as the Plan is confirmed on or before February 23, 2025, (i) directed the U.S. Trustee not to convene an initial meeting of creditors under Section 341(a) of the Bankruptcy Code and (ii) waived the requirement that the Debtors file statements of financial affairs, schedules of assets and liabilities, and reports under Bankruptcy Rule 2015.3; and (h) granted related relief.

7.     The Disclosure Statement and Plan, among other case-related pleadings and information, were also made publicly available free of charge on the Notice and Claims Agent's website, https://www.veritaglobal.net/thecontainerstore.

---

[9]     The Release Opt-Out Forms, among other things, provided an opportunity for each Non-Voting Holder (as defined below) to "opt out" of the Plan's Third-Party Release (as defined below), a form of which is annexed as Exhibits 4a and 4b to the Solicitation Procedures Order (the "***Release Opt-Out Forms***").

[10]     A form of the Combined Notice is annexed as Exhibit 1 to the Solicitation Procedures Order (the "***Combined Notice***").

8.      The Solicitation Package advised recipients that (a) the date for determining which Holders of Class 3 Prepetition Term Loan Claims were entitled to vote to accept or reject the Plan was December 18, 2024 (the "***Voting Record Date***") and (b) the deadline for submitting a vote to accept or reject the Plan was January 21, 2025 at 4:00 p.m. (Prevailing Central Time) (the "***Voting Deadline***").  Each Ballot contained detailed instructions regarding how to complete it and how to make any applicable elections contained therein.  The Voting Record Date and the Voting Deadline were clearly identified in the Solicitation Package.

9.      The materials in the Solicitation Package also established and communicated how the Notice and Claims Agent would tabulate the votes and elections contained in the Ballots.  Those tabulation rules provided, among other things, that the following Ballots would not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder, (b) any Ballot that is not actually received by the Notice and Claims Agent by the Voting Deadline (unless, with the consent of the Required Consenting Term Lenders, the Debtors determine otherwise or as permitted by the Court), (c) any Ballot that does not contain a signature; *provided*, that signatures contained in electronic Ballots submitted via the Notice and Claims Agent's online voting portal will be deemed to be  immediately legally effective, (d) any Ballot that partially rejects and partially accepts the Plan, (e) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan, (f) any Ballot superseded by a later, timely submitted, valid, and properly executed Ballot, and (g) any vote cast by a Person or entity that did not hold a Claim in the Voting Class as of the Voting Record Date.[11]

---

[11]    *See* Disclosure Statement, Art. I.E.5; *see also* Solicitation Procedures Motion, ¶ 11.

10.     The Debtors, through their Notice and Claims Agent, completed the solicitation and tabulation of votes following the Voting Deadline.  As noted above and in the Vote Certification, the Debtors received votes in favor of the Plan from (a) 100% in amount of the Class 3 Prepetition Term Loan Claims that voted and (b) 100% in number of Holders of Class 3 Prepetition Term Loan Claims that voted.[12]  Further, as set forth in Exhibit B of the Vote Certification, "irrespective of whether the voting amounts of Converted Holders are excluded from the voting, the Voting Class still voted to accept the Plan by the requisite number of Holders and amounts under Section 1126(c) of the Bankruptcy Code."  In addition to soliciting votes on the Plan, the Ballots also allowed Holders of Class 3 Prepetition Term Loan Claims to opt-out of the Third-Party Release contained in Article IX of the Plan, as discussed in greater detail in paragraphs 73 through 75, *infra*.

C.     **Non-Voting Classes**

11.     The Plan provides that (a) Class 1 (Other Secured Claims), Class 2 (Prepetition ABL Claims), and Class 4 (General Unsecured Claims) are Unimpaired and, thus, presumed to have accepted the Plan,[13] (b) Class 5 (Subordinated Claims) and Class 8 (Existing Equity Interests) are Impaired and not expected to receive any recovery and, thus, Holders of Claims and Interests in such Classes are deemed to reject the Plan,[14] and Class 6 (Intercompany Claims) and Class 7

---

[12]   *See Declaration of Darlene S. Calderon of Kurtzman Carson Consultants, LLC d/b/a Verita Global LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 164] (the "**Vote Certification**").

[13]   Pursuant to Section 1126(f) of the Bankruptcy Code, each holder of a claim or interest in an unimpaired class is "conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class . . . is not required."  11 U.S.C. § 1126(f).

[14]   Pursuant to Section 1126(g) of the Bankruptcy Code, each holder of a claim or equity interest "is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.  11 U.S.C. § 1126(g).

(Intercompany Interests) may either be Impaired or Unimpaired and may not receive any recovery and, thus, Holders of Claims and Interests in such Classes are deemed to reject the Plan, (Classes 1, 2, 4, 5, 6, and 7, collectively, the "**Non-Voting Classes**," and the Holders of such Claims or Interests, collectively, the "**Non-Voting Holders**").  As described above, however, the Solicitation Procedures Order approved service of the Notice of Non-Voting Status and the Release Opt-Out Forms to Non-Voting Holders thereby, among other things, providing each such Non-Voting Holder with the opportunity to "opt out" of the Third-Party Release.  The Notice of Non-Voting Status and the Release Opt-Out Forms were served on non-Affiliate Non-Voting Holders by the Notice and Claims Agent on or before December 27, 2024.[15]

### D.   Service of Combined Notice and Publication

12.    Following the entry of the Solicitation Procedures Order, on December 24 and December 27, 2024, the Debtors caused the Notice and Claims Agent to serve the Combined Notice on the Debtors' creditor matrix in accordance with the terms of the Solicitation Procedures Order.[16]  In addition, the Debtors caused a form of the Combined Notice to be published in the national editions of *The New York Times* and *USA Today* on December 27, 2024 (the "**Publication Notice**"), in accordance with the terms of the Solicitation Procedures Order.[17]

### E.   Plan Supplement and Proposed Combined Order

13.    On January 14, 2025, the Debtors filed with the Court the *Notice of Filing of Plan Supplement for the Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc.*

---

[15]   *See Certificate of Service*, dated January 3, 2025 [Docket No. 116] (the "**Postpetition Certificate of Service**").

[16]   *See* Postpetition Certificate of Service.

[17]   *See Affidavit of Publication of the Notice of Publication of the Notice of (I) Commencement of Chapter 11 Cases, (II) Combined Hearing on Disclosure Statement, Prepackaged Joint Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines in The New York Times and USA Today* [Docket No. 117] (the "**Affidavit of Publication**").

*and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 132] (the "**Plan Supplement**"), which included, among other things, the New Organizational Documents.   On January 17, 2025, the Debtors also filed a proposed form of *Order (I) Approving Debtors' Disclosure Statement and (II) Confirming First Amended Prepackaged Joint Plan of Reorganization of the Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 147] (as amended or modified, the "**Proposed Combined Order**").  The Debtors expect to satisfy all conditions precedent to the Effective Date shortly after the Court's entry of the Proposed Combined Order and expect for the plan to become effective in short order.

## II.    OVERVIEW OF THE PLAN

14.    As noted above, the restructuring contemplated in the Plan will allow the Debtors to emerge from the Chapter 11 Cases with a capital structure better aligned with the Debtors' long-term growth and business strategy.  Specifically, the Plan resolves the Debtors' outstanding funded debt obligations by reducing their funded debt liabilities from approximately $243.1 million to approximately $190 million upon emergence, and leaving the Company better capitalized through the refinancing and ongoing availability provided under the DIP Facilities and Exit Facilities.

15.    The following table summarizes the treatment of Claims and Interests under the Plan and designates which Classes are Impaired by the Plan and which Classes of Claims and Interests are entitled to vote on the Plan:[18]

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed | Unimpaired | Not Entitled to Vote<br><br>(Presumed to |

---

[18]    The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor (with the consent of the Required Consenting Term Lenders), will, on the Effective Date, (i) be paid in full in Cash including the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired. | | Accept) |
| 2 | Prepetition ABL Claims | Upon the ABL Refinancing, each Holder of an Allowed Prepetition ABL Claim will have received, in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Prepetition ABL Claim, payment in full in Cash (including the replacement or Cash collateralization of all issued and undrawn letters of credit in accordance with and in the amounts specified under the Prepetition ABL Credit Agreement).  To the extent any Obligations are outstanding on the Effective Date, the Claims on account of such Obligations will receive treatment as necessary to render such Claims Unimpaired, including, repayment in Cash of such Claims required to be satisfied in Cash pursuant to the terms of the Petition ABL Credit Agreement. | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Term Loan Claims | Except to the extent that a Holder of a Prepetition Term Loan Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim will receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Prepetition Term Loan Claim, its Pro Rata Share of 100% of the New Equity Interests, subject to dilution by the Management Incentive Plan and the DIP Equity Premium. | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Subject to <u>Article V.C of the Plan</u> and except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim against a Debtor will receive payment in full in Cash in accordance with applicable | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | law and the terms and conditions of the particular transaction giving rise to, or the agreement that governs, such Allowed General Unsecured Claim on the later of (i) the date due in the ordinary course of business or (ii) the Effective Date; *provided*, *however*, that no Holder of an Allowed General Unsecured Claim will receive any distribution for any Claim that has previously been satisfied pursuant to a Final Order of the Bankruptcy Court. | | |
| 5 | Subordinated Claims | Holders of Subordinated Claims will receive no recovery or distribution on account of such Subordinated Claims.  Unless otherwise provided under the Plan, on the Effective Date, Subordinated Claims will be canceled, released, discharged, and extinguished. | Impaired | Not Entitled to Vote<br><br>(Deemed to Reject) |
| 6 | Intercompany Claims | No property will be distributed to the Holders of Allowed Intercompany Claims.  Unless otherwise provided for under the Plan, on the Effective Date, at the option of the applicable Debtor with the consent of the Required Consenting Lenders, Intercompany Claims will be either (i) Reinstated or (ii) set off, settled, distributed, contributed, merged, canceled, or released.  For the avoidance of doubt, all Intercompany Claims between Debtors and Non-Debtor Affiliates will ride through and continue in full force and effect unless otherwise agreed by the applicable Debtor and Non-Debtor Affiliate. | Impaired/ Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | No property will be distributed to the Holders of Allowed Intercompany Interests.  Unless otherwise provided for under the Plan, on the Effective Date, at the option of the applicable Debtor with the consent of the Required Consenting Lenders, Intercompany Interests will be either (i) Reinstated or (ii) set off, settled, distributed, contributed, merged, canceled, or released. | Impaired/ Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept or Deemed to Reject) |
| 8 | Existing Equity Interests | Holders of Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Existing Equity Interests. On the Effective Date, Existing Equity Interests will be canceled, released, discharged, and extinguished, and will be of no further force or effect. | Impaired | Not Entitled to Vote<br><br>(Deemed to Reject) |

### III.    LIMITED OBJECTIONS RECEIVED

16.    As noted above, the Debtors have received only three formal objections to confirmation of the Plan.  The first two objections – one from the U.S. Trustee [Docket No. 150] (the "***U.S. Trustee Objection***") and one from the SEC [Docket No. 152] (the "***SEC Objection***" and together with the U.S. Trustee Objection, the "***Release Objections***") – relate primarily to the opt out mechanism utilized by the Debtors to obtain consent to the Third-Party Release.  The third objection was a limited objection filed by the three Objecting Landlords [Docket No. 161] (the "***Landlord Objection***" and together with the Release Objections, the *"Objections")* which takes issue with limited language contained in two provisions governing the assumption of Unexpired Leases (and, specifically, the Debtors' ability to amend such leases as needed to effectuate the Restructuring Transactions contemplated under the Plan) that was contained in the First Amened Plan and a modified version of the Proposed Combined Order filed with the Court [Docket No. 166] (the "***Modified Proposed Combined Order").***  Additionally, in advance of confirmation, the Debtors received informal comments from various parties with respect to the Plan.  With respect to the latter, the Debtors have resolved such comments and reflected such resolution in the Modified Proposed Combined Order as well as in the First Amended Plan.  As to the Release Objections and the Landlord Objection, the Debtors have addressed the merits of such Objections in Section III of this memorandum.

### ARGUMENT

17.    This memorandum is divided into three parts.  First, the Debtors request final approval of the Disclosure Statement and a finding that the Debtors complied with the Solicitation Procedures Order.  Second, the Debtors demonstrate that the Plan satisfies Section 1129 of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan and approve the

Restructuring Transactions provided for therein.[19]  Finally, in Section III, the Debtors address the arguments raised in the Objections.  In support of the Plan, the Debtors have filed contemporaneously herewith (a) the *Declaration of Chad E. Coben, Chief Restructuring Officer, in Support of Confirmation of the Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 162] (the "**Coben Declaration**"), and (b) the *Declaration of Adam Dunayer in Support of Confirmation of the Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 163] (the "**Dunayer Declaration**" and together with the Coben Declaration, the "**Confirmation Declarations**").  The Debtors also rely upon the First Day Declaration,[20] the Prepetition Certificate of Service, the Postpetition Certificate of Service, and the Vote Certification.

# I.      APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED.

### A.      Creditors Received Sufficient Notice of the Hearing and Objection Deadline for Approval of the Disclosure Statement.

18.      Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure statement generally requires twenty-eight (28) days' notice.[21]  Similarly, Bankruptcy Rule 2002(b) provides that parties in interest should receive twenty-eight (28) days' notice of the objection

---

[19]   *See In re Lakeside Glob. II Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code.") (internal citations omitted); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) ("As the proponents of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code [Section] 1129 has been met.") (internal citation omitted); *In re Lone Star Utils. LLC*, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code section 1129(a) by a preponderance of the evidence.").

[20]   *Declaration of Chad E. Coben, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6] (the "**First Day Declaration**").

