**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **THE CONTAINER STORE GROUP, INC.,** | § | |
| ***et al.,***[1] | § | **Case No. 24-90627 (APR)** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |

**THE UNITED STATES TRUSTEE'S EMERGENCY MOTION FOR A
STAY OF CONFIRMATION ORDER PENDING APPEAL**

*Relief Requested by February 7, 2025.*

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> **Represented parties should act through their attorney.**
>
> **Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

TO THE HONORABLE ALFREDO R PÉREZ, UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas ("United States Trustee"), moves under Federal Rule of Bankruptcy Procedure 8007(a)(1) for a stay of the Court's *Order (I) Approving Debtors' Disclosure Statement and (II) Confirming First Amended*

---

[1]     The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: The Container Store Group, Inc. (5401); The Container Store, Inc. (6981); C Studio Manufacturing Inc. (4763); C Studio Manufacturing LLC (5770); and TCS Gift Card Services, LLC (7975). The Debtors' mailing address is 500 Freeport Parkway, Coppell, TX 75019.

*Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of The Bankruptcy Code* (ECF No. 181) (the "Order"), pending resolution of the United States Trustee's appeal.

Alternatively, the United States Trustee requests a stay of the third-party release, injunctive, and gatekeeping provisions of the *First Amended Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") of The Container Store Group, Inc. and its affiliates (collectively the "Debtors") pending appeal.

For the reasons set forth below, the Court should grant the United States Trustee's request for a stay.

## BACKGROUND

1.      On December 22, 2024, Debtors filed voluntary chapter 11 petitions.  (ECF No. 1). The next day, the Debtors moved for emergency approval and solicitation procedures (ECF No. 17) with respect to the Plan (ECF No. 19) to expedite their prepackaged case for confirmation.  At the hearing that same day, the Court approved the solicitation procedures and conditionally approved the disclosure statement, but the Court noted the United States Trustee's objection to the third-party releases and opt out procedures and preserved these matters for plan confirmation.

2.      The Plan provided for eight classes of claims or interests.  Class 4 general unsecured claims were deemed to accept the Plan because these claimants would receive 100%.  (ECF No. 181 at 101-02).  The Plan included two classes that were deemed to reject the Plan because they would receive nothing: Class 5 Subordinated Claims and Class 8 Existing Equity Interests, which included public shareholders.  (ECF No. 181 at 102; 103).  Class 8 Equity Interests would be canceled, after which the Reorganized Debtors would issue new privately held equity to the DIP lenders.  (ECF No. 181 at 103;110-11; 81).

3.     The Debtors did not solicit votes from Holders of Claims in Classes 1, 2, 4, 5, 6, 7, and 8 (collectively the "Non-Voting Classes").  Instead, the Debtors sent a Non-Voting Status Notice and Release Opt-Out Form to members of the Non-Voting Classes.

4.     The following chart summarizes the Classes of Claims and Interests under the Plan, and whether they were entitled to vote:

| Class | Claim/Equity Interest | Status (Unimpaired or Impaired) | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept | 100% |
| 2 | ABL Claims | Unimpaired | Presumed to Accept | 100% |
| 3 | Term Loan Claims | Impaired | Entitled to Vote | 4.5% to 17.6% |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept | 100% |
| 5 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 6 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A |
| 7 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A |
| 8 | Existing Equity Interests | Impaired | Deemed to Reject | 0% |

5.     The Plan contains a third-party release provision that purports to release claims by non-debtors against other non-debtors for "good and valuable consideration," despite Classes 5 and 8 receiving nothing under the Plan or from any released parties (ECF No. 181 at 133-34, Plan at Art. IX.C.).  Based on the definition of "Releasing Party,"[2] the Plan imposes the third-party