[21]   *See* FED. R. BANKR. P. 3017(a) ("the court shall hold a hearing on at least 28 days' notice to the debtor, creditors, equity security holders and other parties in interest . . . to consider the disclosure statement and any objections or modifications thereto").

deadline and the hearing to consider approval of the disclosure statement.[22]   Courts in the Fifth Circuit and elsewhere have adopted the general rule that due process requires "notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding.'"[23]   When evaluating the notice and the sufficiency thereof, courts will consider "[f]irst, whether the notice apprised the claimant of the pendency of the action, and second, whether it was sufficiently timely to permit the claimant to act."[24]   Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[25]

19.     As noted above, on December 23, 2024, the Court entered the Solicitation Procedures Order which, among other things, scheduled the Combined Hearing, approved certain objection and reply deadlines, and approved the form of Combined Notice and manner of service thereof.[26]   The Combined Notice informed recipients of, among other things: (a) the commencement of the Chapter 11 Cases, (b) the date and time set for the Combined Hearing, and (c) the Objection Deadline.[27]   On December 24, 2024, the Combined Notice was served upon the Debtors' full creditor matrix and the Debtors' master service list.  Accordingly, the Debtors submit that all parties in interest had notice at least thirty-one (31) days prior to the Combined Hearing and at least twenty-eight (28) days prior to the Objection Deadline, in compliance with both Bankruptcy Rule 3017(a) and Bankruptcy Rule 2002(b).[28]

---

[22]   *See* FED. R. BANKR. P. 2002(b).

[23]   *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

[24]   *In re Tex. Tamale Co., Inc.*, 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998) (applying two-part test); *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (same).

[25]   *See In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

[26]   *See* Solicitation Procedures Order.

[27]   *See id.*, Ex. 1.

[28]   *See* Postpetition Certificate of Service.

20.     Further, the Debtors caused the Publication Notice to be published in the national editions of *The New York Times* and *USA Today* on December 27, 2024, which publication, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[29]  Both the Combined Notice and the Publication Notice also included instructions regarding how parties in interest could obtain copies of the Plan and the Disclosure Statement free of charge through the Notice and Claims Agent's website, https://www.veritaglobal.net/thecontainerstore.

21.     For the reasons set forth above, the Debtors submit that they have satisfied Bankruptcy Rules 2002(b) and 3017(a).

**B.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved.**

22.     The Disclosure Statement complies with Section 1125(a) of the Bankruptcy Code, which requires that a disclosure statement provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[30]  "Adequate information" is a flexible standard based on the facts and circumstances of each case.[31]  Courts within the Fifth Circuit and elsewhere

---

[29]     *See* Affidavit of Publication.

[30]     11 U.S.C. § 1125(a)(1); *see, e.g., In re J.D. Mfg., Inc.*, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("Adequacy of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice."); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case.") (emphasis in original).

[31]     *See, e.g.*, 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of each case.") (internal citations omitted); *Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible

acknowledge that determining what constitutes "adequate information" for the purpose of satisfying Section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[32]

23.    Courts may consider various factors when evaluating the adequacy of the disclosures in a proposed disclosure statement, including: (a) the events that led to the filing of a bankruptcy petition, (b) the relationship of the debtor with its affiliates, (c) a description of the available assets and their value, (d) the anticipated future of the company, (e) claims asserted against the debtor, (f) the estimated return to creditors under a chapter 7 liquidation, (g) the chapter 11 plan or a summary thereof, (h) financial information relevant to a creditor's decision to accept or reject the chapter 11 plan, (i) information relevant to the risks posed to creditors under the plan, (j) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers, and (k) the source of information stated in the disclosure statement.[33]

24.    The Disclosure Statement is extensive and comprehensive.  It contains descriptions of, among other things: (a) the Plan, (b) an overview of the Debtors' businesses, (c) key events leading to the commencement of the Chapter 11 Cases, (d) anticipated events during the Chapter 11 Cases, (e) financial information and financial projections that would be relevant to creditors' determinations of whether to accept or reject the Plan, (f) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, (g) a valuation analysis, (h) risk factors affecting the Plan, and (i) federal tax law

---

standard); *In re Applegate Prop.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[32]    *See, e.g., In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518 (holding that courts are vested with wide discretion to determine whether disclosure statement contains "adequate information" within meaning of Section 1125(a) of the Bankruptcy Code); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.").

[33]    *See In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Disclosure regarding all topics is not necessary in every case.  *See, e.g., In re U.S. Brass Corp.*, 194 B.R. at 425; *In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

consequences of the Plan.[34]  In addition, the Disclosure Statement and the Plan were subject to review and comment by the signatories to the Transaction Support Agreement.[35]

25.     Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of Section 1125(a) of the Bankruptcy Code, in satisfaction of Sections 1125(b) and 1126(b)(2) of the Bankruptcy Code, and should therefore be approved. Moreover, no party has objected to the adequacy of the Disclosure Statement.

C.     **The Debtors' Prepetition Solicitation of Votes Complied With the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order.**

26.     The Debtors commenced the solicitation of votes on the Plan from Holders of Class 3 Prepetition Term Loan Claims prior to the Petition Date.[36]  To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with Sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).  Similarly, Section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless the plan (or summary thereof) and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited.  For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with the solicitation.

---

[34]   *See* Coben Declaration, ¶ 12.

[35]   *See* Coben Declaration, ¶ 31.

[36]   *See* Prepetition Certificate of Service.

1. **The Disclosure Statement Demonstrates That the Debtors Complied With Applicable Non-bankruptcy Law With Respect to the Prepetition Solicitation.**

27. Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and interests prepetition without a court-approved disclosure statement if the solicitation complies with applicable non-bankruptcy law—including generally applicable federal and state securities laws or regulations—or, if no such laws exist, the solicited holders receive "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.[37]

28. To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation procedures are exempt from securities law registration requirements pursuant to Section 4(a)(2), Regulation D, and/or Regulation S of the Securities Act,[38] or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree.  Specifically, Section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.[39]

29. The Debtors have complied with the requirements of Section 4(a)(2) of the Securities Act, Regulation D, and Regulation S thereunder, as applicable, with respect to the

---

[37] *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also* 11 U.S.C. § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.").

[38] The Securities Act of 1933 (the "***Securities Act***").

[39] *See* Securities Act, 15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.501 *et seq.*; 17 C.F.R. § 230.901 *et seq.*

requirements for transactions exempt from the registration requirements under the Securities Act in order to address the scenario where the prepetition solicitation of votes would be deemed a private placement of securities. The prepetition solicitation materials made clear that it was only applicable to those Holders of Class 3 Prepetition Term Loan Claims (the only Class solicited prepetition) who certified that they were one of the following: (a) a "qualified institutional buyer" (as such term is defined in Rule 144A of the Securities Act), (b) an "accredited investor" (as such term is defined in Rule 501 of Regulation D of the Securities Act), or (c) for Holders of Class 3 Prepetition Term Loan Claims located outside the United States, a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S of the Securities Act) and not participating on behalf of or on account of a U.S. person.[40] Therefore, the prepetition solicitation meets the requirements of applicable non-bankruptcy law and, thus, complies with Section 1126(b)(1) of the Bankruptcy Code.

30.    In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject a plan of reorganization and, as set forth below, the solicitation complied with such rules.[41]

### 2. The Ballot Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules.

31.    Bankruptcy Rule 3017(d) requires the Debtors to transmit a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and equity security holders

---

[40]    *See, e.g.*, Regulation D, 17 C.F.R. § 230.506 (deeming a transaction a non-public offering under Section 4(a)(2) of the Securities Act if the transaction only involves accredited investors, provided certain other conditions are satisfied); Regulation S, 17 C.F.R. § 230.903 (deeming a transaction occurring outside the United States, and, therefore, not subject to Section 5 of the Securities Act, if the transaction only involves purchasers who are not a U.S. person, provided certain conditions are satisfied).

[41]    Fed. R. Bankr. P. 3017(d).

entitled to vote on the plan."[42]  Bankruptcy Rule 3018(c) provides that, "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[43]  As set forth in the Prepetition Certificate of Service, the Ballot was transmitted to all Holders of Class 3 Prepetition Term Loan Claims.[44]  The form of Ballot complied with the Bankruptcy Rules and is consistent with Official Form No. 314.  Moreover, the form of Ballot was approved by the Bankruptcy Court in the Solicitation Procedures Order.[45]  Further, there have been no objections to the sufficiency of the Ballot.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

> ### 3.     The Voting Record Date Complied with the Bankruptcy Rules and the Solicitation Procedures Order.

32.     In a prepetition solicitation, the identity of holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials is to be determined "on the date specified in the solicitation."[46]  The Solicitation Procedures Order, the Disclosure Statement, and the Ballot clearly identify December 18, 2024 as the Voting Record Date.  No party in interest has objected to the Voting Record Date.  Therefore, the Debtors respectfully request that the Court approve December 18, 2024 as the Voting Record Date on a final basis, to the extent not previously approved on a final basis in the Solicitation Procedures Order.

---

[42]   *Id.*

[43]   Fed. R. Bankr. P. 3018(c).

[44]   *See* Prepetition Certificate of Service.

[45]   *See* Solicitation Procedures Order, ¶12.

[46]   Fed. R. Bankr. P. 3018(b).

### 4. The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Solicitation Procedures Order.

33. The Debtors' solicitation period for Holders of Class 3 Prepetition Term Loan Claims complied with Bankruptcy Rule 3018. First, as set forth above, the Plan and Disclosure Statement were transmitted to all Holders of Class 3 Prepetition Term Loan Claims in accordance with Bankruptcy Rule 3018(b).[47] Second, the solicitation period—which lasted from December 21, 2024 through January 21, 2025 (approximately 31 days)—complied with the deadlines set forth in the Solicitation Procedures Order and was adequate under the particular facts and circumstances of these Chapter 11 Cases and applicable bankruptcy law. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018.

### 5. The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order.

34. The Debtors further submit that the tabulation of votes was completed in a manner consistent with the Solicitation Procedures approved in the Solicitation Procedures Order and in accordance with applicable bankruptcy law. As described in the Solicitation Procedures Motion and the Vote Certification, the Notice and Claims Agent used standard tabulation procedures in tabulating votes from Holders of Claims in Class 3. Specifically, the Notice and Claims Agent reviewed and tabulated all valid Ballots received through January 21, 2025, each in accordance with the court-approved Solicitation Procedures and the Disclosure Statement.[48]

### 6. Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order.

35. As further described in the Solicitation Procedures Motion, certain Holders of Claims and Interests were not provided a Solicitation Package because such Holders were either

---

[47] *See* Prepetition Certificate of Service, ¶¶ 2, 3.

[48] *See* Vote Certification.

Unimpaired under, and conclusively presumed to accept, the Plan pursuant to Section 1126(f) of the Bankruptcy Code and/or were receiving nothing under the Plan and deemed to reject the Plan. In the Solicitation Procedures Order, the Court approved the Debtors' Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package to Holders of Claims and Interests presumed to accept and/or deemed to reject the Plan.[49]  As set forth above, the Court-approved Combined Notice was sent to the Debtors' full creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Notice and Claims Agent's website.  In addition, the Court-approved Notice of Non-Voting Status and Release Opt-Out Forms were sent to all non-Affiliate Holders of Claims and Interests in Non-Voting Classes in accordance with the Solicitation Procedures Order.[50]

### 7.    Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.

36.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[51]  Section 1125(e) of the Bankruptcy Code is understood to "provide[] a safe harbor for the disclosure and solicitation process of a bankruptcy."[52]

37.    As set forth in the First Day Declaration, the Dunayer Declaration, and the Disclosure Statement, the parties to the Transaction Support Agreement at all times engaged in

---

[49]    *See* Solicitation Procedures Order, ¶ 5.

[50]    *See id.*

[51]    11 U.S.C. § 1125(e).

[52]    *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011).

arm's-length, good-faith negotiations,[53] and all parties, including the Debtors, the Released Parties, and the Exculpated Parties took appropriate actions in connection with the solicitation of votes on the Plan in compliance with Section 1125 of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Court grant these parties the protections provided under Section 1125(e) of the Bankruptcy Code.

## II.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

38.    To confirm a plan, a court must find that both the plan and the debtor is in compliance with each of the requirements of Section 1129 of the Bankruptcy Code.  Further, the proponent of a plan must demonstrate compliance with Section 1129 by a preponderance of the evidence.[54]  For the reasons set forth below, the Plan and the Debtors meet the requirements of Section 1129 of the Bankruptcy Code.[55]

### A.    The Plan Complies with All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1).

39.    Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]."[56]  As set forth herein, the Plan complies with the requirements of the Bankruptcy Code in terms of both (a) the classification of Claims and Interests and (b) the content of the Plan.

---

[53]   *See* First Day Declaration ¶¶ 59-60; *see also* Dunayer Declaration, ¶ 16.

[54]   *In re Briscoe Enters.*, Ltd., II, 994 F.2d, 1160, 1165 (5th Cir. 1993) (recognizing that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").

[55]   In the event all requirements of Section 1129(a) are met other than every impaired class having accepted the Plan, the Court may confirm the Plan if the "cramdown" requirements under Section 1129(b) of the Bankruptcy Code are satisfied.  11 U.S.C. § 1129(b)(1).  Here, an Impaired Class—Class 3 (Prepetition Term Loan Claims)—have voted to accept the Plan.

[56]   11 U.S.C. § 1129(a)(1).  The legislative history of Section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 governing classification of claims and contents of the plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

1. **The Classification of Claims and Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

40.     Section 1122(a)[57] of the Bankruptcy Code states: "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[58]  The plan proponent has broad discretion in classifying claims under Section 1122 and, as implied by the statute, a plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such classification.[59]  In evaluating whether a plan complies with Section 1122, courts look to the kind, species, or character of each category of claims.  If a plan classifies substantially similar claims in different classes, there must exist a reasonable, non-discriminatory basis for such treatment, such as a business or economic justification for the separate classification or a legal distinction between the claims.[60]  Here, the Plan classifies substantially similar Claims in the same Class, satisfying Section 1122(a) of the Bankruptcy Code.

41.     Article III of the Plan classifies six Classes of Claims against the Debtors and two Classes of Interests in the Debtors, which are described in the Plan and Disclosure Statement. Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims

---

[57]   The Plan does not include a class for administrative convenience so Section 1122(b) of the Bankruptcy Code does not apply in the Chapter 11 Cases.

[58]   11 U.S.C. § 1122(a).

[59]   *In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009); *see also In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound Lines (In re Eagle Bus Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278-79 (5th Cir. 1991) ("A fair reading of both subsections [of Section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class").