_____

[2]     Specifically, as defined by the Plan: "'***Releasing Parties***' means, collectively, each of, and in each case in its capacity as such: (a) each Non-Debtor Affiliate; (b) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (c) each Consenting Stakeholder; (d) each Prepetition Agents; (e) each DIP Agent; (f) each DIP Term Lender; (g) the DIP ABL Lender; (h) each Exit Facility Agent; (i) each lender under the Exit Facilities; (j) each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively

release on "each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively elect to opt out of the Releases contained in this Plan," either on the ballot or the Non-Voting Notice, or that does not object to the releases. (ECF No. 19, Plan I.A., ¶ 157). In other words, the Plan imposes third-party releases on all those who (i) vote to reject the Plan; (ii) vote to accept the plan; (iii) were ineligible to vote on the Plan because they are deemed to accept or reject the Plan, including because they are receiving nothing under the Plan; and (iv) abstained from voting on the Plan, unless they opt-out of the third-party releases on the ballot or Non-Voting Notice or otherwise object to the releases. *See id.*

6. Moreover, the third-party releases extend to all claims against each Released Party—which includes, among others, the Debtors' non-debtor affiliates and their current and former directors, officers, and proxyholders; the DIP lenders and their agents; and the Debtor's current and former insiders[3]—even if the Releasing Party does not know or suspect such claims to

---

elect to opt out of the Releases contained in this Plan or that does not (A) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (B) provide to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; and (k) each Related Party of each Entity in clauses (a) through (j), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (j) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (j); provided, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void ab initio." (ECF No. 181 at 91, Plan I.A., ¶ 157).

[3] Specifically, as defined by the Plan: "'***Released Party***' means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) each Consenting Stakeholder; (f) each Prepetition Agent; (g) each DIP Agent; (h) each DIP Term Lender; (i) the DIP ABL Lender; (j) each Exit Facility Agent; (k) each lender under the Exit Facilities; (l) each Releasing Party; and (m) each Related Party of each Entity in clauses (a) through (l); *provided*, that, in each case, an Entity shall not be a Released Party if it (a) elects to opt out of the Third-Party Release as provided on its respective Release Opt-Out Form, (b) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (c) provides to the

exist.  (ECF No. 19, Plan, IX.C (" . . . is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown . . . ")).

7.    As described above, numerous holders of claims are included as Releasing Parties, and that definition includes their "Related Parties,"[4] which means that a legion of unidentified parties that are not involved in these cases are being deemed to consent to the third-party release through no action of their own and possibly with no notice of the effect on them.  It is unreasonable to expect a non-debtor party to affirmatively consent to the releases of unknown claims—when it may not have even "suspected such claims to exist"—possibly held against another unidentified non-debtor party.

8.    The Plan also contains injunction and gatekeeping provisions that provide liabilities released in the Plan shall be permanently enjoined upon confirmation and if a claim relates, or is

---

Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation; *provided*, *further*, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder shall be void *ab initio*."  (ECF No. 181 at 91, Plan I.A., ¶ 155).

[4]    Specifically, as defined by the Plan: "'***Related Parties***' means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxy-holders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees"  (ECF No. 181 at 90, Plan I.A., ¶ 153).

reasonably likely to relate, to a Release, a party must obtain a bankruptcy court determination on that such claims or causes of action are colorable.  (ECF No. 19, Plan at IX.E).

9.      Accordingly, the United States Trustee at plan confirmation renewed his objection to the third-party releases in the Plan and the use of the opt-out procedures considering the Supreme Court's holding in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).  (ECF No. 150).[5]

10.      At the January 24, 2025, hearing, the evidence showed that the balloting agent served 16,968 Notices of Non-Voting Status and Release Opt-Out Forms ("Opt-Out Forms") on non-voting Classes 1, 2, 4, and 8.  The balloting agent only received 165 Opt-Out Forms from the non-voting Classes as follows:  Class 1 (Other Secured Claims) (45 opt-out forms sent/3 returned); Class 2 (ABL Claims), 3 opt-out forms sent/0 returned; Class 4 (General Unsecured Claims), 13,068 opt-out forms sent/147 returned; and Class 8 (Existing Equity Interests), 3,852 opt-out forms sent/15 returned.  (ECF No. 179 at 2-3).  In addition, 297 Opt-Out Forms were returned as non-deliverable.  (ECF No. 179 at 2-3).

11.      At the hearing, the Court overruled the United States Trustee's and SEC's objections and confirmed the Plan.  (ECF No. 181).