[60]   *See In re Briscoe Enters.*, 994 F.2d at 1167 (Claims may be classified separately for good business reasons and a plan proponent cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re Mirant Corp.*, 2007 WL 1258932 at *7 (Bankr. N.D. Tex. Apr. 27, 2007) ("Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class. Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for that classification.").

(including DIP Facility Claims), Priority Tax Claims, and Other Priority Claims are not classified and are separately treated.  The Classes under the Plan are designated as follows:  Other Secured Claims (Class 1), Prepetition ABL Claims (Class 2), Prepetition Term Loan Claims (Class 3), General Unsecured Claims (Class 4), Subordinated Claims (Class 5), Intercompany Claims (Class 6), Intercompany Interests (Class 7), and Existing Equity Interests (Class 8).

42.     The classification scheme set forth in the Plan complies with Section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other.  Furthermore, the classification scheme created by the Plan is based on the similar nature of the Claims or Interests contained in each Class and not upon an impermissible classification factor.  Similar Claims have not been placed into different Classes in order to affect the outcome of the vote on the Plan.  Rather, Other Secured Claims, Prepetition ABL Claims, Prepetition Term Loan Claims, General Unsecured Claims, and Intercompany Claims, respectively, have been classified separately because of the nature of such Claims and/or their unique proposed treatment under the Plan, as negotiated in connection with the Transaction Support Agreement.[61]  Intercompany Interests and Existing Equity Interests have been classified separately due to their distinct nature and their separate proposed treatment under the Plan.[62]  Because each Class consists of only similar Claims or Interests, the Court should approve the classification scheme of the Plan as consistent with Section 1122(a) of the Bankruptcy Code.

---

[61]   *See* Coben Declaration, ¶ 16.

[62]   *See id.*

### 2.  The Plan Satisfies the Requirements of Section 1123(a).

43.  The Plan complies with all subsections of Section 1123(a) of the Bankruptcy Code, which sets forth seven requirements that every chapter 11 plan must satisfy.[63]

44.  <u>Designation of Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)</u>.  Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of interests and claims, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising in the "gap" period in an involuntary case),[64] and Section 507(a)(8) (priority tax claims).[65]  As described above, Article III of the Plan designates Classes of Claims and Interests in compliance with Section 1123(a)(1).

45.  <u>Specification of Unimpaired Classes – 11 U.S.C. § 1123(a)(2)</u>.  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[66]  Article III of the Plan provides that Claims and Interests in Classes 1, 2, and 4 are Unimpaired under, and conclusively presumed to accept, the Plan.  Furthermore, Claims and Interests in Classes 6 and 7 may be Unimpaired under, and may be conclusively presumed to accept, the Plan.[67]

46.  <u>Specification of Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)</u>.  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[68]  As provided in Article III of the Plan, Claims and

---

[63]  11 U.S.C. § 1123(a).  Section 1123(a)(8) does not apply in the Chapter 11 Cases because the Debtors are not individuals.

[64]  The Debtors commenced a voluntary chapter 11 case; therefore, there are no "gap" period claims of the kind specified in Section 507(a)(3) of the Bankruptcy Code.

[65]  11 U.S.C. § 1123(a)(1).

[66]  11 U.S.C. § 1123(a)(2).

[67]  The Plan provides that Claims and Interests in Classes 6 and 7 may be either Impaired or Unimpaired.

[68]  11 U.S.C. § 1123(a)(3).

Interests in Classes 3 and 5 are designated as Impaired under the Plan. In accordance with Section 1123(a)(3), Article III of the Plan specifies the treatment afforded to the Impaired Classes of Claims – Class 3 Prepetition Term Loan Claims and Class 5 Subordinated Claims. Furthermore, Claims and Interests in Classes 6 and 7 may be Impaired under, and may be conclusively deemed to reject, the Plan.[69]

47.      <u>Same Treatment of Claims or Interests Within Each Class – 11 U.S.C. § 1123(a)(4)</u>. Section 1123(a)(4) of the Bankruptcy Code requires that the treatment of each claim or interest in each particular class be the same as the treatment of all other claims or interests in such class unless the holder of a particular claim or interest agrees to less favorable treatment.[70] The Plan complies with Section 1123(a)(4) by ensuring that the treatment of each Claim or Interest in each particular Class is the same as the treatment of all other Claims or Interests in such Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest.

48.      <u>Adequate Means for Implementation of Plan – 11 U.S.C. § 1123(a)(5)</u>. Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means."[71] In

---

[69]   *See* Footnote 63.

[70]   11 U.S.C. § 1123(a)(4).

[71]   *See* 11 U.S.C. § 1123(a)(5). Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's implementation, "such as—

(A)  retention by the debtor of all or any part of the property of the estate;

(B)  transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;

(C)  merger or consolidation of the debtor with one or more persons;

(D)  sale of all or any part of property of the estate … among those having an interest in such property of the estate;

(E)  satisfaction or modification of any lien;

(F)  cancellation or modification of any indenture or similar instrument;

accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article V of the Plan, provides adequate means for its implementation, including, among other things: (a) the continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors under Articles IV.C and IV.D of the Plan, respectively; (b) the adoption of the New Organizational Documents that will govern the Reorganized Debtors and the appointment of the initial board of managers of the Reorganized Debtors, as provided in Articles IV.J and IV.M of the Plan, respectively, and as set forth in the Plan Supplement; (c) the issuance of New Equity Interests for distribution in accordance with the terms of the Plan, as detailed in Article IV.H; (d) the entry by the Reorganized Debtors into the Exit Facilities Documents, as detailed in Article IV.G of the Plan; (e) the cancellation of obligations of the Debtors under the Prepetition Term Loan Documents (to the extent not already cancelled and extinguished), the Prepetition ABL Facility Documents (to the extent not already cancelled and extinguished), the DIP Facilities Documents, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest, in each case, to the extent provided in the Plan, as detailed in Article IV.E of the Plan; (g) the release and discharge of all Liens, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Exit Facility Documents), on the Effective Date and concurrently with the applicable

---

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose."

distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, as detailed in Article IV.K of the Plan; (h) the preservation of certain causes of action by the Reorganized Debtors pursuant to Article IV.N of the Plan; (i) the various discharges, releases, injunctions, indemnifications and exculpations provided in Article IX of the Plan; (j) the process for implementation of the Management Incentive Plan and continuation of certain employee benefits, as described in Articles V of the Plan; and (k) the assumption or rejection of executory contracts and unexpired leases to which any Debtor is a party, as detailed in Article V of the Plan.[72] Accordingly, the Plan provides adequate means for its implementation in a manner consistent with Section 1123(a)(5) of the Bankruptcy Code.

49.     Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6).  Under Section 1123(a)(6) of the Bankruptcy Code, a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision prohibiting the issuance of nonvoting equity securities . . . ." 11 U.S.C. § 1123(a)(6).  Article IV.J of the Plan provides that the New Organizational Documents of the Debtors shall be deemed to be modified to prohibit the issuance of non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code.[73]  In addition, the Second Amended and Restated Certificate of Incorporation of the Reorganized Parent includes language that prohibits the issuance of non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code.[74] As a result, the Plan complies with Section 1123(a)(6) of the Bankruptcy Code to the extent applicable.

---

[72]     *See* Coben Declaration, ¶ 22.

[73]     *See* Coben Declaration, ¶ 24.

[74]     *See* Plan Supplement, Ex. B-2.

50.     <u>Selection of Directors and Officers — 11 U.S.C. § 1123(a)(7)</u>.  Section 1123(a)(7) of the Bankruptcy Code provides that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee."[75]

51.     In accordance with Section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' formation documents, bylaws and similar constituent documents, the manner of selection of officers and directors or managers, as appliable, of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  As contemplated by the Transaction Support Agreement and the Governance Term Sheet, Reorganized Parent's go-forward board will be designated by the Required Consenting Lenders, who will hold, collectively, the vast majority of the equity in Reorganized Parent.[76]  The Debtors disclosed in the Plan Supplement the known proposed members of Reorganized Parent's board of managers and their affiliations as well as the parties entitled to appoint the remaining board members.[77]  Additionally, it is expected that the Debtors existing officers are expected to continue as officers of the Reorganized Debtors following the Effective Date.[78]  Each of the insiders is compensated with an annual salary and the opportunity to earn additional awards through various incentive plans, as described in the Wages Motion and the Plan.[79]  In addition, as described in the Plan, the Reorganized Debtors will adopt the Management

---

[75]   11 U.S.C. § 1123(a)(7).

[76]   *See* Coben Declaration, ¶ 26

[77]   *See* Plan Supplement, Ex. G; *see also* Coben Declaration, ¶ 26.

[78]   For the avoidance of doubt, no employees are relatives of officers such that they would qualify as "insiders" under Section 101(31) of the Bankruptcy Code.

[79]   The "***Wages Motion***" means the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay of Certain Employee Compensation and Benefits, (B) Maintain and Continue Such Benefits and Other*

Incentive Plan after the Effective Date.[80]   Accordingly, the Plan satisfies the requirements of Section 1123(a)(7) of the Bankruptcy Code.

### 3. The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

52.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.[81]   Among other things, Section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[82]

53.     The Plan is consistent with Section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 4 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of, or otherwise provides treatment in accordance with Section 1124(2) to, the Holders of Claims and Interests within such Classes.[83]   On the other hand, Classes 3, 5, and 8 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[84]   Classes 6 and 7 may be either Impaired or Unimpaired because the Plan may modify the rights of

---

*Employee-Related Programs, and (C) Pay Prepetition Claims of Contracted Labor; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* [Docket No. 11].

[80]   *See* Plan, Art. IV.M.

[81]   *See* 11 U.S.C. § 1123(b).

[82]   *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[83]   *See* Plan, Art. III.

[84]   *See id.*

the Holders of Claims or Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[85]  As permitted by Section 1123(b)(2) of the Bankruptcy Code, for the reasons set forth below, Article V of the Plan provides for the assumption, subject to certain exceptions set forth in Article V of the Plan, of all of the Debtors' executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code.[86]  Finally, for the reasons set forth below, the release, exculpation, and injunction provisions contained in Article IX of the Plan are consistent with Section 1123(b) of the Bankruptcy Code.

### 4. The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Are Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code.

54.    As set forth in Section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.[87]  Pursuant to Article V of the Plan, and except as otherwise provided therein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed assumed and amended (as necessary to implement the terms of the Restructuring Transaction), as of the Effective Date, unless such contract or lease: (a) is set forth in the Rejected Executory Contract/Unexpired Lease List, (b) is the subject of another motion to reject filed on or before the Confirmation Date previously expired or terminated pursuant to its own terms, or (c) previously expired or terminated pursuant to its own terms.  The Plan provides that entry of the Combined Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.[88]

---

[85]  *See id.*

[86]  *See* Plan, Art. VI.

[87]  11 U.S.C. § 1123(b)(2).

[88]  *See* Plan, Art. V.A.

55.     Under the Plan, the Debtors reserve the right to amend or supplement the Rejected Executory Contract/Unexpired Lease List in their discretion before the Effective Date.[89]  After the Effective Date, the Reorganized Debtors have the right to amend the Rejected Executory Contract/Unexpired Lease List; *provided*, that such right to amend shall not apply to any Unexpired Lease for nonresidential property; *provided, further* that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.[90]  Any Rejection Damages Claims for Executory Contracts or Unexpired Leases that the Debtors, with the consent of the Required Consenting Term Lenders, elect to reject shall be paid in full on the Effective Date, subject to the applicable provisions of the Bankruptcy Code; *provided* that such Claim is not a Subordinated Claim, in which case such Claim shall be treated as a Subordinated Claim pursuant to the terms of this Plan.[91]

56.     Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[92]  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[93]  Indeed, courts recognize that to impose more exacting scrutiny than the

---

[89]  *See id.*

[90]  *See id.*

[91]  *See* Plan, Art. V.C.

[92]  11 U.S.C. § 365(a).

[93]  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (recognizing business judgment standard); *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513, 523 (1984) (same); *In re Eagle Bus Mfg.*, 134 B.R. at 597 (confirming plan in which decisions regarding assumption or rejection of executory contracts and unexpired leases were based on sound business judgment and in best interests of the estate); *see also In re Idearc, Inc.*, 423 B.R. at 162 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) (for the proposition that courts will approve a debtor's assumption or rejection of an executory contract or unexpired lease

business judgment standard would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provision for private control" of the estate's administration.[94]

57.     The assumption or rejection by the Debtors of their executory contracts and unexpired leases in accordance with and subject to the terms and conditions of the Plan is both beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11.[95]  The assumption or rejection of each of the executory contracts and unexpired leases proposed to be assumed or rejected pursuant to Section 365 of the Bankruptcy Code and the Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their Estates and their creditors.[96]  Based upon, among other things, the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, each Reorganized Debtor that is assuming an executory contract or unexpired lease pursuant to the Plan will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed or assumed and assigned on and after the Effective Date.[97]

58.     Finally, the assumption by the Debtors of (a) the Indemnification Obligations pursuant to Article V.H of the Plan and (b) all the D&O Insurance Policies pursuant to Article V.F of the Plan, is of fundamental importance to the Debtors' reorganization process, a sound exercise of the Debtors' business judgment, and in the best interest of the Debtors and their Estates.[98]

---

unless evidence is presented that the debtor's decision to assume or reject "was so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice")).

[94]     *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

[95]     *See* Coben Declaration, ¶ 28.

[96]     *See id.*

[97]     *See id.*

[98]     *See* Coben Declaration, ¶ 29.

5.    **Assumption of the Transaction Support Agreement and Payment of the Premiums and Fees Thereunder Is Appropriate.**

59.    The Plan provides for the assumption of the Transaction Support Agreement and for the payment of certain premiums and fees in consideration for the substantial commitments made thereunder. [99]

60.    Pursuant to the Transaction Support Agreement, the Debtors have agreed to pay the DIP Put Option Premium,[100] the DIP Commitment Premium,[101] and the DIP Equity Premium[102] (collectively, the "***Consent Premium***") in consideration for the various contributions and, in certain instances, material concessions made by the Consenting Stakeholders under the Plan.