12.      The Court noted that "[p]rior to *Purdue*, the Fifth Circuit did not have non-consensual third-party releases" because "[w]e have been in a situation for years . . . since *Pacific Lumber*."  (ECF No. 201, Tr. at 41:16-17).  The Court concluded that "*Purdue* [did not] really change[] anything in the Fifth Circuit as it relates to non-consensual third-party releases" and "giving the

---

[5]      The SEC likewise objected to the Plan because the Plan's nonconsensual third-party release is prohibited under the Supreme Court's ruling in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) and failure to return and opt out form should not be considered consent.  (ECF No. 152).

opportunity for the Debtors to opt out is consistent with having consensual third-party releases."
(ECF No. 201, Tr. at 41:25-42:17).

## ARGUMENT

61.     Federal Rule of Bankruptcy Procedure 8007 provides a mechanism for seeking a
stay of an order of a bankruptcy judge pending the outcome of an appeal.

62.     Specifically, Rule 8007 provides that a request for a stay pending appeal "must
ordinarily be presented to the bankruptcy judge in the first instance." *See* Fed. R. Bankr. P. 8007.

63.     To determine whether to grant a stay pending appeal, the court generally must consider four factors: (1) whether the movant will likely succeed on the merits on appeal; (2) whether
the movant will suffer irreparable injury if the stay is denied; (3) whether issuance of the stay will
substantially injure the other parties interested in the proceeding; and (4) where the public interest
lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also In re First S. Sav. Ass'n*, 820 F.2d 700,
709 (5th Cir. 1987). "The first two factors are the most critical." *Tex. Democratic Party v. Abbott*,
961 F.2d 389, 397 (5th Cir. 2020). Further, "where there is a serious legal question involved and
the balance of equities heavily favors a stay; in those situations, the movant only needs to present
a substantial case on the merits." *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th
Cir. 2011).

64.     Where the government is a party, the injury and public interest factors merge. *Cf.
Nken*, 556 U.S. at 426 (holding factors of "assessing the harm to the opposing party and weighing
the public interest" "merge when the Government is the opposing party"). "Before issuing a stay,
[i]t is ultimately necessary . . . to balance the equities—to explore the relative harms to applicant
and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance*

*Project*, 582 U.S. 571, 580 (2017) (quotation marks and citation omitted). The balance of equities favors granting a stay of the third-party release provisions here.

## I.   The United States Trustee Has a Likelihood of Success on The Merits

65.   In an appeal of an order of a bankruptcy court, the bankruptcy court's conclusions of law are reviewed de novo. *See, e.g.*, *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1042 (5th Cir. 2012).

66.   "[T]he appellant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Arnold v. Garlock*, 278 F.3d 426, 439 (5th Cir. 2001) (quotations omitted).

67.   The United States Trustee is likely to succeed on this appeal—at the very least, this case raises sufficiently serious questions to make them a fair ground for litigation.

68.   The Supreme Court held in *Purdue* that the Bankruptcy Code does not authorize imposing nonconsensual releases of claims belonging to non-debtors against other non-debtors. *Purdue*, 603 U.S. 227. This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions"). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

69.   A consensual third-party release is a side agreement between non-debtors governed by nonbankruptcy law. As the Deputy Solicitor General said in *Purdue*, a bankruptcy court can "can acknowledge the parties' agreement" to a third-party release, but the authority for consensual

releases is the agreement itself, not the Bankruptcy Code.  Transcript of Oral Argument at 6-7, *Purdue*, 603 U.S. 204 (2024) (No. 23-124).  If a claim has been "extinguished by virtue of the agreement of the parties," then the court does not "need the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right."  *Id*. at 7.

70.     Here, rather than acknowledging an already existing release agreement between non-debtors, the confirmation order imposes a third-party release on claimants without their affirmative consent if they did not return a ballot opting out of it or otherwise object.  The opt-out procedures purportedly used to establish consent by creditors were insufficient to show the affirmative consent required by law.  As a result, the Plan imposes nonconsensual third-party releases on numerous affected parties without their manifested consent.

71.     For the reasons discussed below, a creditor's failure to object or check an opt-out box on a ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan.  Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.