61.    The Debtors' assumption of the Transaction Support Agreement is integral to the Debtors' ability to effectuate the Restructuring Transactions contemplated by the Plan and to maximize value for all stakeholders.[103]  The Consent Premium was the subject of arm's-length and good faith negotiations between the Debtors, the Consenting Stakeholders and, together with the Restructuring Fees and Expenses, [104] are integral components of the Transaction Support

---

[99]    *See* Plan, Art. V.A.

[100]    The DIP Put Option Premium is payable to certain Consenting Term Lenders backstopping the DIP Facilities in an amount equal to their pro rata share of a put option premium comprising 5% of the aggregate amount of the commitments to fund the First-Out DIP Term Loans under the DIP Term Loan Facility, payable in kind upon the initial funding of the First-Out DIP Term Loans in the form of additional First-Out DIP Term Loans.

[101]    The DIP Commitment Premium is payable to DIP Term Lenders in an amount equal to 2% of the aggregate principal amount of the First-Out DIP Term Loans.

[102]    The DIP Equity Premium is payable to Holders of Prepetition Term Loan Claims that fund the DIP Term Loans, in an amount equal to a pro rata amount of 64% of the New Equity Interests, subject to dilution only by the Management Incentive Plan.

[103]    *See* Dunayer Declaration, ¶ 16.

[104]    "***Restructuring Fees and Expenses***" means all reasonable and documented fees and expenses of the (a) Agents, (b) Prepetition Term Loan Agent Advisors, (c) DIP Term Loan Agent Advisors; (d) Exit Facility Agent Advisors, and (e) Ad Hoc Group Advisors in each case, payable in accordance with the terms hereof, the applicable engagement and/or fee letters with the Debtors, the Transaction Support Agreement, the DIP Facilities Documents, the Prepetition Term Loan Documents, the DIP & Exit ABL Commitment Letter, and the Interim DIP/Cash Collateral Order, as applicable, and subject to any order of the Bankruptcy Court and any other applicable agreements by such party with respect thereto.

Agreement and the Plan.[105]  The Ad Hoc Group has spent substantial time and expense negotiating the Restructuring Transactions with the Debtors.  In addition, the Consenting Lenders have agreed to make substantial contributions under the Plan including, among other things, (a) compromising Claims and accepting impaired recoveries, (b) participating in raising new money debt, including the DIP Term Loan Facility, and (c) negotiating and supporting the Restructuring Transactions that maintain the Debtors' businesses and provide full recoveries to Holders of General Unsecured Claims.[106]

### 6.    The Plan Complies With Section 1123(d) of the Bankruptcy Code.

62.    Section 365(b)(1) and Section 1123(b)(2) of the Bankruptcy Code provide that a debtor may not assume an executory contract or unexpired lease unless, among other things, it cures any defaults at the time of assumption.[107]  Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."[108]

63.    The Plan complies with Section 1123(d) of the Bankruptcy Code.  Article V.B of the Plan and the Proposed Combined Order provide for the satisfaction of any monetary amounts by which each executory contract and unexpired lease to be assumed is in default by payment of the default amount in cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree in accordance with Section 365(b)(1) of the Bankruptcy Code.

---

[105]    *See* Dunayer Declaration, ¶ 16.

[106]    *See id.*

[107]    11 U.S.C. § 365(b)(1); 11 U.S.C. § 1123(b)(2).

[108]    11 U.S.C. § 1123(d).

7.    **The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code.**

64.    The Plan includes certain releases of the Debtors and third-parties, an exculpation provision, and an injunction provision.[109]  These provisions comply with the Bankruptcy Code and applicable law because, among other things, they are fair and equitable, are given for valuable consideration, are the product of extensive good faith, arm's-length negotiations by sophisticated entities that were represented by able counsel and financial advisors, were a material inducement for parties to enter into the Transaction Support Agreement, and are in the best interests of the Debtors and the Chapter 11 Cases.[110]  In addition, the Third-Party Release contained in the Plan is consensual and consistent with Fifth Circuit precedent.  None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of Section 1123(b) of the Bankruptcy Code are satisfied.

a.    **The Debtor Release Complies With the Bankruptcy Code and Is Appropriate.**

65.    Article IX.B of the Plan provides for the Debtors to release the Released Parties, as contemplated by Section 1123(b)(3)(A) of the Bankruptcy Code.  Section 1123(b)(3)(A) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[111]  Accordingly, pursuant to Section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by its various stakeholders pursuant to the Plan.[112]  In considering the appropriateness of such releases, courts in

---

[109]    *See* Plan, Art. IX.

[110]    *See* Coben Declaration, ¶ 49.

[111]    11 U.S.C. § 1123(b)(3)(A).

[112]    *See*, *e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *see also In re Heritage Org., L.L.C.,* 375 B.R. 230, 259

the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[113]

*(i)*      ***The Debtor Release is Fair and Equitable***

66.      While courts sometimes conflate the two prongs of the foregoing analysis, the "fair and equitable" prong is generally interpreted, consistent with that term's usage in Section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[114]  Courts generally determine whether a release is "in the best interest of the estate" by reference to the following factors:

(a)    the probability of success of litigation;

(b)    the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

(c)    the interest of creditors with proper deference to their reasonable views; and

(d)    the extent to which the settlement is truly the product of arm's-length negotiations.[115]

Ultimately, courts afford a debtor some discretion in determining for itself the appropriateness of granting plan releases of estate causes of action.[116]

67.      Article IX.B of the Plan provides for releases by the Debtors, the Reorganized Debtors, and their Estates of any and all Causes of Action, including any derivative claims, that

---

(Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[113]    *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

[114]    *In re Mirant Corp.*, 348 B.R. at 738.

[115]    *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citation omitted); *In re Mirant Corp.*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)).

[116]    *See In re Gen. Homes*, 134 B.R. at 861 ("[t]he court concludes that such a release is within the discretion of the Debtor").

38

the Debtors could assert against the Released Parties[117] (the "***Debtor Release***"). The Debtor Release easily meets the controlling standard. The Plan, including the Debtor Release, complies with the Bankruptcy Code's absolute priority rule because (a) Classes 1, 2, and 4 are Unimpaired, (b) Class 3 has voted to accept the Plan, (c) the Holders of Claims and Interests in Classes 6 and 7 are Affiliates and/or party to the Restructuring Support Agreement, pursuant to which they agreed to support the Plan, and (d) with respect to Holders of Claims and Interests in Classes 5 and 8 respectively, no Holder of a Claim or Interest junior to the Claims and Interests in Classes 5 and 8 will receive or retain on account of such Claims or Interests any property under the Plan.[118] Therefore, the release is "fair and equitable" to all Classes.[119]

---

[117] "***Released Party***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor, (b) each Reorganized Debtor, (c) each Non-Debtor Affiliate, (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors, officers, and proxyholders, (e) each Consenting Stakeholder, (f) each Prepetition Agent, (g) each DIP Agent, (h) each DIP Term Lender, (i) the DIP ABL Lender, (j) each Exit Facility Agent, (k) each lender under the Exit Facilities, (l) each Releasing Party, and (m) each Related Party of each Entity in clauses (a) through (l); *provided*, that, in each case, an Entity shall not be a Released Party if it (a) elects to opt out of the Third-Party Release as provided on its respective Release Opt-Out Form, (b) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (c) provides to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; *provided*, *further*, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void *ab initio*.

"***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

[118] Claims in Class 7 (510(b) Claims) are subordinated under Section 510(b) of the Bankruptcy Code "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." *See* 11 U.S.C. § 510(b).

[119] *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("[T]he absolute priority rule provides that a *dissenting class* of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (internal citation omitted) (emphasis added); *see also In re Mirant Corp.*, 348 B.R. at 738 ("Because 'fair and equitable' translates to the absolute priority rule, in order for a

### *(ii)* *The Debtor Release is in the Debtors' Best Interests*

68.     In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.[120]  To begin, based on their review, the Debtors are not aware of any claims being released that might reasonably be expected to yield value for their Estates.  As discussed in Article III of the Disclosure Statement, on December 4, 2024, the Board constituted a two-member independent special subcommittee of the Restructuring Committee (the "***Investigation Subcommittee***")[121]  in order to identify the existence of any valuable claims or causes of action that should be prosecuted for the benefit of the Debtors' Estates.  The Investigation Subcommittee tasked Hunton Andrews Kurth LLP ("***Hunton***")[122] with leading an investigation into (a) potential claims or causes of action belonging to the Debtors against those of the Released Parties that were viewed as the most likely targets of potentially viable and/or valuable claims (the "***Identified Potential Targets***") and (b) prepetition transactions entered into by the Debtors that may give rise to potential claims or causes of action against the Identified Potential Targets.[123]  To the extent that any such claim or cause of action was identified, the Investigation Subcommittee was given the mandate to determine whether any such potential claim or cause of action should be preserved for the benefit of the Debtors' Estates and stakeholders.

69.     As set forth in the Coben Declaration, as part of the investigation, and at the request of the Investigation Subcommittee, Hunton conducted a thorough investigation into the

---

settlement to meet that test it must be consistent with the requirement that *dissenting classes* of creditors must be fully satisfied before any junior creditor receives anything on account of its claim") (emphasis added).

[120]   *See* Coben Declaration, ¶ 49.

[121]   The Investigation Subcommittee members are Karen Stuckey and Charles Tyson.

[122]   In connection with the Company's contingency planning efforts, the Company engaged Hunton as co-counsel on November 26, 2024.

[123]   *See* Coben Declaration, ¶ 52.

transactions and conduct leading up to the bankruptcy filing.[124]   The Investigation Subcommittee determined, based in part on its own review of the factual record as well as the findings and recommendations of Hunton, that (i) the pursuit of Claims and Causes of Action of the Debtors against the Identified Potential Targets, is unlikely to yield value for the Debtors' Estates even if such Claims or Causes of Action may be viable; and (ii) the benefits of pursuing such Claims or Causes of Action are outweighed by the benefits afforded by the Plan.[125]   Thus, the Investigation Subcommittee concluded that such Claims or Causes of Action likely offered no additional value to the Debtors or their Estates, particularly in light of the terms of the Plan and the recovery and settlements embodied  therein, including that all of the Debtors' general unsecured creditors and holders of Other Secured Claims are being paid in full.[126]   The Investigation Subcommittee and Hunton also conveyed these findings to the Board and explained that, based upon its investigation, the Debtor Release contemplated by the Plan was reasonable and should be approved by the Board as an essential and critical provision of the Plan.[127]

70.     Further supporting the conclusion that the Debtor Release is in the best interest of the Estates is the fact that each Released Party has played an integral role in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a de-leveraged capital structure, and/or may be unwilling to support the Plan without the Debtor Release.[128]   The Plan is supported

---

[124]   *See id.*

[125]   *See id.* at ¶ 54.

[126]   *See id.*

[127]   *See id.*

[128]   *See* Coben Declaration, ¶ 56; *see also Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'") (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296 (9th Cir. 1985)).

by the holders of over 90% of the Prepetition Term Loan Claims, the sole impaired creditors under the Plan. It is highly unlikely that all claims would be unimpaired or paid in full but for the Plan, including the Debtor Release. Moreover, many of the Released Parties would be entitled to indemnification for the costs attendant to any Claims asserted. Given that (a) such indemnification obligations are General Unsecured Claims, (b) all General Unsecured Claims are proposed to be paid in full and under the Plan, and (c) the Plan also provides for the assumption of all Indemnification Provisions, there is a further practical economic reality for the provision of the Debtor Release and alignment with other Plan provisions even in the absence of the conclusions reached by the Investigation Subcommittee. Lastly, the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and financial advisors.[129] Accordingly, the Debtor Release is fair, equitable, and in the best interests of its Estates, are justified under the controlling Fifth Circuit standard, and should be approved.

**b.** ***The Consensual Third-Party Release Complies With the Bankruptcy Code and Is Appropriate.***

71.     The third-party release provision contained in Article IX.C of the Plan provides that each Releasing Party,[130] including each Holder of a Claim or Equity Interest in a Class who does

---

[129]  *See* Coben Declaration, ¶ 49.

[130]  "***Releasing Parties*** *means*, collectively, each of, and in each case in its capacity as such: (a) each Non-Debtor Affiliate; (b) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (c) each Consenting Stakeholder; (d) each Prepetition Agents; (e) each DIP Agent; (f) each DIP Term Lender; (g) the DIP ABL Lender; (h) each Exit Facility Agent; (i) each lender under the Exit Facilities; (j) each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively elect to opt out of the Releases contained in this Plan or that does not (A) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (B) provide to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; and (k) each Related Party of each Entity in clauses (a) through (j), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (j) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (j); provided, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void ab initio.

not affirmatively elect to opt out of the releases contained in the Plan, is deemed to release the claims it holds against the Debtors, the Reorganized Debtors, and the other Released Parties (the "***Third-Party Release***").  A release is justified and in conformity with Fifth Circuit precedent when the release is *consensual*.[131]  Indeed, as noted by a bankruptcy court in this Circuit, "most courts allow consensual non-debtor releases to be included in a plan."[132]  Here, the solicitation process gave, and the Plan expressly allows for, the ability of affected parties in interest to object to (formally or informally) or opt out of the Third-Party Release.  Accordingly, the Third-Party Release is justified under Fifth Circuit precedent as consensual.

72.     The Fifth Circuit, like other circuits, has not directly defined what constitutes a "consensual" third-party release.  Nonetheless, bankruptcy courts in the Fifth Circuit largely analyze whether third-party releases are consensual by focusing on the facts and circumstances of the specific *process*—i.e., whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[133]

73.     The notice furnished by the Debtors to parties in interest, the review opportunity afforded to such parties, and the general disclosure in these Chapter 11 Cases meets the established

---

[131]  *See, e.g.*, *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'  Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex.  2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent*") (emphasis in original).  The Debtors acknowledge the line of decisions from the United States Court of Appeals for the Fifth Circuit that limit or prohibit third party releases.  However, as set forth in such decisions, such limitation applies to *nonconsensual* third party releases.  *See Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031, 1059 (5th Cir. 2012); *Bank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995).