72.     As explained below, the failure of the Code to define consent means that state contract law governs whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.  The Court approved the third-party releases here because prior cases in this district have approved non-debtor releases based on a failure to opt out.  But just like those cases, the Court did not apply state contract law here.  Instead, the Court stated that the "major inquiry" is: "Was this a process that was fair and that it was intended to get notice to people, so that they could make a decision?"  (ECF No. 201, Tr. at 42:19-21).  In other words, the Court bound creditors to non-debtor releases based on a failure to

opt out because it treated the creditors' silence as a form litigation default. But as explained below, the Court's default theory does not support disregarding applicable state law.

### A.   State Law Governs Whether a Release Is Consensual

73.     The foundation of a consensual release is an agreement between the parties. Whether parties have reached an agreement—including an agreement not to sue—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law. *See, e.g.*, *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471–72 (1965)).

74.     No such exception applies here. The Bankruptcy Code does not define a "consensual release." It contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law. Nor does 11 U.S.C. § 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma, L.P.*, 603 U.S. at 216 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to

10

include third-party releases in a plan must derive from some other source of law.  Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[6]

75.     As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id*. at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract

---

[6]     Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."  *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law."  *Id*.

76.     Here, the Debtors did not meet the state-law burden of establishing that the Releasing Parties expressly consented to release their property rights.

## B.     Under State law, silence does not confer consent in contract, except in limited circumstances not applicable here

77.     Under Texas law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[7]  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").

78.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[8]  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *accord* 1 Corbin on Contracts

---

[7]     While the Plan provides that its construction and enforcement is governed by the laws of the State of New York, debtors cannot choose the law to apply to contracts between non-debtors.  In any event, no one has anyone suggested there would be a different outcome under New York or any other jurisdiction's law, so no choice of law is required.  *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014).

[8]     Texas, like many states, follows the Restatement (Second) of Contracts § 69.  *See, e.g., Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 52 (Tex. 2008); *The Levin Law Grp., P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex. App. 2010); *Texas v. Triax Oil & Gas, Inc.*, 966 S.W. 2d 123, 128 (Tex. App. 1998).

§ 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).  Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist.  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS §§ 17(1), 69 cmt. a.

79.     There are only very limited exceptions to that principle.  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

80.     Given no one has argued that such extraordinary circumstances exist here, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

81.     Texas state law is in accord.  Under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases.  *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000).  Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services.  Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement.  But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other.  A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

82.     Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds.  *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)).  "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'"  *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)).  "[A] meeting of the minds is an essential element of an implied in fact contract."  *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted); *see also Beverick v. Koch Power, Inc., 186 S.W.3d 145, 152* (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

83.     As the Fifth Circuit has explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .  While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms."  *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of

an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'" *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

### C.   Failing to Opt Out Does Not Provide the Required Affirmative Consent

84.   The Plan coerces all holders of claims who do not opt out into bestowing broad non-debtor third-party releases to numerous known and unknown third parties on conduct that may not even be related to the bankruptcy cases or the reorganization.  This deprives creditors of their legal state-law rights under the pretense of consent.  Indeed, the Plan's inclusion of a wide class of related parties, *see* Plan, I.A.153, is so broad that it would be impossible to provide notice to all parties affected by the third-party releases.  This Court erred in approving the third-party releases in the Plan because there is not sufficient evidence of manifested consent from creditors to release their legal rights against non-debtors.

85.   An affirmative agreement—something more than the failure to opt out or object— is required to support a consensual third-party release.  *See Patterson*, 636 B.R. at 686; *Tonawanda Coke Corp.*, 662 B.R. at 222–23.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. For example, the *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11, found that contract law does not support consent by failure to opt out.  *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688 (emphasis added).

86.   The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a

consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

87.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not a contract to resolve claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the Debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors . . . . [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

88.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law and the question was not whether one could opt out of a class action—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance

of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286 (quotation marks and citation omitted).

89.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied. *Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id.* at 1286.

90.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.  Nevertheless, the Plan unilaterally imposes broad non-debtor releases on every type of creditor who does not affirmatively opt out.  Plan, Art. IX.C.