[132]  *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

[133]  Conf. Hr'g Tr. 47:7-11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730]; *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323-24 (Bankr. S.D. Tex. 2024) (noting procedures for providing notice and opportunity to opt out of third party releases).

requirements for the Third-Party Release to be considered consensual.  Indeed, the Debtors clearly and conspicuously, in all-bold text, included the full text of the Third-Party Release language, including a description of the Claims being released, in the Ballot, the Release Opt-Out Forms, and the Notice of Non-Voting Status, which were sent to all potential Releasing Parties.[134] Additionally, the Debtors made this information available free of charge on the case website maintained in these Chapter 11 Cases by the Notice and Claims Agent.[135]  In each of the foregoing, the Debtors explicitly provided the potential Releasing Parties with clear directions for how to opt out of the Third-Party Release.   The Solicitation Procedures Motion further provided that the Notice and Claims Agent would assist potential Releasing Parties with locating or receiving unique Ballot ID numbers to be utilized for submitting an opt-out through the Notice and Claims Agent's website portal. And notably, the Debtors know the process worked because, as reflected in the Vote Certification, numerous parties did, in fact, timely elect to opt out of the Third-Party Release by submitting Ballots or Release Opt-Out Forms, as applicable, to the Notice and Claims Agent.[136]

74.     Additionally, prior to the Court's approval and entry of the Solicitation Procedures Order, the U.S. Trustee provided language to the Debtors (that the Debtors accepted and inserted in the Ballot) that made clear that, even if a creditor opted out of the Third-Party Release, such creditor would still receive the consideration and treatment for its Claim provided under the Plan.[137]  Importantly, under the Plan, the Releasing Party granting the Third-Party Release could opt out of the Third-Party Release without the need to object to or vote against confirmation of the

---

[134]    *See* Prepetition Certificate of Service.

[135]    *See* https://www.veritaglobal.net/thecontainerstore.

[136]    *See* Vote Certification.

[137]    *See* bold, conspicuous language in the box on the first page of each Ballot providing: "Please be advised that your decision to opt out <u>does not</u> affect the amount of distribution you will receive under the Plan. Specifically, your recovery under the Plan will be the same if you opt out…"

Plan.  Said differently, a party could opt out of the Third-Party Release without impacting its recovery under the Plan and regardless of whether that party voted to accept or reject the Plan.[138] This procedure was laid out in detail in the Solicitation Procedures Motion and the Notices approved by the Court and provided to the Releasing Parties.

75.     Further, the Release Opt-Out Form is only one way by which a party can effectively opt out of the Third-Party Release.  As set forth in the Plan, any party can also file an objection on the docket maintained in these Chapter 11 Cases or send an email to the Debtors' counsel stating that they do not wish to grant the Third-Party Release and, upon doing so, such party will not be held to be a Releasing Party.[139]

76.     Suffice it to say, the confluence of steps that the Debtors took in connection with the Third-Party Release meet the applicable consent standard employed by courts within this Circuit which, as noted above, looks to whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[140]

77.     The Fifth Circuit has also shed light on the issue of consent through a series of decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third-party release provision.[141]  For example, in *Republic Supply*, the Fifth Circuit found that the

---

[138]  The U.S. Trustee's suggestion that the Third-Party Release is  not consensual because parties voting in favor of the Plan are deemed "Releasing Parties" is unpersuasive in light of the fact that the Debtors included the language requested by the U.S. Trustee which unambiguously provides that distributions are not tied to opt outs (nor does the Plan propose a so-called death trap in which creditors who vote to reject the Plan forfeit the right to a distribution).

[139]  Plan Art. I.A.157.

[140]  Conf. Hr'g Tr. 47:7-11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730].

[141]  *See Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286-88 (5th Cir. 2016); *FOMPuerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 Fed. App'x 909, 911-12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization,"[142] and ultimately held that such provision was binding and enforceable.[143]  The Fifth Circuit addressed the same issue on three occasions thereafter, analyzing the specificity of the third-party release to determine its *res judicata* effect.[144]  *Republic Supply* and its Fifth Circuit progeny ultimately stand for the proposition that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[145] This rule is consistent with the theory that "[t]he validity of a consensual release is primarily a question of contract law because such releases are no different from any other settlement or contract."[146]

78.     The Third-Party Release meets the *Republic Supply* standard.  First, the Third-Party Release is consensual.  As set forth above, parties in interest were provided fair and extensive notice of the Chapter 11 Cases, the Plan (including the Third-Party Release), and the deadline to object to confirmation of the Plan and related releases.  Further, all Holders of Claims in the Voting Class were provided with an opportunity to opt out of the Third-Party Release on their Ballots, and all non-Affiliate Holders of Claims and Interests in Non-Voting Classes were provided with an opportunity to opt out of the Third-Party Release on the Release Opt-Out Forms included with the Notice of Non-Voting Status.  Any Holders of Claims in the Voting Class or Non-Voting Classes

---

[142]  *Republic Supply*, 815 F.2d at 1050.

[143]  *Id.* at 1053.

[144]  *See generally Hernandez*, 628 Fed. App'x. 281 (comparing the specificity of the third-party release provisions at issue in *Republic Supply*, *Applewood*, and *Dr. Barnes Eyecenter*).

[145]  *In re Wool Growers*, 371 B.R. at 776 (citing *Republic Supply*, 815 F.2d at 1050; *FOMPuerto Rico*, 255 Fed. App'x at 911-12).

[146]  *Id.* at 775 (*citations omitted*).

that timely submitted a valid Release Opt-Out Form or otherwise objected to granting the Third-Party Release (formally or informally) will not be deemed to grant the Third-Party Release.[147]

79.     In sum, all potential Releasing Parties were given ample opportunity to opt out of the Third-Party Release, all parties in interest were given ample notice of the Third-Party Release and all potential Releasing Parties were given ample opportunity to demonstrate their consent to the Third-Party Release by taking the simple and easy-to-follow steps necessary to elect to opt out of the Third-Party Release, thus demonstrating their consent or non-consent.[148]

80.     Second, the language in the Plan and the prepetition solicitation materials is sufficiently specific so as to put the Releasing Parties on notice of the Third-Party Release.  The Third-Party Release describes in detail the nature and type of Claims being released, including Claims with respect to:

> (1) the management, ownership, or operation of the Debtors or the Non-Debtor Affiliates, (2) the purchase, sale, or rescission of any Security of the Debtors or the Non-Debtor Affiliates, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Entity, (5) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, filing, or consummation of this Plan, the Disclosure Statement, the Transaction Support Agreement, the Definitive Documents, the Prepetition ABL Facility Documents, the Prepetition Term Loan Documents, the DIP Facilities Documents, the Exit Facilities Documents (and any financing permitted thereunder), the Chapter 11 Cases, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the Disclosure Statement, the Transaction Support Agreement, the Definitive Documents, the Prepetition ABL Facility Documents, the Prepetition Term Loan Documents, the DIP Facilities Documents, the Exit Facilities Documents (and any financing permitted thereunder), the New Governance Documents, the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of the Plan, or the Restructuring

---

[147]     *See* Plan, Art. A.157.

[148]     *See* Vote Certification.

Transactions, including the issuance or distribution of Securities pursuant to this Plan, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan or any other related agreement, or (10) any other act, or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date.[149]

Each of the Ballots and the Release Opt-Out Forms contained the same clear disclosure providing the nature and types of Claims being released, thus providing sufficient specificity to the Releasing Parties of the nature and types of Claims being released. The clear language of the Plan and the language sent to the Releasing Parties in the Ballot and Release Opt-Out Forms transparently placed the Releasing Parties on notice of the types of Claims being released. And notably, this language is consistent with other third-party releases that have been approved by this Court.

81. Third, the Third-Party Release is integral to the Plan and a condition to the global settlement embodied therein. As described above and in the Coben Declaration, the provisions of the Plan and Transaction Support Agreement, including the Third-Party Release, were integral to the global settlement, and such parties may be unwilling to support the Plan without the Third-Party Release.[150] Indeed, the Transaction Term Sheet attached to the Transaction Support Agreement, which set forth the global settlement embodied in the Plan, required that the parties would incorporate release provisions into the Plan.[151]

82. Fourth, the Third-Party Release is to be provided in exchange for significant consideration. All parties in interest benefit from the Restructuring Transactions contemplated by the Transaction Support Agreement and the Plan—including the distributions under the Plan and the reduction of debt—which will allow the Debtors to emerge as reorganized entities better positioned for long-term growth to the benefit of the Debtors' employees, vendors, and commercial

---

[149] Plan, Article X.C.

[150] *See* Coben Declaration, ¶ 56.

[151] *See* Disclosure Statement, Ex. B.

counterparties.  That accomplishment is a direct result of the contributions of and, in some cases, material concessions made by, the Released Parties.  Such contributions include, among other things, (a) compromising Claims and accepting impaired recoveries, (b) participating in raising new money debt (and providing backstop commitments with respect to those investments), (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases, (d) negotiating and supporting the Plan, and (e) in the case of the Debtors' directors, officers, and employees, their immense efforts on behalf of the Debtors both prior to and throughout the Chapter 11 Cases.[152]  Furthermore, Holders of Claims and Interests who do not opt out of the Third-Party Release will be considered Released Parties, receiving a release from Releasing Parties under the Plan.

83.    The Consenting Stakeholders engaged with the Debtors in extensive good faith negotiations and spent many months working with the Debtors to develop and implement a value-maximizing restructuring, culminating with the upcoming hearing on confirmation of the Plan.[153]  The Transaction Support Agreement provided the Debtors with liquidity during the Chapter 11 Cases by providing for DIP Facilities of approximately $255 million (inclusive of up-front fees paid-in-kind), backstopped by certain of the Consenting Term Lenders, which also provided financing for the Debtors to repay the outstanding Prepetition Term Loan Facility during the Chapter 11 Cases.[154]  In short, the contributions and efforts of the Released Parties in formulating the Plan have allowed the Debtors to achieve a value-maximizing outcome and strongly support approval of the Third-Party Release.

---

[152]  *See* Coben Declaration, ¶ 56.

[153]  *See id.*

[154]  *See id.*

84.     Finally, courts have held that creditors who fail to return their ballot, or are not entitled to vote because they are unimpaired, have demonstrated their consent to third-party releases contained in a plan, and can thus be bound by such releases.[155]  Here, the Plan goes further by providing (i) Holders of Claims in the Voting Class with the opportunity to opt-out of the Third-Party Release, regardless of whether they voted to accept or reject the Plan, by indicating their election to opt-out on their Ballot, and (ii) Holders of Claims and Interests in Non-Voting Classes with the opportunity to opt-out of the Third-Party Release by indicating their election to opt-out on the Release Opt-Out Form.  Thus, only Holders of Claims and Interests who elect not to opt-out of the Third-Party Release will be deemed to have consented to the grant of the Third-Party Release.

### c.      The Exculpation Provision Complies With the Bankruptcy Code and is Appropriate.

85.     Article IX.D of the Plan provides that each Exculpated Party—*i.e.*, the Debtors—shall be released and exculpated from any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date relating to the Chapter 11 Cases, except for acts or omissions that are found to have been the product of willful misconduct, actual fraud, or gross negligence (the "***Exculpation Provision***").  Unlike the Third-Party Release, the Exculpation Provision does not affect the liability of Exculpated Parties *per se*, but rather sets a standard of care of willful misconduct, actual fraud, or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[156]  A

---

[155]   In *In re Indianapolis Downs, LLC*, the court confirmed a plan that provided that creditors were deemed to have consented to the plan's third party release provisions where: (a) the creditor voted to reject or accept the plan and failed to "opt-out", (b) the creditor failed to return his/her ballot, or (c) the creditor's claims were unimpaired, and therefore, were not entitled to vote.  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013); *see also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual).

[156]   *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

bankruptcy court may approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[157]  Accordingly, an exculpation provision represents a legal conclusion resulting from certain findings a bankruptcy court must reach in confirming a plan.[158]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[159]  Exculpation provisions appropriately prevent future collateral attacks against the Debtors.  Accordingly, the Exculpation Provision in the Plan is appropriate because it provides protection to the Debtors, who served as fiduciaries during the restructuring process.

86.    The Exculpation Provision is an integral component of the global settlement embodied in the Plan and is the product of good faith, arm's-length negotiations.[160]  The Exculpation Provision is narrowly tailored to the Debtors,[161] excludes acts of willful misconduct, actual fraud, and gross negligence, and relates only to acts or omissions in connection with or arising out of the administration of the Chapter 11 Cases.[162]  Accordingly, the Debtors respectfully submit that the Exculpation Provision should be approved.

---

[157]   *See* 11 U.S.C. § 1129(a)(3).

[158]   *See* 11 U.S.C. § 157(b)(2)(L).

[159]   *In re PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity" for actions within the scope of their duties).

[160]   *See* Coben Declaration, ¶ 57.

[161]   Notably, the Original Plan's included "Estate Fiduciaries" in its definition of "Exculpated Parties."  Based upon comments received from the U.S. Trustee, this definition was modified in the First Amended Plan and now only includes the Debtors.  *See* Plan, Art. I.74.

[162]   *See* Coben Declaration, ¶ 58; *See* Plan, Art. IX.D.

        **d.**      **The Injunction Provision and Gatekeeping Provision Comply With the Bankruptcy Code and is Appropriate.**

87.     The injunction provision set forth in Article IX.E of the Plan (the "***Injunction Provision***") implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all Persons from commencing or maintaining any action against the Debtors or the Reorganized Debtors on account of or in connection with or with respect to any Claims or Interests discharged, released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a key provision of the Plan.  Accordingly, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Injunction Provision should be approved.[163]

88.     In addition, the Plan provides for a "gatekeeping" provision to implement the Plan's exculpation and release provisions.  Specifically, Article IX.E of the Plan provides that, for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third-Party Release, or Exculpation, the Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize a Person or Entity to bring such Claim or Cause of Action Covered Claim against any of the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties (the "***Gatekeeping Provision***").  The Gatekeeping Provision is consistent with the one authorized in *In re Highland*

---

[163] *See, e.g.*, *In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing.") (citing *In re Pacific Lumber*, 584 F.3d at 253; *In re Pilgrim's Pride Corp*, 2010 WL 200000, *5 (Bankr. N.D. Tex. Jan. 14, 2010)).