91.     Debtors argued at the confirmation hearing that "[i]f it is done properly, an opt-out mechanism puts a decision in front of a creditor or stakeholder whether they want to grant the release or not.  And that stakeholder is told in clear and conspicuous language how to do it.  And

17

the creditor's or interest holder's decision should be respected." (ECF No. 201, Tr. at 32:6-12). But there is no record evidence to support Debtors' speculation that all these stakeholders made an informed *decision* not to opt out and instead bind themselves to release potential claims for no consideration. Nor is it a reasonable inference given that less than 1% responded to the Notice of Opt-Out (only 165 of 16,968 Notices of Opt-Out were returned) and there were almost 300 Notices returned as undeliverable so stakeholders never received them. *See supra* at ¶ 10. The Court here nevertheless deemed the "[t]he only people . . .that would be giving a release would be only parties for whom the people who received notice would have been able to opt out." (ECF No. 201, Tr. at 43-44).

92.     But the more fundamental problem with Debtors' argument and the Court's reasoning is that the opt out is an unsolicited offer to the creditor or stakeholder to which they are not obligated to respond.[9]  As such, their silence does not implicate any decision one way or the other as to that unsolicited offer to release their claims.

93.     *First*, merely casting a vote on a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* Restatement (Second) of Contracts § 69 cmt. a (1981). While the *Smallhold* court was correct to apply "ordinary contract principles," *Smallhold,*

---

[9]     At the hearing, Debtors also argued that imposing releases on those who do not opt out is appropriate because "there is federal court practice that deems consent based on a proper process, including, but not limited to class actions." (ECF No. 201, Tr. at 32:2-5). This analogy to class actions fails. The Supreme Court has unanimously admonished: "[C]ourts may not 'recognize a common-law kind of class action' or 'create de facto class actions at will.'" *United States v. Sanchez-Gomez*, 584 U.S. 381, 389 (2018) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 901 (2008)) (cleaned up). Further, consent is not the reason why class members are bound by a court-approved class-action settlement. Rather, once a class has been certified its members "are considered parties to the litigation in many important respects" and "may be bound by the *judgment*." *Sanchez-Gomez*, 584 U.S. at 387 (cleaned up; emphasis added); *accord Sosna v. Iowa*, 419 U.S. 393, 399 n.8 (1975).

*Inc.*, 2024 WL 4296938, at *3, in concluding that voting on a plan without opting out can be deemed consent, it erred by failing to consider whether any of the exceptions to the rule that silence is not consent apply in this context.  They do not.

94.     Merely voting to approve a plan is not an expression of consent to a non-debtor release.  *See, e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion).  As explained in *Arrowmill*, a voluntary release arises only "because the creditor agrees" to it.  211 B.R. at 507 (emphasis in original).

95.     There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law.  *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt."  *Arrowmill*, 211 B.R. at 507.

96.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors.  Voting to accept a plan but remaining silent about a

non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

97.     Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Creditors have no affirmative obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence).  And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released nondebtors that would impose such a duty.  A claimant's failure to respond with an affirmative acceptance of a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

98.     Nor are creditors who cast a vote on a plan without checking an opt-out box "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received are through distributions from the debtor's chapter 11 plan.  Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the nondebtor releases, consent to the nondebtor release cannot be inferred from acceptance of those benefits.  *See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied regardless of failure to opt out).  Further, acceptance of a "benefit"—distributions under the plan—that the offeror had no right to refuse the offeree does not manifest acceptance of the offer.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence

of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

99.     And all this is made clearer by the circumstance where a creditor casts his vote on a plan by *rejecting* that plan but neglects, for reasons unknown, to also check an opt out box. Those voting to reject a plan have not affirmatively consented to a non-debtor release by failing to opt out of it. To the contrary, they have affirmatively rejected the plan. It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

100.     In *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the United States Bankruptcy Court for the Southern District of New York explained why the independent consent to a third-party release required under contract law cannot be inferred from a vote to reject a chapter 11 plan:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*Id.* at 79 (emphasis added).