*Capital* and ones contained in recent plans confirmed in this District.[164]   In addition, the Gatekeeping Provision is limited to parties that have performed valuable services in connection with the Debtors' restructuring, including negotiating and supporting the Transaction Support Agreement, the Plan, the DIP Facilities, and the Exit Facilities, among other aspects of the Restructuring Transactions.[165]   The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors, the Reorganized Debtors, and the Released Parties. Accordingly, the Gatekeeping Provision is appropriate and should be approved.

**B.    The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).**

89.     Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply "with the applicable provisions of this title."[166]   Whereas Section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, Section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.[167]   In determining whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code.[168]

90.     As set forth above and as evidenced by the Vote Certification, the Prepetition Certificate of Service, and the Postpetition Certificate of Service, the Debtors have complied with

---

[164]   *See NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022).

[165]   *See* Coben Declaration, ¶ 61.

[166]   11 U.S.C. § 1129(a)(2).

[167]   *See* 7 Collier on Bankruptcy ¶ 1129.02[2] (16th ed.).

[168]   The legislative history to Section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126.  H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement. In addition, the Debtors and their professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.[169] Accordingly, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.[170]

### C. The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3).

91.     Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization only if the plan has been "proposed in good faith and not by any means forbidden by law."[171] Section 1129(a)(3) does not define good faith, but it is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[172] "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give the debtors a reasonable opportunity to make a fresh start."[173] The plan proponent must also show that the plan

---

[169] *See* Coben Declaration, ¶ 31.

[170] *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding Section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

[171] 11 U.S.C. § 1129(a)(3).

[172] *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

[173] *In re Cajun Elec. Power Coop.*, 150 F.3d at 519 (quoting *In re T-H New Orleans*, 116 F.3d at 802); *see also Brite v. Sun Country Dev. (In re Sun Country Dev.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code'" (citations omitted)).

has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.[174]

92.    The objectives and purposes of the Bankruptcy Code, and chapter 11 reorganization in particular, have been described by the United States Supreme Court as follows: "to revive the debtors' businesses and thereby preserve jobs and protect investors" and to "maximiz[e] the value of the bankruptcy estate;"[175] "to permit the successful rehabilitation of debtors;"[176] and "to provide jobs, to satisfy creditors' claims, and to produce a return for [debtors'] owners."[177]  These opinions recognize the primary legislative goal of rehabilitating viable businesses.[178]

93.    The Plan accomplishes this goal in the Chapter 11 Cases by providing the means by which the Reorganized Debtors may continue to operate as viable entities.  The Debtors filed the Chapter 11 Cases to preserve the going concern value of their businesses and to maximize the value of their Estates.[179]  The Plan is the culmination of the Debtors' efforts and the product of extensive negotiations between and among the Debtors and the Consenting Stakeholders, and it provides a mechanism for preserving the going-concern value of the Debtors through emergence from chapter 11.  In addition, the Plan provides for the continued employment of the Debtors' employees and a full recovery to trade creditors.

---

[174]  *See In re T-H New Orleans*, 116 F.3d at 802 (finding that a court may only confirm a plan for reorganization if the plan has been proposed in good faith and not by any means forbidden by law and that where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of Section 1129(a)(3) is satisfied); *see also In re Food City, Inc.*, 110 B.R. 808, 810 (Bankr. W.D. Tex. 1990) (explaining that the term "law" as used in this section, includes state law, and applies not to the substantive provision of a plan itself but rather to the means employed in proposing a plan.).

[175]  *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

[176]  *In re Bildisco*, 465 U.S. at 527.

[177]  *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

[178]  *See In re Bildisco*, 465 U.S. at 528.

[179]  *See* First Day Declaration, ¶ 11.

94. As will be further demonstrated at the Combined Hearing, the Debtors have satisfied the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code. The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing a company burdened by an unsustainable debt load. The terms of the Plan were negotiated in good faith with the Consenting Stakeholders, and their respective advisors, and achieve an outcome that is fundamentally fair to all stakeholders.[180] Indeed, the broad-based and near-unanimous support behind the Plan speaks to the good faith of the parties involved and the fairness of the Plan.

D. **The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4).**

95. Section 1129(a)(4) of the Bankruptcy Code provides that a court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[181] In other words, the debtor must disclose to the court all professional fees and expenses, and such professional fees and expenses must be subject to court approval.[182]

96. In accordance with Section 1129(a)(4) of the Bankruptcy Code, no payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases, including Claims for professional fees, has been or will be made by any Debtor other than payments that have been authorized by order of the Bankruptcy Court. Article II.A of the Plan provides for the payment of various Administrative

---

[180]   *See* Coben Declaration, ¶ 34.

[181]   11 U.S.C. § 1129(a)(4).

[182]   *See In re Cajun Elec. Power Coop.*, 150 F.3d at 514-15 (concluding that Section 1129(a)(4) is designed to assure payments for professional services are subject to the bankruptcy court's approval and determination of reasonableness); *see also In re McCommas LFG Processing Partners, LP*, 2007 Bankr. LEXIS 4053, at *45 (Bankr. N.D. Tex. 2007).

Claims, including professional Fee Claims, which are subject to Court approval and the standards of the Bankruptcy Code.  Accordingly, the provisions in the Plan comply with Section 1129(a)(4) of the Bankruptcy Code.

     E.     **The Debtors Have Disclosed All Necessary Information Regarding the Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5).**

97.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor.[183]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by Section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[184]  In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. [185]  Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) that management has experience in the reorganized debtor's business and industry,[186] (b) that management has experience in financial and management matters, [187] (c) that the debtor and creditors believe control of the entity by the proposed individuals will be beneficial,[188] and (d) that

---

[183]   *See* 11 U.S.C. § 1129(a)(5)(A)(i).

[184]   *See* 11 U.S.C. § 1129(a)(5)(B).

[185]   *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

[186]   *See In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied Section 1129(a)(5)).

[187]   *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992) ; *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[188]   *See In re Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management

the post-confirmation governance does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[189]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[190]

98.     The Debtors disclosed in the Plan Supplement the identity of the known managers of Reorganized Parent who will serve as of the Effective Date.  In addition, the Debtors disclosed the identity of the officers of Reorganized Parent who will be employed as of the Effective Date in paragraph 51 herein.  Furthermore, there are no employees who are insiders other than by virtue of being a director or officer.

99.     As noted above, certain of the individuals who will serve as managers and officers of the Reorganized Debtors are members of the Debtors' existing management team.  The Reorganized Debtors' appointment or continuance of officers, directors, and managers is "consistent with the interests of creditors and equity security holders and with public policy."[191] The proposed managers and officers of the Reorganized Debtors have significant knowledge and business and industry experience and will give the Reorganized Debtors continuity in running their businesses.  The Debtors submit that the requirements of Section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

---

post-confirmation will prejudice the creditors"); *see also In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[189]   *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[190]   7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed.).

[191]   11 U.S.C. § 1129(a)(5)(A)(ii).

F.      **The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6).**

100.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and no rate changes under the Plan will require governmental regulatory approval. As a result, the requirements of Section 1129(a)(6) of the Bankruptcy Code have been satisfied.

G.      **The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7).**

101.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders. This "best interests" test focuses on individual dissenting creditors, rather than classes of claims.[192] The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[193]

102.    As Section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or interests.[194] If a class of claims or interests unanimously approves the plan, the best interests test is deemed satisfied for all members of that class.[195] Under the Plan, Claims in Class 3 are Impaired and allowed to vote on the Plan. The Plan was accepted by 100% in amount of the Class 3 Prepetition Term Loan Claims that voted

---

[192]   *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

[193]   11 U.S.C. § 1129(a)(7).

[194]   *See* 11 U.S.C. § 1129(a)(7).

[195]   *In re Drexel Burnham Lambert*, 138 B.R. at 761; *see also In re Star Ambulance Serv., LLC*, 540 B.R. at 264.

and 100% in number of Holders of Class 3 Prepetition Term Loan Claims that voted.[196]  As such, although the best interests test is applicable only to each rejecting Holder of Claims in Class 3, the Liquidation Analysis establishes (as described therein) that the best interests test is satisfied as to each Impaired Class.

103.    Based on the liquidation analysis performed by FTI Consulting, Inc. ("**FTI**"), financial advisor to the Debtors, and annexed to the Disclosure Statement as Exhibit D (the "**Liquidation Analysis**"), including the methodology used and estimations and assumptions made therein, it is clear that the best interests test is satisfied as to Class 3.  A chapter 7 liquidation of the Debtors' Estates would result in a substantial loss of value otherwise available to Holders of Claims in Class 3 when compared to the proposed distributions under the Plan.[197]  In fact, a liquidation under chapter 7 as set forth in the Liquidation Analysis would materially and adversely affect the ultimate proceeds available for distribution to all Holders of Allowed Claims and Interests in the Chapter 11 Cases.  The Plan provides Holders of Claims in Class 3 with a recovery greater than what would be available in a liquidation under chapter 7 and, thus, the Plan satisfies the best interests test.

## H.    Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8).

104.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired by a plan.[198]  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under Section 1129(a)(8) of the Bankruptcy Code.[199]  A class of claims accepts

---

[196]  *See* Vote Certification.

[197]  *See* Disclosure Statement, Ex. D; Coben Declaration, ¶ 82.

[198]  *See* 11 U.S.C. § 1129(a)(8).

[199]  *See* 11 U.S.C. § 1126(f).

a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[200]  As further discussed below, if any class of claims or interests rejects a plan, such plan must satisfy the "cramdown" requirements of Section 1129(b) of the Bankruptcy Code with respect to such claims or interests.

105.     The Holders of Claims in the Voting Class were eligible to vote and overwhelmingly voted in favor of the Plan.  In particular,   100% in dollar amount and 100% in number of outstanding Class 3 Claims.[201]   However, Class 5 (Subordinated Claims) and Class 8 (Existing Equity Interests) were deemed to reject the Plan, and Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) were deemed to accept or reject the Plan.  The Plan therefore does not satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 5 and 8, and possibly with respect to Classes 6 and 7.  Yet, the Plan is nevertheless confirmable because, as discussed below, it satisfies Section 1129(b) of the Bankruptcy Code with respect to these rejecting Classes.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9).**

106.     The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code, which requires that persons holding priority claims under the Bankruptcy Code receive specified cash payments.[202]  The treatment of Administrative Claims (other than DIP Facility Claims)

---

[200]   11 U.S.C. § 1126(c).

[201]   *See* Vote Certification.

[202]   11 U.S.C. § 1129(a)(9).  Under Section 1129(a)(9), unless otherwise agreed, a plan must provide that:

the holder of a claim entitled to priority under Section 507(a)(2) or 507(a)(3) will receive cash for the allowed amount of the claims on the effective date of the plan;

the holder of a claim entitled to priority under Section 507(a)(1), (4), (5), (6), or (7) will receive either deferred cash payments for the allowed amount or cash for the allowed amount for the claim on the effective date of the plan;

(Article II.A), DIP Claims (Article II.B), Priority Tax Claims (Article II.C), and Other Priority Claims (Article II.D) under the Plan is, in each case, consistent with Section 1129(a)(9) of the Bankruptcy Code.

**J.    At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10).**

107.   In general, Section 1129(a)(10) requires that, to the extent there is a class of impaired claims under a plan that at least one impaired class of claims must accept the plan, excluding the votes of any insiders.[203]  As shown in the Vote Certification, Class 3 voted to accept the Plan.[204]  As such, at least one impaired Class of Claims has voted in sufficient number and amount to accept the Plan, without regard to the votes of insiders.[205]  Accordingly, the Plan satisfies Section 1129(a)(10) of the Bankruptcy Code.

**K.    The Plan is Feasible – 11 U.S.C. § 1129(a)(11).**

108.   Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[206]  As described below, the Plan is feasible under Section 1129(a)(11) of the Bankruptcy Code.

---

the holder of a tax claim entitled to priority under Section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order of relief under Section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Section 1122(b)); and

the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period, as prescribed in subparagraph (C).

203   11 U.S.C. § 1129(a)(10).

204   *See* Vote Certification.

205   *See* Vote Certification.

206   11 U.S.C. § 1129(a)(11).

109.    To establish that a plan is feasible, "the [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."[207] Indeed, "[a]ll the bankruptcy court must find is that the plan offer[s] 'a reasonable probability of success.'"[208]  While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not."[209]  The courts have fashioned a series of factors that may be considered in the determination of whether a debtor's plan is feasible.  These factors, while varying from case to case, traditionally include: (a) the adequacy of the debtor's capital structure, (b) the earning power of its business, (c) economic conditions, (d) the abilities of the debtor's management, (e) the probability of the continuation of the same management, and (f) other related matters affecting successful performance under the provisions of the plan.[210]  As demonstrated below, consideration of these factors supports a finding that the Plan is feasible.

110.    Here, the Coben Declaration and the Financial Projections attached to the Disclosure Statement as Exhibit C demonstrate that the Plan is feasible.  These Financial Projections demonstrate that the Debtors will have sufficient earnings to meet their obligations under the Plan.[211]  Although the Debtors' businesses operate in a competitive industry and market,

---

[207]    *In re Briscoe Enters.*, 994 F.2d at 1165-66 (quoting *In re Lakeside Glob. II*, 116 B.R. at 507).

[208]    *In re T-H New Orleans,* 116 F.3d at 801 (quoting *In re Landing Assocs.*, 157 B.R. at 820).

[209]    *In re Briscoe Enters.*, 994 F.2d at 1164; *see also In re T-H New Orleans*, 116 F.3d at 801.  Further, a number of courts have held that this standard constitutes a "relatively low threshold of proof."  *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking.").

[210]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991)); *In re Toy & Sports Warehouse*, 37 B.R. at 151 (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)); *see also In re T-H New Orleans*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible).