101.     Even worse, the plan-imposed releases cannot be forced on those who do not vote and do not opt out—whether because they abstain from voting or are ineligible to vote. *See Smallhold*, 2024 WL 4296938. This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. In either case, the creditor has not manifested affirmative consent to a nondebtor release by failing to return an opt out form or by failing to object

to the plan. *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (holding failing to return a ballot is "not a sufficient manifestation of consent to a third-party release"); *SunEdison*, 576 B.R. at 458–61 (holding that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result); *Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut.*, 442 B.R. at 355. Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan. The same is true for those who have no right to vote on a plan—whether an unimpaired creditor or an impaired creditor receiving nothing under a plan who is deemed to reject the plan. Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form.

102.    Even where there are conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient under state law to transform a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan. And creditors who have no intention of voting in the first place are unlikely to do so. Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461.

103.    Thus, the court in *SunEdison* rejected the Debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id.* at 460–61. The court found that the nonvoting creditors'

silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes).  *Id.*

104.    Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut., Inc.*, 442 B.R. at 355.

105.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed Third-Party Release, and implying a 'consent' to the Third-Party Release based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings*, 533 B.R. 64 at 81  It is reasonable to require creditors to pay attention to what the Debtors is doing in bankruptcy as it relates to the creditor's rights against the Debtors.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the Debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As the court in *Emerge Energy Services, LP*, similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

106.    In addition, Judge Scott W. Everrett in the Northern District of Texas found that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release," courts should look at Texas law to determine whether opt-out provisions are effective to confer consent to a third party.  *In re 4 W. Holdings, Inc.*, Case No. 18-30777, ECF No. 2086 (Bankr. N.D. Tex. Oct. 18, 2022).  In examining Texas state law, Judge Everett held in *4 West Holdings, Inc.* that silence does not equate to consent under Texas contract law and that none of the three exceptions to that principle applied to the opt-out provisions.  *Id.*

107.    Consistent with these holdings, the United States Trustee submits that evidence of affirmative consent is required by applicable law for the third-party releases to be effective.  Here, the Court erred by failing to apply state law by not construing the inaction of an abstaining party to mean that they consent to the broad third-party releases in the Plan.

### D.    The Debtors Cannot Lawfully Impose Releases by Deeming a Failure to Opt Out as a Form of Default

108.    Instead of applying state contract law to determine whether there is consent to the third-party release, the Court stated that the "major inquiry" is: "Was this a process that was fair and that it was intended to get notice to people, so that they could make a decision?"  (ECF No. 201, Tr. at 42:19-21).  The reasoning appears to be that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness from binding them to the release.  *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

109.     But applicable state contract law cannot be disregarded based on such a procedural default theory.  Forfeiture principles do not apply to consent, which requires an affirmative manifestation of assent, not a mere failure to object.  As the court in *Smallhold* recently explained, "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.[10]  *Smallhold, Inc.*, 2024 WL 4296938, at *2; *see also id.* at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.").  But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id.*  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id.*

110.     Because a nonconsensual non-debtor release is "per se unlawful . . . it is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id.* That is because, unlike for a creditor's claims against the Debtors, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  "It is reasonable to require creditors to pay attention to what the Debtor is doing in bankruptcy as it relates to the creditor's rights against the Debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the Debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12.

---

[10]     As discussed further below, *infra* ¶ 54, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

111.    The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the Debtors.  Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution.

*Id*. at *2.

112.    None of the cases that imposed a non-debtor release based merely on a creditor's failure to object or opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan."  *Id*.  Thus, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release."  *Id*. at *10.

113.    Because *Purdue* establishes that a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default."  *Id*. at *2.  Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny."  *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-

debtor release. Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at *11 (emphasis added).[11]

### E.     There Is No Authority for the Plan's Injunction Against Non-Debtors Pursuing Their Claims Against Non-Debtors

114.    This Court also erred by approving the injunction enforcing the third-party release by barring claims against non-debtors. *Purdue* stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue*, 603 U.S. at 227. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankrutcies, and these cases are not asbestos-related. *See Purdue*, 603 U.S. at 222 (citing 11 U.S.C. § 524(e)).