[211]    Disclosure Statement, Ex. C; *see also* Coben Declaration, ¶¶ 69-72.

and although it is impossible to predict with certainty the precise future profitability of the Debtors' businesses or industries and markets in which the Debtors operate, confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, the Reorganized Debtors, or any successors to the Reorganized Debtors under the Plan.[212] The proposed Plan, negotiated in good faith between the Debtors and their major creditor constituencies, has more than a reasonable likelihood of success because the transactions contemplated under the Plan will enable the Debtors to continue their current operations while generating positive free cash flow and will eliminate meaningful amounts of prepetition debt.[213]

111.    In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient free cash flow to allow the Debtors to continue to operate their businesses successfully after emergence and to satisfy all of their obligations under the Plan. By substantially reducing the Debtors' prepetition debt and negotiating the Exit Facilities, the Reorganized Debtors will be better positioned to service ongoing debt obligations and generate cash flow to reinvest in their businesses.  Indeed, the Plan ensures that the Debtors' capital structure is aligned with their businesses and long-term growth strategy.  Accordingly, the Plan provides for a workable reorganization, with more than a reasonable likelihood of success, and, therefore, satisfies Section 1129(a)(11) of the Bankruptcy Code.

**L.    All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12).**

112.    Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[a]ll fees payable under Section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the

---

[212]    *See* Coben Declaration, ¶ 72.

[213]    *See id.* at ¶ 70.

payment of all such fees on the effective date of the plan."[214]  Article II provides for the payment

by each of the Debtors of all fees payable pursuant to Section 1930(a) of the Judicial Code for each

quarter (including any fraction thereof) until the earliest to occur of (a) the final decree closing

such Debtors' Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case or (c) an

order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

Thus, the Plan meets the requirements of Section 1129(a)(12) of the Bankruptcy Code.

### M.   The Debtors Do Not Have Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13).

113.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization

provide for the continued payment of certain retiree benefits "for the duration of the period that

the debtor has obligated itself to provide such benefits."[215]  The Debtors do not have obligations

to pay retiree benefits and, therefore, Section 1129(a)(13) of the Bankruptcy Code, to the extent

applicable to the Debtors, is satisfied.

### N.   Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable.

114.    Based on the facts of the Chapter 11 Cases, Sections 1129(a)(14) through (16) of

the Bankruptcy Code are not applicable to these Chapter 11 Cases.

### O.   Section 1129(b):  The Plan Satisfies the "Cramdown" Requirements

115.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of

a plan in circumstances where the plan is not accepted by all impaired classes of claims and

Interests.  This mechanism is known colloquially as "cram down."  Section 1129(b) provides in

pertinent part:

> [I]f all of the applicable requirements of [Section 1129(a) of the
> Bankruptcy Code] other than [the requirement contained in

---

[214]   11 U.S.C. § 1129(a)(12).

[215]   11 U.S.C. § 1129(a)(13).

Section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[216]

116.     Thus, under Section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan over rejection by impaired classes of claims or Interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.[217]

117.     Claims in Class 5 (Subordinated Claims) and Interests in Class 8 (Existing Equity Interests) are Impaired under the Plan, and the Holders of such Claims and Interests have been deemed to reject the Plan.  Additionally, Claims and Interests in Classes 6 and 7 may be Impaired, and the Holders of such Claims and Interests may be deemed to reject the Plan.  The Debtors, however, respectfully submit that the Plan may nonetheless be confirmed over the deemed rejection by such Classes pursuant to Section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with respect to all non-accepting Impaired Classes.  Moreover, the Voting Class voted in favor of the Plan, meaning the unfair discrimination and fair and equitable analysis is inapplicable to such Class (though the Plan nonetheless would satisfy those requirements as to the Voting Class if they were applicable).

### 1.     The Plan Does Not Discriminate Unfairly

118.     The Plan does not discriminate unfairly with respect to Impaired Classes that were deemed to have rejected the Plan.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[218]  Rather, courts typically examine the facts and

---

[216]   11 U.S.C. § 1129(b)(1).

[217]   *See id.*

[218]   *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and

circumstances of the particular case to determine whether unfair discrimination exists.[219]  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[220]  In other words, Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.[221]  Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class,[222] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.[223]

119.    Here, the Plan's treatment of the Impaired Classes that have been deemed to reject the Plan is proper because (a) all similarly situated Claims and Interests will receive substantially similar treatment, (b) there is a reasonable basis for those Claims and Interests being classified separately from other Claims and Interests that remain Unimpaired, and (c) the Plan's classification scheme rests on a legally acceptable rationale.

120.    Claims and Interests in deemed rejecting Classes are not similarly situated to the Claims and Interests in any other Classes, given their distinctly different legal character from all

---

that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

[219]  *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

[220]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[221]  *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

[222]  *See, e.g., Johns-Manville Corp.*, 68 B.R. at 636.

[223]  *See, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

other Claims and Interests.  The Plan does not discriminate unfairly against Class 5 (Subordinated Claims) or Class 8 (Existing Equity Interests) because there is no other Class of Claims or Interests similarly situated to the Claims or Interests in Classes 5 or 8, respectively.[224]

121.    Similarly, Claims in Class 6 (Intercompany Claims) and Interests in Class 7 (Intercompany Interests) are entirely unique from Claims or Interests in any other Class and, therefore, are appropriately placed in their own Classes.   The Debtors separately classified (a) Intercompany Claims from other Claims and (b) Intercompany Interests from other Interests to preserve the option to (x) reinstate or (y) set off, settle, distribute, contribute, merge, cancel, or release such Claims and Interests, respectively.   Such treatment allows the Debtors greater flexibility to determine whether it is more efficient to maintain their organizational structure and certain entity relationships when they are implementing the Restructuring Transactions rather than prior thereto.  Significantly, the optionality does not affect any stakeholders' recovery under the Plan and is intended only for administrative convenience in the restructuring process.

122.    Further, Class 5 (Subordinated Claims) consists solely of Claims that may be subordinated pursuant to Sections 509(c), 510(b), or 510(c) of the Bankruptcy Code.

123.    Finally, it warrants mention that the higher recovery for the Holders of Claims in Class 4 (General Unsecured Claims) as compared to the recovery to Holders of other unsecured Claims, to the extent there are any, is necessary in order for the Debtors to successfully reorganize. The majority of the Holders of General Unsecured Claims are vendors, service providers, and customers that will have an ongoing relationship with the Reorganized Debtors.  By leaving General Unsecured Claims Unimpaired, the Debtors are able to ensure payment for creditors that are crucial to the Reorganized Debtors' long-term success.  Moreover, the payment in full of

---

[224]    *See* Coben Declaration, ¶ 45.

General Unsecured Claims is the result of an agreement by the Debtors and the Consenting Stakeholders to facilitate a prompt and smooth exit from chapter 11 and ensure a bright future for the Reorganized Debtors.  Courts have held that there is no unfair discrimination where the variance in treatment is the result of an allocation of a secured creditor's collateral that would otherwise be absent from the pool of assets funding unsecured creditor recoveries.[225]

124.    Accordingly, because the Plan does not discriminate unfairly with respect to Classes that have been or may be deemed to reject the Plan, the Debtors respectfully submit that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code.

### 2.        The Plan Is Fair and Equitable

125.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[226]  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[227]  Additionally, in

---

[225]    *See, e.g.*, *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 91 (D. Del. 2018) (finding that plan distributions to unsecured creditors out of "gift" of the secured creditors collateral, resulting in differential distributions, did not amount to unfair discrimination); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001). In *Nuverra*, Judge Carey specifically noted that the "Third Circuit has allowed for the confirmation of [a] plan that enables secured creditors to gift distributions to unsecured creditors" and that "a number of courts have confirmed such plans finding that such sharing arrangements do not violate the prohibition against unfair discrimination." *See In re Nuverra Env't Sols., Inc.*, No. 17-10949 (KJC) (Bankr. D. Del. July 24, 2017) Hr'g Tr. 9:12-21 [Docket No. 363].

[226]    *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[227]    *See* 203 N. LaSalle P'ship, 526 U.S. at 459.

order for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claims).[228]

126.    With respect to the Classes that are deemed to reject the Plan (*i.e.*, Classes 5 and 8, and potentially Classes 6 and 7), no Claim or Interest in a Class junior to such Classes will receive a recovery under the Plan on account of such Claim or Interest.[229]  Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of Section 1129(b) of the Bankruptcy Code.

### P.    The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d).

127.    Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act.  The Plan meets these requirements because the principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no filing by any governmental agency asserting such a purpose.

### Q.    The Waiver of a Stay of the Combined Order Is Appropriate.

128.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral).  Each rule also permits modification of the imposed stay upon court order.

129.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Combined Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Combined

---

[228]    *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[229]    *See* Plan, Art. III.; Coben Declaration, ¶ 46.

Order will be effective immediately upon its entry.  First, the Transaction Support Agreement contains a milestone that the Plan to go effective no later than 14 days after entry of the Combined Order, and the Debtors will need to take action to consummate the Plan prior to that time period. Moreover, these Chapter 11 Cases and the related transactions contemplated in the Plan have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.[230]  Additionally, each day the Debtors remain in chapter 11, they incur significant administrative and professional costs.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Combined Order may be effective immediately upon its entry.

## III.  THE OBJECTIONS SHOULD BE OVERRULED

### A.  The Release Objectors' Reliance on *Purdue* is Misplaced

130.  The U.S. Trustee and the SEC (together, the "***Release Objectors***") object to the Third-Party Release relying on a misreading of the Supreme Court's June 27, 2024 opinion in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024), which held that the Bankruptcy Code does not allow for the inclusion of non-consensual, third-party releases in chapter 11 plans outside the context of Section 524(g) of the Bankruptcy Code.  However, as clearly noted in its opinion, the Supreme Court limited its holding to the issue before it:

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here.  Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a

---

[230]  *See generally* Coben Decl.

third-party nondebtor.[231]

As this Court is well-aware, the Fifth Circuit has long-prohibited nonconsensual, third-party releases in chapter 11 plans.  Accordingly, "*Purdue* did not change the law in this Circuit."[232]

131.    As noted above in paragraphs 71 through 84, third-party releases are permitted under Fifth Circuit precedent when the release is consensual.[233]  Indeed, bankruptcy courts within the Fifth Circuit "commonly exercise jurisdiction to approve [consensual third-party] releases…"[234]  Here, as discussed in detail above, the Third-Party Release and the opt-out process is fully consensual.[235]  Accordingly, the Third-Party Release is permissible under Fifth Circuit precedent.

132.    The Release Objectors, however, contend that *Purdue* mandates revisiting what constitutes "consent."  More specifically the Release Objectors argue that a Releasing Party's failure to opt out of the Third-Party Release is insufficient to demonstrate consent, instead arguing an affirmative action by the Releasing Party (i.e., opting in) is required.  Despite the fact that the Supreme Court's decision in *Purdue* did not change the law in the Fifth Circuit, the Release Objectors seek to use that decision to upend the existing practice in the Southern District of Texas of providing consent to a third-party release through an opt-out (as opposed to an opt-in).  However, nothing in *Purdue* supports, much less mandates, revisiting longstanding practice by courts within the Fifth Circuit under which third-party releases have been consistently held to be

---

[231]    *Purdue Pharma*, 144 S.Ct. at 2087-88 (emphasis added).

[232]    *In re Robertshaw US Holding Corp.*, 662 B.R. 300 at 323 (Bankr. S.D. Tex. 2024); Conf. Hr'g Tr. 32:3-4, *In re Independence Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]. ("Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases.").

[233]    *Cole v. Nabors Corporate Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 608-09 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'").

[234]    *Id.*

[235]    *See* ¶¶ 71 – 84, *supra*.

consensual where parties have the opportunity to opt out.  Thus, the Release Objections are *not* based on what *Purdue* requires, they are based on the Release Objectors' desire to see *Purdue* expanded to compel a result that is inconsistent with longstanding Fifth Circuit practice.  No such expansion is warranted, and the Release Objections should be overruled.

133.    Further, the Release Objectors' arguments have been presented, and rejected, numerous times in this District and in others.[236]  For example, in *In re Robertshaw US Holding Corp.*, Judge Lopez upheld an opt-out process similar to what was used in this case over the U.S. Trustee's objection.[237]  More recently, this Court overruled almost identical objections from the Release Objectors in the *Independence Contract Drilling* and *Vroom* cases.[238]  The third-party

---

[236]  *See, e.g.*, Conf. Hr'g Tr. 20:20-23, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 128] ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they… don't run afoul of *Purdue*."); Conf. H'rg Tr. 32:18-35:9, *In re Intrum AB et al.*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third party releases for which consent was confirmed through opt outs); Nov. 14 H'rg Tr. 66:3-6, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D.Tex. Nov. 18, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law. I think it complies with every provision under the law. I think the opt-outs worked."); *In re Wesco Aircraft Holdings, Inc.*, et al., No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) [Docket No. 2550]; Memorandum Decision on Plan Confirmation at 28; *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) [Docket No. 959] ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out. There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. . . . And, again, Purdue did not change the law in this Circuit."); Conf. Hr'g Tr. at 14, *In re Invitae Corp. et al.*, No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) (overruling the Office of the U.S. Trustee's objections, predicated on *Purdue*, with respect to plan releases, *the opt out mechanism*, and gatekeeper provisions); *see also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (confirming a plan that provided that creditors were deemed to have consented to the plan's third party release provisions where: (a) the creditor voted to reject or accept the plan and failed to "opt-out", (b) the creditor failed to return his/her ballot, or (c) the creditor's claims were unimpaired, and therefore, were not entitled to vote).

[237]  662 B.R. 300 at 323 (Bankr. S.D. Tex. 2024).  In its objection, the U.S. Trustee (a) observed that Judge Lopez's approval of the opt-out procedure in *Robertshaw* referenced opt outs utilized in class actions and (b) contends that such reliance was misplaced.  *See* UST Objection at ¶¶ 57-68.  However, this reference was a footnote in the opinion.  *In re Robertshaw*, 662 B.R. at 323 n. 120.  Indeed, Judge Lopez's decision was grounded on other factors as well, including his finding that the third-party releases were "appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out."  *Id. at 323-24.*  The U.S. Trustee tellingly fails to cite to other recent cases in this District which made similar findings. *See n. 234 infra.*

[238]  Conf. Hr'g Tr. [31:25-32:13], *In re Independence Contract Drilling, Inc*., No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ("*Purdue* does not address the use of injunctions in consensual third party releases, as the one before the Court today.  Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases… Therefore, for all these reasons, the Court overrules the objections and will confirm the Plan.");

release provisions and opt-out procedures in these cases are almost identical to the provisions and procedures approved in *Robertshaw*, *Independence Contract Drilling*, and *Vroom*, and the U.S. Trustee does not present any arguments as to why the result should be any different here.[239]  That failure is not surprising given the factual similarities between those cases and these Chapter 11 Cases.