115.    Even if releases between non-debtors are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the inter-

---

[11]    For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

vention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id.* (noting that an injunction is an "extraordinary remedy"). The Debtors have made no attempt to show that any of these factors are met. Nor could they. If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third-party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those state-law releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

### F.   The Plan Contains an Improper Gatekeeping Provision

116.   The Plan also unilaterally imposes a Gatekeeping Provision that forces a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action is released. By specifying that this Court "shall determine" whether a claimant can proceed, the Plan's Gatekeeping Provision effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors. The Gatekeeping Provision would apply even after the Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

117.   The procedure proposed by the Gatekeeping Provision is unlawful. The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal. *See, e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008. Affirmative defenses cannot be adjudicated prior to the filing of the action to which they relate. Moreover, as to claims

between non-debtors, there is no reason why the court in which the relevant action has been filed cannot determine whether the claim was released under the Plan. This is not unlike the concurrent jurisdiction of non-bankruptcy courts to determine whether a claim has been discharged in bankruptcy. *See, e.g.*, *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021); *Eden v. Robert A. Chapski, Ltd.*, 405 F.3d 582, 588 (7th Cir. 2005).

118.    Unsurprisingly, a similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18–23.

119.    Here, when ruling on this provision, this Court found that "*Highland Capital* permits the gatekeeping function with respect to the exculpated parties, which, in this case, is only the Debtor, as well as the parties that are released." (ECF No. 201, Tr. at 42:18-21). Although *Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 424 (5th Cir. 2022), recognized that gatekeeping provisions may be permissible under some circumstances in connection with the limited exculpation the Fifth Circuit permits, the rationale of that decision is not applicable to an injunction to enforce a third-party release.[12] In approving a limited gatekeeping clause, the Fifth Circuit in *Highland* acknowledged the "unique" circumstances of that case, which involved a struggle for control between the current and former managers of the debtor, and where the gatekeeping order was also

---

[12]    The Fifth Circuit does not permit exculpation—and thus gatekeeping—for anybody but "the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties." *Highland Capital*, 48 F.4th at 437.

supported by specific findings regarding the vexatious and bad faith conduct of the party against whom it was principally directed. *Highland*, 47 F.4th at 428.[13] In any event, those unique circumstances are absent from this case; Debtors have provided no evidence of vexatious litigants as support for the gatekeeping provision.

120.   The United States Trustee has a likelihood of success on appeal of this issue, because, the Court likely erred by not striking the Gatekeeping Provision from the Plan.

## II.   The Balance of Harms Weighs in Favor of a Stay

121.   Not only does the United States Trustee have a likelihood of success on appeal, the balance of the harms also weighs in favor of granting a stay.

122.   As noted above, when the government is a party, the injury and public interest factors merge. *Cf. Nken*, 556 U.S. at 426. That is particularly true here, where the United States Trustee is acting as the congressionally designated "bankruptcy watch-dog[]," H.R. Rep. No. 95-595 at 88 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6049, and fulfilling his "responsibility to represent and protect the public interest," *Adams v. Zarnel (In re Zarnel)*, 691 F.3d 156, 162 (2d Cir. 2010). The United States Trustee "shall" monitor and file comments upon proposed disclosure statements and chapter 11 plans. 28 U.S.C. § 586(a)(3)(B).

123.   It is the United States Trustee's duty to advocate on behalf of the interest of the integrity of the bankruptcy system and the public interest in ensuring compliance with the law. The United States Trustee is pursuing this issue on appeal and seeks a limited stay on behalf of those interests.

---

[13]   The Fifth Circuit has long recognized the inherent authority of courts "to impose a pre-filing injunction to deter vexatious, abusive, and harassing litigation." *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 187 (5th Cir. 2008) (citing cases). Any such injunction, however, must be tailored to protect the "legitimate rights of litigants," *id.* at 190, and as such relief may be issued only where there is a record of abusive conduct by the enjoined litigant. *See id.* at 191.