134.    Additionally, like the publicly traded equity securities that were cancelled in *Independence Contract Drilling*, TCSG's stock was delisted from the New York Stock Exchange on December 9, 2024, prior to the bankruptcy filing and before the Notice of Non-Voting Status and Opt-Out Forms were served on Holders of Claims and Interests in the Non-Voting Classes.[240]  Thus, there is simply no reason to suggest that the opt out mechanism utilized here should not be similarly approved.

135.    Lastly, the portion of the U.S. Trustee's objection that asserts that parties who vote to reject the Plan will still be Releasing Parties if they do not opt out is without merit in these Chapter 11 Cases.[241]  Under the Plan, there is only one Voting Class, which consists solely of Holders of Prepetition Term Loan Claims (i.e., sophisticated financial parties).  The vast majority of these Holders are Consenting Stakeholders who are already bound by the Third-Party Release

---

Conf. Hr'g Tr. 21:9-22:2, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 128] (overruling the U.S. Trustee's objection).

[239]  For its part, the SEC claims that there is some distinction that ought to be made between the facts of these cases and those of *Robertshaw* because the securities in *Robertshaw* were closely held. *See* SEC Objection at ¶17.  Such distinction is insufficient, standing alone, to compel a contrary conclusion here and, tellingly, the SEC does not even attempt to distinguish the facts of *Independence Contract Drilling* which involved a debtor whose shares were publicly traded.

[240]  NYSE to Commence Delisting Proceedings Against The Container Store Group, Inc.,  Business Wire (Dec. 9, 2024),        https://www.businesswire.com/news/home/20241209673244/en/NYSE-to-Commence-Delisting-Proceedings-Against-The-Container-Store-Group-Inc.-TCS.

[241]  *See* UST Objection ¶¶ 42-46.

through the Transaction Support Agreement.  Further, no Holders of Claims in the Voting Class voted to reject the Plan.

136.     Accordingly, the consensual Third-Party Release is appropriate, consistent with precedent from both the Fifth Circuit itself and the courts within the Fifth Circuit, and should be approved.

**B.     The Scope of the Third-Party Release is Appropriate**

137.     The U.S. Trustee's objection that the scope of the Third-Party Release is too broad is similarly misplaced.  Specifically, the U.S. Trustee asserts that the Third-Party Release is overbroad with respect to the (a) types of conduct sought to be released[242] and (b) the potential universe of "Related Parties".[243]

138.     With respect to the former, the types of matters covered by the Third-Party Release are entirely consistent with third-party releases approved in other cases within this District (and, indeed, often over the objection of the U.S. Trustee).[244]  Furthermore, the Third-Party Release is appropriately and narrowly tailored to the Released Parties' engagement with the Debtors and the Restructuring Transactions as well as to the contributions provided by the Released Parties, including participation in raising new money debt and permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases.[245]

139.     As to the potential universe of "Related Parties," in the First Amended Plan and the Modified Proposed Combined Order, the Debtors have changed the definition of "Releasing Parties" to narrow the scope of the release being given by Related Parties to make clear that Related

---

[242]   *See* UST Objection at ¶ 9.

[243]   *See* UST Objection at ¶¶  8, 54.

[244]   *See* note 236, *supra* ¶ 133.

[245]   *See* Coben Declaration, ¶ 56.

Parties were solely granting the release "to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (j) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (j) [of the "Releasing Party" definition]."[246]  As a result, the scope of the Third-Party Release as it pertains to Related Parties is appropriate because the only Related Parties that are bound by it are (a) those parties that are so closely related to a Releasing Party that the Releasing Party could direct them to consent to the Third-Party Release or (b) Related Parties that would be bringing a claim derivatively on behalf of a Releasing Party.  Accordingly, the U.S. Trustee's objection on this ground should be overruled.

C.   **The Exculpation Provision, Injunction Provision and Gatekeeping Provision Are Each Consistent with Fifth Circuit Law and Plans Confirmed in this District**

140.   The U.S. Trustee also objects to the Plan's Exculpation Provision.[247]  First, the U.S. Trustee's objection to the inclusion of Reorganized Debtors is misplaced as the definition of "Exculpated Parties" in the Plan does not include the Reorganized Debtors.  Second, as noted above, the First Amended Plan filed at Docket No. 165 narrowed the definition of Exculpated Parties to include only the Debtors.   Accordingly, the Exculpation Provision is fully consistent with *Highland Capital* and this aspect of the U.S. Trustee's objection has been rendered moot.

141.   The U.S. Trustee further objects to the Injunction Provision and Gatekeeping Provision set forth at Article IX.E of the Plan and discussed at Paragraphs 87 through 88 *supra.* However, contrary to the U.S. Trustee's assertions,[248] both of these provisions are consistent with

---

[246]   First Amended Plan, Art. I.157.

[247]   *See* UST Objection at ¶¶ 74-77.

[248]   *See* UST Objection at ¶¶ 78-83.

applicable law and practice in the Fifth Circuit and this District.  The Injunction Provision is merely the means by which the Third-Party Release is enforced.  The U.S. Trustee's assertion that, even if the Third-Party Release is allowed, an injunction enforcing it is not is an assertion that borders on nonsensical.[249]  Without an enforcement mechanism, the Third-Party Release is essentially a nullity.  This argument from the U.S. Trustee is simply a back door through which it attempts to once again attack the Third-Party Release itself.  As this Court has noted, "[c]ase law in the Fifth Circuit allows the use of injunctions in consensual third party releases."[250]  Also, as set forth above in paragraph 87 of this memorandum, the Injunction Provision is a key part of the Plan that is integral to its function.  Accordingly, the U.S. Trustee's objection to the Injunction Provision should be overruled.

142.    The same is true of the Gatekeeping Provision.  The Fifth Circuit in *Highland Capital* approved a gatekeeping provision related to claims that were being exculpated under the plan.[251]  While the Gatekeeping Provision in the Plan applies to both the Exculpation Provision and the Third-Party Release, the logic behind them is the same.  The claims released by the Third-Party Release are subject to the same injunction that applies to the claims subject to the Exculpation Provision.  Accordingly, it is appropriate for this Court to exercise the same jurisdiction over claims potentially released by the Third-Party Release as it exercises with respect to claims subject to the Exculpation Provision.  Further, the Gatekeeping Provision here is consistent with practice in this District and is substantially similar to gatekeeping provisions contained in plans approved

---

[249]  *See* UST Objection ¶ 79.

[250]  Conf. Hr'g Tr. 32:3-4, *In re Independence Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]; *see also In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) (collecting cases); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent.").

[251]  *See In re Highland Capital* 48 F.4th at 439 (noting that "[c]ourts have long recognized bankruptcy courts can perform a gatekeeping function").

by this Court and other bankruptcy courts within this District.[252]  Additionally, as set forth above in paragraph 88, the Gatekeeping Provision is limited to parties that have performed valuable services in connection with the Debtors' restructuring, including negotiating and supporting the Transaction Support Agreement, the Plan, the DIP Facilities, and the Exit Facilities, among other aspects of the Restructuring Transactions.  Accordingly, the U.S. Trustee's objection to the Gatekeeping Provision should similarly be overruled.

### D.    The Landlord Objection

143.    The Landlord Objection focuses on two provisions that relate to the Plan's proposed assumption of Unexpired Leases, one provision that was contained in the First Amended Plan and the other that was contained in the Modified Proposed Combined Order.[253]

144.    The first provision, in pertinent part, provides as follows:

> On the Effective Date, except as otherwise provided in this Plan, each of the Executory Contracts and Unexpired Leases not previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court shall be deemed assumed **and amended (solely to the extent necessary to implement the terms of the Restructuring Transactions)**, as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code…

First Amended Plan, V.A (emphasis added).  The only portion of this provision that the Objecting Landlords oppose is the bolded clause.  Notably, the majority of this provision was included in the Original Plan[254] and the revision contained in the First Amended Plan actually scaled back the parenthetical at the request of another landlord party as follows ("... (~~as~~ solely to the extent

---

[252]  *See, e.g.*, *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (CML), Docket No. 857; *In re Independence Contract Drilling, Inc.*, Case No. 24-90612 (ARP), Docket No. 91.

[253]  Notably, the specific language that the Objecting Landlords find objectionable (which is the clause "by the provisions of the Plan" highlighted in bold above) was included in the Original Proposed Order.

[254]  "On the Effective Date, except as otherwise provided in this Plan, each of the Executory Contracts and Unexpired Leases not previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court shall be deemed assumed and amended (as necessary to implement the terms of the Restructuring Transactions), as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code." Original Plan, Art. V.A.

necessary to implement the terms of the Restructuring Transactions)")[255] in an effort to better clarify its intended narrow scope.

145.    The second provision at issue, in pertinent part, provides as follows:

> Any Change of Control Provision in (a) any Unexpired Lease of non-residential real property shall be unenforceable solely in connection with (x) assumption of such Unexpired Lease and (y) the Restructuring Transactions, to the extent that any Change of Control Provision would be triggered by the assumption of such Unexpired Lease or the consummation of Restructuring Transactions, and (b) any contract, agreement, or other document of the Debtors, including any Executory Contract or Unexpired Lease (except as specified in the foregoing clause (a)) assumed by the Debtors, shall be deemed modified in accordance with section 365 of the Bankruptcy Code such that assumption of such agreement and consummation of the transactions contemplated by the Plan shall not (either alone or in combination with any other condition, event, circumstance or occurrence)…(i) be prohibited, restricted, or conditioned…, (ii) breach…[modify] or [terminate]…such Executory Contract or Unexpired Lease, (iii) result in any penalty or other fees or payments,…or (iv) entitle the [counterparty] to do or impose any of the foregoing…. Each Executory Contract or Unexpired Lease (including any amendments thereto entered into after the Petition Date and prior to the Effective Date) assumed pursuant to Article V of the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified **by the provisions of the Plan**, any order of this Court authorizing and providing for its assumption, or applicable law.

Proposed Combined Order, ¶ 26 (emphasis added).  The only portion of this provision that the Objecting Landlords find objectionable is the bolded clause.

146.    The Objecting Landlords object to the narrow clauses in each of the foregoing provisions arguing that a debtor cannot amend an unexpired lease of non-residential real property absent consent of the landlord.[256]  However, this objection makes no sense when applied to the

---

[255]   The First Amended Plan replaced the phrase "as necessary" with the phrase "solely to the extent necessary."

[256]   Landlord Objection, ¶ 13.

narrow Plan provisions at issue and in the context of assumption of executory contracts and unexpired leases.  As part of the Plan, the Debtors are assuming all or virtually all of their Unexpired Leases.  These consist primarily of store leases where the Debtors operate their retail business.  It goes without saying that these leases are essential to the Debtors' operations, the success of the business post-reorganization, and the preservation of value and jobs.  Also as part of the Plan, the Holders of DIP Term Loan Claims and Prepetition Term Loan Claims will become the new owners of the Debtors.  It is therefore critical to the success of this reorganization that this change of control not create technical defaults under the Debtors' Unexpired Leases.  Accordingly, the Plan and the Proposed Combined Order contain language to ensure that such foot faults do not stall or stop the reorganization before it even gets out of the gate.

147.    Section 365 of the Bankruptcy Code is "designed to foster, not frustrate, the reorganization and the economic well-being of debtors in possession."[257]  Congress' purpose in providing for the assumption of contracts and leases was to allow a debtor to retain the benefits of such contracts and leases as part of its reorganization.  It would be "perverse and anomalous" to allow the Debtors in these Chapter 11 Cases to assume the Unexpired Leases only to immediately face defaults or other negative consequences "solely because [they] filed for bankruptcy."[258]

148.    The flaw in the Landlord Objection is underscored by the fact that (a) the Objecting Landlords have themselves acknowledged that "[t]he Landlords generally do not object to the Debtors' assumption of the Leases. . ."[259] and (b) the Debtors have drafted (and, as to the first provision noted above, redrafted, in the First Amended Plan) these provisions in a manner that makes clear that they are not intended to be used as a sword by which to force material substantive

---

[257]   *In re Foostar, Inc.*, 323 B.R. 566, 574 (Bankr. S.D.N.Y. 2005).

[258]   *Id.*

[259]   Landlord Objection, ¶ 13.

lease amendments upon any landlord.  Indeed, each of the subject provisions are simply designed to ensure that a core component of the Plan – the assumption of the Debtors' real property leases – is not undercut by some technical default allegedly caused by a change of control or similar provision contained in one or more of the Unexpired Leases.

149.     Thus, the Objecting Landlords are seeking to elevate form over substance and advocate for a result that threatens one of the core aspects of the Plan – i.e., the Debtors' ability to ensure that the assumptions proposed in the Plan are allowed to be effectuated notwithstanding that they might technically run afoul of a change of control or similar provision contained within one or more of their Unexpired Leases.  The Debtors seek to do no more—but no less—than Section 365 empowers them to do with respect to these leases to ensure that they are safely assumed (the result everyone agrees upon).  The Debtors' language accomplishes this goal; the objection should be overruled.

## CONCLUSION

150.     For all of the reasons set forth herein and in the Coben Declaration, the Dunayer Declaration, and the Vote Certification, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Combined Order, and granting such other and further relief as is just and proper.

Dated:  January 23, 2025
        Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@HuntonAK.com
       ashleyharper@HuntonAK.com
       pguffy@HuntonAK.com

- and -

**LATHAM & WATKINS LLP**
George A. Davis (NY Bar No. 2401214)
Hugh Murtagh (NY Bar No. 5002498)
Tianjiao (TJ) Li (NY Bar No. 5689567)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       hugh.murtagh@lw.com
       tj.li@lw.com
       jon.weichselbaum@lw.com

Ted A. Dillman (CA Bar No. 258499)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Email:  ted.dillman@lw.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II