124.    A stay pending appeal preserves the public's right to meaningful appellate review. *In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737 at *10.   Debtors may attempt to dismiss the United States Trustee's appeals—evading any appellate review of the Court's eligibility determination—based on the doctrine of equitable mootness.   *See, e.g.*, *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994), *cert. denied*, 513 U.S. 1152 (1995) (noting that under equitable mootness standard, a court "may decline to consider the merits;" recognizing that standard is "prudential").   Under equitable mootness, an appellate court may "decline review of an otherwise viable appeal of a Chapter 11 reorganization plan, but only when the reorganization has progressed too far for the requested relief practicably to be granted."   *In re Blast Energy Services, Inc.*, 593 F.3d 418, 424 (5th Cir. 2010).   While the United States Trustee vigorously maintains that doctrine would not apply here, appellate courts may disagree, so he must—to protect his rights—seek a stay of the Order to avoid that potential threat.

125.    The harm from this issue not being reviewed on appeal would be irreparable.   The "loss of appellate rights is a quintessential form of prejudice" and satisfies the irreparable harm requirement.   *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737 at *10 ("[T]he risk of mootness in the absence of a stay satisfies [the irreparable harm] prong.").   By contrast, there is no articulable prejudice to Debtors from entry of a stay order.   The Plan is a debt for equity transaction with Class 3, which has already been completed, *see* ECF No. 200.

126.    The United States Trustee's appeal raises an important public interest.   If a stay is denied, parties who had their causes of action extinguished will be irreparably harmed if the statute of limitations applicable to their cause of action expires during the pendency of the appeal.   Further, the appeal raises, among other things, issues related to the ability of certain parties—including

debtors, their professionals, and certain favored creditors—to use the reorganization process to induce unsuspecting non-debtor parties to release any claims they may have against other non-debtor parties, in ways not contemplated by the Bankruptcy Code.

127.    As set forth above, there is a substantial likelihood that the United States Trustee will prevail on the merits in his appeal, so the current releases should not have been allowed to apply to parties that did not consent to them in the first place.

128.    To the extent, Debtors show that a delay would cause significant harm to the reorganized debtors, the United States Trustee alternatively asks for a limited stay of the enforcement of the third-party release (Plan IX.C), injunctive (Plan IX.E), and gatekeeping (Plan IX.E) provisions pending resolution of its appeal.  "This Court may, in its discretion, tailor a stay so that it operates with respect to only 'some portion of the proceeding.'" *Int'l Refugee Assistance Project*, 582 U.S. at 580 (*citing Nken*, 556 U.S. at 428).  Further, any delay can be minimized by expediting the appeal, as the government plans to ask the district court to do.  Nevertheless, even if the order on appeal is later confirmed, the limited stay of the release, injunctive, and gatekeeping provisions would not otherwise delay plan implementation and does not outweigh the potential elimination of the right to appellate review.

## BASIS FOR EMERGENCY RELIEF

129.    The Plan was confirmed on January 24, 2025.  The U.S. Trustee filed his Notice of Appeal on February 3, 2025.  The U.S. Trustee intends to request an expedited briefing schedule with the District Court.  In light of this, the U.S. Trustee requests an emergency hearing on this Motion.

## CONCLUSION

130.    For these reasons, the United States Trustee respectfully asks this Court to grant a stay of the confirmation order, or in the alternative a stay of the plan's third-party release, injunctive, and gatekeeping provisions, pending appeal.

Date: February 3, 2025

Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7, SOUTHERN AND WESTERN
DISTRICTS OF TEXAS

By: */s/ Ha M. Nguyen*
    Ha Nguyen, Trial Attorney
    CA Bar #305411
    FED ID NO. 3623593
    United States Department of Justice
    Office of the United States Trustee
    515 Rusk Street, Suite 3516
    Houston, Texas 77002
    E-mail: Ha.Nguyen@usdoj.gov
    Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025 a copy of the foregoing *United States Trustee's Emergency Motion For A Stay Of Confirmation Order Pending Appeal*, was served by electronic means for all Pacer system participants requesting notice.

*/s/ Ha M. Nguyen*
Ha Nguyen

## CERTIFICATE OF ACCURACY

I certify that the facts set forth in the *United States Trustee's Emergency Motion For A Stay Of Confirmation Order Pending Appeal* are true and correct to the best of my knowledge.

*/s/ Ha M. Nguyen*
Ha Nguyen